# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )      I.D. No.: 0506005981
         )
      v.          )
         )
JAMES E. COOKE, JR.      )
         )
     Defendant.      )
         )

December 15, 2022

Upon Petitioner's Motion for Postconviction Relief
**DENIED**.

## MEMORANDUM OPINION

Maria T. Knoll, Esquire, Matthew Bloom, Esquire, Department of Justice, Wilmington, Delaware. *Attorney for the State.*

James Lawley, Esquire, Beth Muhlhauser, Esquire, Office of the Federal Public Defender, Middle District of Pennsylvania Harrisburg, 100 Chestnut Street, Third Floor, Harrisburg, PA 17101

Christopher S. Koyste, Esquire, Law Office of Christopher S. Koyste, LLC., Wilmington, Delaware, *Attorney for the Petitioner.*

**Graves, T.,** *Retired Judge*[1]

---

[1] Sitting by designation under Del. Const. art. IV, § 38 and 29 *Del. C*. § 5610. *See* D.I. Nos. 608, 613, 705, 706, and 707.

## PREFACE

Pending before the Court is a Motion for Postconviction Relief filed by James E. Cooke ("Cooke" or "defendant") pursuant to Superior Court Criminal Rule 61 ("Rule 61"). This is my decision on this motion.

Any capital murder trial is difficult for everyone including the defendant, the family of the victim, the attorneys, and the judge. This one was much more difficult because of the Defendant's behavior as noted in the Supreme Court's decision affirming his conviction.

The submissions to the Court are voluminous. The motion, answer, and reply total 670 pages of argument. Additionally, thousands of pages of reports, articles, etc. are included in the appendices. There have been evidentiary hearings to bolster or denigrate positions. But, in the long run, nothing has been presented by the defense to overturn the trial verdict and grant a new trial. Nothing has been presented that supports Cooke's claim of innocence. While the focus of this decision is on the 2012 trial and complaints as to what trial defense counsel and prosecutors did or did not do, the Court is mindful of the path that the players had in getting to a trial which included the "dress rehearsal" in the form of the 2007 trial. It is rare for defense attorneys to have the State's case laid out completely for them by a first trial that gets reversed. Counsel in the second trial (2012), which is the subject of this decision, had the opportunity to go to school on the first trial.

Initially, I issue a warning and an apology.  The allegations of wrongdoing, judicial error, ineffective counsel and State misconduct are voluminous.  Defendant argues six defense counsel, the prosecutors, and the two judges involved in this case just got it all wrong.  To address these allegations, I have had to often state the relevant facts repeatedly so those facts are known to the reader in regard to the particular issue at hand.

## COOKE WAIVES ATTENDANCE AT POSTCONVICTION EVIDENTIARY HEARINGS

In the run up to the evidentiary hearings counsel for Mr. Cooke informed the Court that he did not wish to be present at any of the hearings. He had health issues that could only be addressed multiple times every day at the prison. By video a colloquy took place to address his position and the fact that he had a right to attend but did not want to attend. In the conversation with Mr. Cooke, he was alert, focused, and on point. There was no evidence of the alleged incompetency. He simply chose not to attend. Also discussed was the possibility of a video link to the prison, but that would not work because the video set up was in a separate part of the prison from the infirmary.

With the aforementioned, the Court directed his attorneys to communicate with him both before and after each hearing to inform him of what was planned and what actually took place so he could have input into the process. If necessary, witnesses could be brought back to address any questions Mr. Cooke wanted.

Mr. Cooke and counsel all agreed this was the best solution to address his health issues and inability to attend the hearings. Counsel regularly informed the Court they had communicated with Mr. Cooke as to the aforementioned.

# THE FACTS

For the facts I adopt the Supreme Court's summary with minor changes.

Those changes are underlined. Citations are removed.

On April 30, 2005, Lindsay Bonistall was a 20-year-old student at the University of Delaware. That night, Bonistall went to her friend Nicole Gengaro's dorm room and watched Saturday Night Live with Gengaro, Katie Johnson, and Isabel Whiteneck (Rivero). When the show ended at 1:00 a.m. on May 1, 2005, Bonistall left, telling her friends that she might stop at a convenience store along the way home to pick up some food because she was hungry. After Bonistall came home, someone broke into the apartment that Bonistall shared with her roommate, Christine Bush. Bush was out of town that weekend. The intruder attacked Bonistall in her bedroom, tied her hands with an iron cord, and shoved a t-shirt into her mouth as a gag. The intruder beat Bonistall, striking her above her eye and on her chin, and raped her. The intruder then knelt on Bonistall's chest and strangled her to death, using another t-shirt that had been tied and knotted around her neck like a ligature.

The intruder scrawled messages on the walls and countertops of the apartment. The intruder wrote "KKK" at multiple locations around the apartment. In the kitchen area, the intruder wrote "WHITE Power." On a wall in the living room, the intruder wrote, "We Want are [sic] weed back" and "Give us Are [sic] drugs back." The intruder also wrote, "More Bodies Are going to be turn in [sic] up Dead."

To eliminate evidence of the crime, the intruder doused Bonistall's body in bleach. The intruder then dragged her body to the bathtub, put it in, covered it with flammable items, and set it on fire. The fire burned until it set off the hallway smoke alarm and other residents began to evacuate the apartment building. The fire department was called at 2:49 a.m. and the Newark volunteer fire department responded. <u>The next day the Fire Marshal</u> discovered Bonistall's burned body in the bathtub, still bound and gagged. The Fire Marshal determined that the fire had been

5

intentionally set, and testified that the fire would have had to burn for at least an hour before it was put out to cause the damage it did. An autopsy determined that the cause of Bonistall's death was strangulation, and that Bonistall was dead before the fire was started. In other words, the fire would have been set at around 1:45 a.m. at the latest, meaning that Bonistall was killed less than an hour after she left her friends at around 1:00 a.m.

Following the murder, an anonymous person who was attempting to disguise his voice made at least three calls to the Newark Police Department's 911 call center. On May 1, 2005 there was a 911 hang up call with the same phone number as the May 2, 2005 call. In the call on May 2, 2005, the caller said that Bonistall's murder was related to two break-ins that had occurred at nearby apartments during the week before Bonistall's murder. The phone call led the Newark Police Department to investigate connections between Bonistall's murder and the break-ins at the nearby apartments.

The first break-in occurred four days before Bonistall was murdered. Around 1:00 a.m. on April 26, 2005, Cheryl Harmon returned to her apartment. Harmon discovered that someone had written "I WHAT [sic] My drug Money," DON'T Mess With My Men," and "we'll be back" on the walls of her apartment with red fingernail polish. Harmon noticed that she was missing several DVDs and two personalized rings. The point of entry was a living-room window with a pried-off lock.

The second break-in occurred three days later, on April 29, 2005—the evening before Bonistall was murdered. Amalia Cuadra woke up in the middle of the night because someone was shining a flashlight in her face. Cuadra called out to see if it was her roommate, and the intruder responded, "Shut the fuck up or I'll kill you" and "I know you have money. Give me your fucking money." Cuadra gave the intruder $45 in cash, but the intruder said "Give me your fucking credit cards or I'll kill you." Cuadra gave him an American Express card and a VISA card. The intruder then demanded, "Take off your fucking clothes or I'll kill you." Cuadra screamed for her roommate Carolina and dialed 911 on her cell phone. The intruder fled, taking Cuadra's

6

backpack, which had her name <u>in</u> it and contained an iPod and some diet pills in a tin container.

The anonymous caller made two additional calls to the 911 call center on May 7, 2005. In those calls, the anonymous caller gave detailed information about the three crimes, including information that had not been released to the public. The calls convinced the Newark Police that the crimes were linked and had been committed by the same person. Evidence also emerged that focused the investigation on James E. Cooke.

Cooke lived with Rochelle Campbell, his girlfriend and the mother of three of his children. Campbell was pregnant with a fourth child by Cooke at the time. Harmon, Cuadra, and Bonistall's apartments were all within a quarter mile of Cooke's residence and could be seen from his back door. Campbell saw Cooke with the backpack from the Cuadra robbery in the early morning hours of April 30, 2005. Cooke told Campbell that he got the backpack from some college kids who had gotten into a car accident and had left it outside their house. Cooke said the backpack was thrown from the car while the police were investigating the accident. Cooke told Campbell they were drunk. Newark Police have no record of a car accident or a DUI investigation at this location. Cooke showed Campbell the credit cards and told Campbell that he was going to try to use them. Cooke tried to use Cuadra's VISA card at a nearby ATM, but it did not work because Cuadra had already cancelled the card. Cooke then returned home without the backpack or the credit cards.

But Cuadra's credit card company noticed that someone tried to use her stolen credit cards. The Newark Police retrieved the ATM surveillance video of the person who tried to use the card. Cuadra had described the intruder as a light-skinned black male with bumps or freckles on his face and puffy cheeks. That general description matched Cooke. Cuadra also said that the intruder was wearing a gray hoodie, a hat, knitted gloves, and light blue pants. When Cuadra was shown the surveillance video from the ATM, she was ~~fairly~~ sure that it was the intruder, but when the

7

Newark Police showed Cuadra a photo array including Cooke, Cuadra did not pick out Cooke's photo.

The Newark Police used the ATM surveillance video from the Cuadra robbery to create a wanted poster for Bonistall's murderer, which was displayed around Newark, including at the Payless shoe store where Cooke worked part-time. Campbell, Cooke's coworkers from the Payless shoe store, and a woman who recognized Cooke from seeing him playing basketball in nearby Dickey Park, all identified Cooke as the man in the posters. They based their identification in part on the distinctive way the man in the poster stood on his toes and the type of gloves he was wearing. Both the distinctive foot position and the gloves were characteristics these witnesses associated with Cooke. The gloves contained small grips on the inside of the hand in a dotted pattern. The same dotted grip pattern from the gloves was found on the balcony railing outside Bonistall's apartment, on a CD cover in her living room, and on her bed sheets. Campbell also later testified that she was 100 percent certain that the voice on all of the 911 calls was Cooke.

Cooke quit his job without notice after the murder, left Newark, and went to Atlantic City. Cooke then committed four more violent crimes, including three home invasions. In one, Cooke entered the apartment through a second floor window, and when the victim woke up she saw Cooke sitting on her bed. Cooke started to choke the victim before taking several of her credit cards and a necklace. As Cooke was leaving, he tugged at the victim's underwear, but then did not go further. The victims from those four crimes identified Cooke as the perpetrator, and Cooke admitted to committing those four crimes.

Cooke was arrested on June 7, 2005 in connection with the murder of Bonistall. Cooke was then charged with Murder First Degree (2 counts—the second count being felony murder); Rape First Degree; Burglary First Degree; Arson First Degree; Reckless Endangering First Degree; Burglary Second Degree (2 counts); Robbery Second Degree; and Misdemeanor Theft (2 counts). After Cooke was arrested, he was interrogated by Detective Andrew Rubin of the Newark Police Department for four to six

8

hours. Cooke told Detective Rubin that he did not know Bonistall. But when Cooke was arrested at his sister's house, a hoodie was discovered at the house that had a hair that was microscopically similar to Bonistall's hair on it. Investigators analyzed the handwriting of the messages left on the walls in Bonistall's and Harmon's apartments and determined that Cooke could have written both. Investigators analyzed the scrapings recovered from Bonistall's fingernails and determined that they matched Cooke's DNA, as did the sample of semen taken from Bonistall's vagina. After the evidence showed that Cooke had contact with Bonistall, Cooke did a one-eighty. Cooke then said that he not only knew Bonistall, but also claimed that they had smoked marijuana together and had consensual sex on the evening of Friday, April 29, 2005, more than 24 hours before Bonistall's death and the same night Cooke broke into Cuadra's apartment and stole her backpack and credit cards. But Cooke said that he did not kill Bonistall.

Cooke's first trial began on February 2, 2007. Although Cooke insisted that he was innocent and wished to plead not guilty, Cooke's first set of counsel pursued a defense of guilty but mentally ill. The jury found Cooke guilty of all charges on March 8, 2007 and did not accept the contention that Cooke was guilty but mentally ill when he committed the crimes. The jury unanimously recommended death at the penalty phase. The Superior Court sentenced Cooke to death on June 6, 2007. Cooke was then assigned a second set of counsel, who filed an appeal arguing that the guilty but mentally ill plea that was entered over Cooke's objections by Cooke's first set of counsel violated Cooke's constitutional right to direct his own defense and plead not guilty. This Court agreed, and we reversed and remanded the case to the Superior Court for a new trial on August 17, 2009. The new trial was scheduled to begin in February 2011.

The success of Cooke's second set of counsel in obtaining a reversal of his convictions and death sentence did not satisfy him. Cooke filed multiple actions under 42 U.S.C. § 1983 against his second set of counsel and a host of others in December 2010, alleging violations of his constitutional rights. As a result, the Superior Court granted Cooke's second set of counsel's motion

to withdraw, and the trial was rescheduled. Then, due to a Supreme Court Rule change, the case was reassigned to a new Superior Court judge on February 24, 2011.

Cooke's third set of counsel was appointed on March 7, 2011. Cooke, however, became discontented with his third set of counsel too. Therefore, on November 10, 2011, Cooke requested to represent himself. A hearing on that application was held on November 30, 2011. At the hearing, the Superior Court conducted a colloquy with Cooke to ensure that his choice to represent himself was knowing and voluntary. The Superior Court made it clear that if it granted Cooke's request to represent himself, it would not grant a continuance to allow Cooke more time to prepare, because Cooke was already familiar with the evidence against him. After assuring itself that Cooke understood the choice he was making, the Superior Court granted Cooke's request to represent himself. The Superior Court also appointed his counsel to be standby counsel to help Cooke prepare his defense, and directed standby counsel to prepare for trial in case Cooke was no longer able to represent himself or forfeited his right to do so.

Cooke represented himself during the selection of the jury, and then Cooke's second trial began on March 7, 2012. But Cooke would not follow the Superior Court's orders and was repeatedly disruptive and disrespectful. Thus, on March 9, 2012, the third day of the State's case-in-chief, the Superior Court determined that Cooke had forfeited his right to represent himself. After a continuance to give standby counsel more time to prepare, standby counsel took over Cooke's defense and completed the trial. The jury found Cooke guilty of all charges except one charge of misdemeanor theft. At the penalty phase, the jury recommended a sentence of death by a vote of 11-1 as to felony murder and by a vote of 10-2 as to intentional murder. The Superior Court sentenced Cooke to death on September 17, 2012.

*Cooke v. State*, 97 A.3d 513, 518-23 (Del. 2014).

Cooke was sentenced to life in prison without parole when the death penalty

statute was ruled unconstitutional.

Additional facts are discussed in this decision as necessary to address the allegations in the Rule 61 motion.

## TIMELINE OF THE CASE

The crimes for which the Defendant was convicted took place in the Spring of 2005. He was arrested five weeks following the weekend crimes including Ms. Bonistall's murder.

The first trial took place in February, 2007. The Defendant was convicted. In August, 2009, the Supreme Court reversed the Defendant's convictions. *Cooke v. State*, 977 A.2d 803 (Del. 2009). Then, conflicts arose between counsel who prevailed on the appeal and the Defendant. After eight months those counsel were gone. New counsel were appointed. At the same time a Superior Court rule change required another judge to be assigned.

The second trial began in February, 2012. The Defendant was convicted. In August, 2014, the Supreme Court affirmed the convictions and death sentence. *Cooke v. State*, 97 A.3d 513 (Del. 2014). By this time, the trial judge in this second trial had retired.

In March, 2015, a timely Superior Court Rule 61 motion was filed. However, it was only a "placeholder" motion with no substantive issues raised.

Thereafter, the death penalty decisions of the Delaware Supreme Court mooted the Defendant's death sentence and he was resentenced to life without parole in 2017.

In February, 2019, the defense filed an Amended Postconviction Motion which is the subject of this decision. It took four years for any substantive issues to be raised.

In June, 2020, this judge was assigned to the case.

In November, 2020, the State's Answer in Opposition to the Defendant's Postconviction Motion was filed.

In February, 2021, the Defendant's reply was filed.

In all, the motion, answer and reply are 670 pages in length.

Then came an 88-page discovery motion and the State's 50-page answer. This Court's discovery ruling took place in July, 2021. Evidentiary hearings began in November, 2021 and ended at the end of March, 2022. A full-day of oral argument took place on May 9, 2022.

On August 12, 2022 the defense filed a motion requesting the Court stay its decision for two weeks to allow the defense to review materials it just received from the FBI pursuant to a Freedom of Information request. The motion was granted. Then came a motion to allow those materials to be evidence on behalf of the defense, the State's answer and the defense reply. Oral argument took place on November 16, 2022. Rather than blend the decision on this evidence into the completed decision, I have addressed the issues in an Addendum.

Noting the timeline not only shows the history of the case, but also the difficulties involved concerning memories as to what occurred at trial, including the whats and whys of what took place. Transcripts do not help much in this matter when the events examined are up to 15 years old. Memories fade. Transcripts tell you what happened, not why. That is why Rule 61 has a one (1) year time limitation to get the allegations on the table.

Nevertheless, we all play the cards we are dealt and regardless of the age of the case, the Court is satisfied that Cooke's many allegations have been properly addressed.

## PRIOR COUNSEL

The present motion attacks all of the attorneys involved in this case from 2005 through 2014, both as trial counsel and/or appellate counsel. The defense called each attorney as a witness in this Rule 61 motion.

The following is a nutshell of what the Court finds pertinent as to what the attorneys knew and what they did with what they knew.

### First Trial Counsel
### Brendan O'Neill/Kevin J. O'Connell

Counsel fought against the State's evidence extremely hard. Motions and full hearings were held, but in the end the State's best evidence was ruled admissible.

Both counsel testified they believed the forensic and circumstantial evidence against Cooke was overwhelming. In an effort to save his life, they changed the plea to guilty but mentally ill.

The facts counsel were facing are summarized below.

It was when Cooke's DNA was revealed to him that he reported consensual sex. Cooke blamed his conduct in regard to killing Ms. Bonistall on smoking "wet" which is marijuana soaked in formaldehyde or PCP. Cooke seemed to find comfort in blaming the murder on the "wet". Counsel tried to explain to him that voluntary intoxication would not be a defense. He later denied killing her.

15

Cooke had told counsel that the sexual intercourse with Ms. Bonistall was not rape and that following their sexual intercourse he basically flipped out, strangled her, poured bleach on her, dragged her to the bathroom, and set her on fire. He had reported the same to defense mental health expert, Dr. Turner, but the details in regard to the sexual intercourse and him getting upset were more graphic. He also admitted to the Cuadra home invasion and the subsequent activity with her backpack and credit cards, the wall writings, and the 911 calls. Later, he recanted.

Subsequently, his version of what occurred was an invitation into Ms. Bonistall's apartment, as well as her bedroom, both smoking wet, and consensual sex. His explanation of her death and fire was someone else did it.

Counsel reported they spent much time explaining to Cooke that this version of events made no sense and the prosecutor would tear it apart.

Nevertheless, that became his story and he stuck with it. At trial, counsel met with the judge and informed him of the following. They believed the Defendant was guilty beyond a reasonable doubt and that if he testified, it would be untruthful. They would not participate in his direct examination and there should be a *Shockley*[2] narrative by Cooke if he testified.

Returning to the events just prior to jury selection, Mr. O'Neill and Mr. O'Connell decided that with the overwhelming evidence against their client, they

---

[2] *Shockley v. State*, 565 A.2d 1373 (Del. 1989).

16

should try to save his life. They then changed the plea from not guilty to guilty but mentally ill over Cooke's objection. Cooke opposed anything as to mental health, even as a mitigator.

At the postconviction hearing, Mr. O'Neil testified he believed Mr. Cooke was competent, but mentally ill. As the pressures of the trial mounted, Cooke became frustrated and overwhelmed, resulting in his outbursts.

Mr. O'Connell reported that the guilty but mentally ill plea was the strategy to try to save his life because the evidence was overwhelming. They would double-dip on the mental health, both in the guilt phase and in the penalty phase.

The Defendant also allegedly confessed to Rev. Beasley and trial counsel believed those communications would be helpful in the penalty phase as at times Cooke had been remorseful. Cooke would not allow this as he would not waive his clerical privilege.

**Appellant Counsel/Intermediate Trial Counsel**

**Jennifer-Kate Aaronson/Joseph Gabay/Patrick J. Collins**

Ms. Aaronson and Mr. Gabay prevailed on the appeal. In his affidavit, Mr. Gabay reported he had no problems communicating with the Defendant in regard to the appeal. He reported Cooke was "highly cooperative and interactive" as to the appeal process. Then Mr. Collins joined Ms. Aaronson and represented Cooke for

the next eight (8) months until Cooke sued them and their experts, destroying the attorney-client relationship.

Their testimony revealed that by the end of their representation of Cooke they thought he was incompetent based on his behavior. He wanted nothing to do with any mental health defense and drove away their expert.

As to venue, the University of Kentucky study/poll revealed the Cooke case was better known in New Castle County, but both Kent and Sussex County juries would be more inclined to impose death, if convicted.

Mr. Collins considered trying to move the case out of State. Ms. Aaronson acknowledged the Kentucky Survey made the lower counties unattractive. Mr. Collins said venue would have been a tough call, familiarity in New Castle County versus death in Kent County or Sussex County.

Strategically, they decided not to try to exclude the boot impression evidence and hair evidence as they thought they could use it to their advantage by way of cross- examination. They discussed the possibility of suppressing the Cuadra photo lineup. But again, she did pick someone other than Cooke on her first try per her testimony.

Ms. Aaronson acknowledged she did not raise in the appeal the question of whether Ms. Campbell could have legally consented to the search of Cooke's

property located in containers in the house. Mr. O'Neill also had said he did not raise this as an issue.

They planned to hire an expert as to the wall writing in an effort to revisit the ruling or as a possible rebuttal witness.

Cooke became hostile to them to the point they questioned his competency. They had an oral opinion from their expert questioning his competency but could not proceed because Cooke drove that witness away. Initially, they agreed with the State to have him examined at the Delaware Psychiatric Center, but everyone backed off this suggestion when it was apparent they were leaving the case.

All of the above may seem like a stream of consciousness, but it is the background of what Mr. Figliola and Mr. Veith inherited, including Cooke's refusal to cooperate with anything regarding his mental health.

# APPLICABLE LAW

## I. PROCEDURAL BARS AND EXCEPTIONS

Rule 61(i)(3)(4) and (5) are set forth below.  Rule 61(h)(1) and (2) are not in play in this case.

> (i)     Bars to relief.
> (3)  Procedural default.  Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this Court, is thereafter barred, unless the movant shows
>
>     (A) Cause for relief from the procedural default and
>
>     (B) Prejudice from violation of the movant's rights.
>
> (4) Former adjudication.  Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceedings, is thereafter barred.
>
> (5)  Bars inapplicable.  The bars to relief in paragraphs (1), (2), (3), and (4) of this subdivision shall not apply either to a claim that the court lacked jurisdiction or to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule.

Rule 61 (d)(2)(i) and 2 (ii) provide:

> (d)  Preliminary consideration.
> (2)  Second  or  subsequent  postconviction motions.—A second or subsequent motion under this rule shall be summarily dismissed, unless the movant was convicted after a trial and the motion either:

> (i)    pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted; or
>
> (ii)    Pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid.

A new rule of constitutional law has not been pled. That leaves the only escape from a potential bar contained in Rule 61(i)(3) and (4) to be new evidence creating a strong inference of innocence.

In *Younger v. State*, 580 A.2d 552 (Del. 1990), our Supreme Court noted these bars must be considered and applied prior to considering the merits of a claim. The bar must be enforced or else the Federal Courts may find selective enforcement nullifies the Rule. *State v. Gattis*, 1995 WL 790961, *3 (Del. Super. Dec 28, 1995), *aff'd*, 697 A.2d 1174 (Del. 1997), *as revised on denial of reh'g* (Sept. 8, 1997).

But, constantly in this case, ineffective assistance of counsel is alleged as grounds to avoid a Rule 61(i) bar thus resulting in the Court having to consider the merits to determine if the ineffective counsel excuse is real. In other words, the mere allegation of ineffective counsel is not sufficient. It must be proven. So, because of

21

ineffective assistance of counsel allegations, the merits of that allegation must be addressed.

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In this motion a large number of claims allege ineffective assistance of counsel, both trial and appellate. Because of the unique path of the proceedings leading to the conviction in 2012, as affirmed by the Supreme Court in 2014, the motion alleges that all trial counsel from the beginning of the case to the 2014 Supreme Court affirmance were ineffective. This is because several of the evidentiary rulings that were made by the judge in the first trial were adopted as the law of the case by the judge in the second trial.

The ineffective assistance of counsel standard applied in this case is the same I set forth in *Powell v. State,* 2016 WL 3023740*, 6-7 (Del. Super. May 24, 2016), *aff'd* 173 A.3d 1044 (Del. 2017) ("*Powell*"). I repeat it here as there is no reason to reinvent the wheel.

## INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD ON REVIEW

The standard used to evaluate claims of ineffective assistance of counsel is the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington* and adopted in Delaware. Powell must demonstrate (1) trial counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for trial counsel's professionally unreasonable representation, the result of the proceeding would have been different. The claim fails if

22

Powell is unable to satisfy either prong of the test. Moreover, the Court shall dismiss entirely conclusory allegations of ineffective assistance of counsel. The movant must provide concrete allegations of prejudice, specifying the nature of the prejudice and the adverse effects actually suffered.

With respect to the first prong, the movant must overcome the strong presumption that counsel's conduct was professionally reasonable. The Court must be highly deferential to trial counsel's decisions and must make "every effort … to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Powell must assert specific allegations that trial counsel acted unreasonably "as viewed against prevailing professional norms" to satisfy the first prong of the *Strickland* analysis. Finally, the Court notes:

> Although America Bar Association standards are guides to reasonableness, they are only guides. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."

The second prong requires the court to determine whether there is a reasonable probability that, absent counsel's errors, the jury's verdict would have been different. In a capital case, this means that the trial court "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Powell has the burden to establish that there was a substantial likelihood, as opposed to a conceivable likelihood, of a different result absent trial counsel's errors. The United States Supreme Court has stated "[i]f it is easier to dispose of an effectiveness claim on the ground of lack of prejudice,… that course should be followed."

With regard to claims of ineffective assistance of counsel, a court's review of trial counsel's strategy is aided by the court's ability to walk in trial counsel's shoes at the time of trial, as best as it is able.

In addition to the *Strickland* ineffective counsel claims, the defense also alleges counsel's representation of Cooke violated the standards set forth in *United States v. Cronic*, 466 U.S. 648 (1984). ("*Cronic*").

*Cronic* holds the obvious. That the special value of having counsel is having an attorney who can actually provide assistance to assure the trial meets the fairness sought in an adversarial criminal process. "When a true adversarial criminal trial has been conducted---even if defense counsel may have made demonstrable error---the kind of testing envisioned by the Sixth Amendment has occurred". *Id*. at 656 (footnotes and citations omitted).

What is envisioned is adequate legal counsel to ensure a confrontation between adversaries *i.e.,* adversarial justice. An attorney in name only who basically "rolls over" is not what the Sixth Amendment is meant to provide.

The Court notes that the Sixth Amendment does not expect counsel to do the impossible or to make up defenses where they do not exist to attempt a useless charade. *Id.* at 656 n. 19.

In *Reed v. State*, 258 A.3d 807 (Del. 2021) our Supreme Court held "*Cronic* applies where the deprivation of counsel is total, as when the accused is denied counsel at a critical state of his trial entirely." Our Supreme Court noted that a *Cronic* case involves a "constructive denial of counsel" because of a complete breakdown in the adversarial process or in attorney-client communication. While

there was sometimes friction between counsel and Cooke, that friction was because they were communicating. Cooke would just get upset when he disagreed with strategy. There was no denial of counsel because of communication problems.

The Court does not find *Cronic* applicable to the conduct of any counsel representing Cooke. Competent counsel challenged the State's case. Ultimately, the verdict was a result of an active adversarial process. Nobody rolled over.

That said, the Court addresses the first trial. Just days prior to jury selection, defense counsel, over the Defendant's objection, changed the plea from not guilty to guilty but mentally ill. This was not a throwing-in-the-towel decision. Strong efforts had been made attacking the evidence. Ultimately, faced with what they concluded was overwhelming evidence, they drew the line at trying to save Cooke's life, and they fought hard in this attempt. *Cronic* was not violated in this strategic move to try to avoid a death sentence.

Nor does their decision made in the days prior to jury selection cast a *Cronic* shadow on their earlier efforts to suppress or exclude certain evidence. The motions attacking the search warrant and evidence turned over by the consent of Rochelle Campbell; the handwriting evidence, *i.e.,* wall writing evidence; the shoe or boot impression evidence; and the voice comparison evidence in which the defense prevailed, were hard-fought evidentiary hearings.

The decision counsel made in an effort to try to save Cooke's life does not pull the rug out from the adversarial process in these pretrial battles. If so, why would the Supreme Court affirm the ruling in regard to the search warrant and consent search?

## INEFFECTIVE-HOW MUCH INVESTIGATION

In the Defendant's motion, it is acknowledged that trial counsel were not duty-bound to investigate every possible lead, every possible avenue of defense, or every possible scenario in a case. This is true. Counsel are not required to scour the globe on the chance something turns up. Reasonably diligent counsel can draw the line when there is good reason to think further investigation would be a waste. One must avoid the benefit of hindsight by pegging adequacy of counsel to counsel's perspective at the time decisions on investigation were made, *i.e.*, get into counsel's shoes. And a reviewing Court should give a "heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 522 (2003).

This said, it appears to this judge that trial counsel are being criticized for not scouring the globe and running down every possible lead. Finally, I note that present counsel have not presented anything of relevance as to another person having committed this crime in spite of having years to follow up on their allegations.

# INEFFECTIVE-APPELLATE COUNSEL

Appellate counsel in a capital appeal should be guided by American Bar Association ("ABA") Guidelines which recognize that death is different and that all arguably meritorious issues should be raised. The Guidelines caution against presenting only the stronger of several meritorious issues. But that does not translate into an obligation of appellate counsel to raise every conceivable issue. Professional judgment needs to determine arguably meritorious issues. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 11.9.2(D). But this case has not been a death penalty case since 2017 when the Delaware death penalty was ruled unconstitutional by the Delaware Supreme Court. Since the Rule 61 motion with merits was not filed until 2019, the Court questions why the ABA Guidelines on death penalty appeals should apply. In non-death penalty appeals counsel should focus on the best issues for reversal and not throw in the kitchen sink. To now judge appellate counsel by ABA death penalty standards in a non-death penalty case makes no sense. Nevertheless, we proceed.

## *BRADY* ALLEGATIONS

As to the allegations that the State committed violations set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*"), I also adopt that which I stated in *Powell*, 2016 WL 30237409, at *32-35:

In *Michael v. State*, the Delaware Supreme Court summarized the rationale behind the *Brady* decision:

> The United States Supreme Court has long held that the prosecution's failure to disclose evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution. The *Brady* rule was not designed to displace the adversary system as the primary means by which truth is uncovered but was designed to ensure that a miscarriage of justice does not occur. The prosecutor is not required to deliver his entire file to defense counsel but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. The *Brady* rule is based on the requirement of due process. In reviewing an alleged violation of the *Brady* rule, [the court] must resolve two questions. First, was the non-disclosure at issue a violation of *Brady*? Second, if the non-disclosure was contrary to the dictates of *Brady*, what was the nature of the error?

*Brady* evidence includes not only exculpatory evidence but also evidence that would be useful for the defense in cross-examining a State's witness; that is, impeachment evidence. A discovery violation does not automatically result in a reversal of the defendant's conviction; the court must assess the nature of the violation.

After finding the State has committed a discovery violation, the court must then examine the "materiality" of the undisclosed evidence to determine if there is a reasonable probability that disclosure would have changed the outcome of the proceeding.

In *Michael*, the Delaware Supreme Court noted that, when the court weighs the question of "materiality," the State's failure to disclose impeachment evidence that "cannot be said to be entirely without significance, may be harmless if it occurs in a trial in which the prosecution presented 'overwhelming' untainted evidence of guilt." If the jury had the benefit of "direct evidence from witnesses who saw the

crime take place or other unusually strong evidence," then the discovery violation may be harmless.

[T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence—that is, to any suppression of so-called "*Brady* material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

The Delaware Supreme Court addressed *Brady* recently in *Wright v. State*. The synopsis of *Brady* case law is worth repeating here.

> Under *Brady* and its progeny, the State's failure to disclose exculpatory and impeachment evidence that is material to the case violates a defendant's due process rights. The reviewing court may also consider any adverse effect from nondisclosure "on the preparation or presentation of the defendant's case." "There are three components of a *Brady* violation: (1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant." In order for the State to discharge its responsibility under *Brady*, the prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense. That entails a duty on the part of the individual prosecutor "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."
>
> Whether a "*Brady* violation" has occurred often turns on the third component—materiality. Materiality does not require the defendant to show that the disclosure of the suppressed evidence would have resulted in an acquittal. Nor is a reviewing court required to order "a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but

29

not likely to have changed the verdict." Rather, the defendant must show that the State's evidence creates "a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." A reasonable probability of a different result occurs where the government's evidentiary suppression "undermines confidence in the outcome of the trial." Materiality is not limited to the individual effect of each piece of exculpatory or impeachment evidence. Instead, materiality is determined "in the context of the entire record." A reviewing court first evaluates "the tendency and force of the undisclosed evidence item by item." The court then evaluates the "cumulative effect" of the suppressed evidence separately. "Individual items of suppressed evidence may not be material on their own, but may, in the aggregate, 'undermine [ ] confidence in the outcome of the trial.' " The State's obligation under *Brady* to disclose evidence favorable to the defense "turns on the *cumulative effect* of all such evidence suppressed by the government."

Helpful factors to help the court to determine the materiality of the withheld evidence include: favorability; admissibility at trial; extent of probative value; cumulative nature of the evidence; weight of other evidence presented; and deference to the opinion of the trial court.

The *Wright* decision held that evidence of a witness' prior agreement to cooperate with the State is useful impeachment evidence and is clearly *Brady* material: "Even though [the witness] ultimately did not testify against his co-defendant in a different trial, his repeated willingness to testify in order to advance his own legal interests, given his criminal record, would have been helpful to the jury in weighing the credibility of [his] testimony."

In *Jackson v. State*, the Delaware Supreme Court found a discovery violation when the State failed to disclose that it had made an implicit promise of leniency to a State's witness facing other charges. The Supreme Court's discussion of the importance of effective cross-examination is instructive:

Effective cross-examination is essential to a defendant's right to a fair trial. It is the "principal means by which the believability of a witness and the truth of his testimony are tested ". Under Delaware law, "the jury is the sole trier of fact, responsible for determining witness credibility and resolving conflicts in testimony." Jurors should have every opportunity to hear impeachment evidence that may undermine a witness' credibility.

An important form of impeachment during cross-examination is to expose a witness' bias, prejudices or motives. "Cross examination on bias is an essential element of the right of an accused under the Delaware constitution to meet the witnesses in their examination," which makes it "an essential element of the constitutional right of confrontation". Moreover, "[e]vidence of bias is always admissible to impeach a witness."

"Evidence [that] the defense can use to impeach a prosecution witness by showing bias or interest ... falls within the *Brady* rule". It falls within the *Brady* rule because "such evidence is 'evidence favorable to an accused' so that, if disclosed and used effectively, it might make the difference between conviction and acquittal." This is because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. Indeed, it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."

The suppression of material evidence violates *Brady*. In *United States v. Bagley*, the United States Supreme Court expanded *Brady*'s "materiality" test, holding that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different.' "

In *Kyles v. Whitley*, the United States Supreme Court further expanded *Bagley's* definition of materiality. The *Kyles* Court held that while a *Brady* violation is "triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but rather whether in the absence of the undisclosed evidence the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." Thus, according to the *Kyles* Court, a " 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial."

The *Kyles* Court also held that materiality is not a "sufficiency of the evidence test." In order to reverse a conviction based upon a *Brady* violation, one must "show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

Therefore, this court will look to determine if a discovery violation occurred and, if so, the court will look to see if it was a true *Brady* violation; that is, if the material had been disclosed, there is a reasonable probability of a different result. (Footnotes and citations omitted).

## PROCEDURAL BARS-OLD RULE/EX POST FACTO

Cooke was convicted in 2012. The Supreme Court affirmed that conviction on July 24, 2014. On June 4, 2014, this Court amended Rule 61(i) concerning procedural bars. On March 24, 2015, Cooke filed the present Motion for Postconviction Relief. It was merely a placeholder motion with no substantive claims. Presumably it was filed to toll the one-year filing deadline contained in Rule 61(i)(1). The substantive claims were filed four years later in a 223 page/698 paragraph amended motion. For Rule 61 purposes, the conviction is final when the Supreme Court affirms if there was a direct appeal. *Jackson v. State*, 654 A.2d 829 (Del. 1995). So, the amended Rule 61(i) was in effect at the time the conviction became final. Likewise, it was the rule in place when the postconviction motion was filed on March 24, 2015. Likewise, it was the rule in place when the first substantive claims were made in 2019.

Nevertheless, an argument that is made initially and repeated throughout the motion is that the June 4, 2014 Rule 61 amendment is not applicable to his motion because his conviction occurred before June 4, 2014. He argues to apply the June 4, 2014 amendment to his case would be unconstitutionally *ex post facto*.

He is wrong. The Rule 61(i) amendment and the procedural bars therein must be applied to Cooke's motion.

The 2014 amendment specifically states, "this amendment shall be effective on June 4, 2014 and shall apply to postconviction motions filed on or after that date".

Our Supreme Court has addressed that *ex post facto* claim in rulings going back to 1991. The law on this issue is well-settled.

In *Bailey v. State*, 588 A.2d 1121 (Del. 1991), Bailey, who shot a young girl for stealing a peach from his peach tree, argued that Rule 61, which was adopted in 1987, was not applicable to him because his conviction long predated 1987. He argued Superior Court Criminal Rule 35 should be applied because that was the Rule allowing a collateral postconviction attack on a conviction prior to 1987.

The Supreme Court held that Rule 61 was the applicable procedural rule for all cases where the conviction predated the adoption of Rule 61 in 1987. Specifically, the Court addressed the *ex post facto* argument Cooke makes. The constitutional bar against *ex post facto* laws is not applicable to procedural rules created by the Courts to address a defendant's right to collateral review. Rule 61, being a procedural rule that basically removed postconviction collateral review from Rule 35, was applicable to all motions filed after the adoption of Rule 61 in 1987.

In 2015, our Supreme Court addressed the June 4, 2014 amendment to the procedural bars in Rule 61(i) holding that applying the amended rule to convictions predating the adoption of the rule was not unconstitutionally retroactive. *Turnage v. State*, 127 A.3d 396, 2015 WL 6746644 (Del. Nov. 4, 2015) (TABLE).

The Court noted that the United States Supreme Court has held that states have no obligation to provide postconviction relief at all. Postconviction relief is not constitutionally required. Rule 61 (i), as amended in 2014, is a procedural rule and applies to all postconviction motions filed after June 4, 2014. The rule change did not remove meaningful access to the Courts for collateral review.

In *Ploof v. State*, 194 A.3d 908, 2018 WL 4600814 (Del. Sept. 18, 2018) (TABLE), our Supreme Court applied its ruling in *Turnage*. Motions filed after June 4, 2014 must comply with the June 4, 2014 amendment. See *Cannon v. State*, 127 A.3d 1164 (Del. 2015); *Durham v. State*, 173 A.3d 1061, 2017 WL 5450746 (Del. Nov. 13, 2017)(TABLE).

The Defendant's arguments fail on both the facts and the law. Factually, the date his conviction became final was after the amendment. The Supreme Court has clearly ruled there is no *ex post facto* rights as to Rule 61. So even if one considered his conviction to be in 2012, he still loses. The June 4, 2014 version is the applicable rule.

# **DOUBLE JEOPARDY**

The Defendant argues that the judge in the first trial committed misconduct by permitting Cooke's lawyers to change his plea from not guilty to guilty, but mentally ill. This misconduct denied Cooke the opportunity to have had a final, valid verdict by the jury in that first trial. This misconduct required jeopardy to attach thereby barring retrial.

The cases cited are not on point at all. They involve situations wherein a judge improperly provoked a mistrial application by the defense. Cooke's case went to verdict and was successfully appealed.

Being held wrong by the Supreme Court is not misconduct. Noteworthy is that two of the justices dissented and determined that the guilty but mentally ill plea was a valid strategy because this was a death penalty case.

There is no legal basis to find that jeopardy attached to the first trial. The Supreme Court ruled on the suppression issue "because a new trial is required." This claim is denied.

## LAW OF THE CASE

Rule 61 counsel argue that everything should have been relitigated in the second trial. Counsel were ineffective for not challenging previous rulings on venue, suppression of property seized at the Defendant's residence, wall writing evidence, the Defendant's statement, and the State's expert in voice identification evidence as to the 911 calls. As to the last point, Judge Herlihy found the expert voice identification unreliable and it was not admitted at either trial. The suppression of the Defendant's property seized at the residence was affirmed by the Supreme Court so there was to be no revisiting that issue. Judge Herlihy did not have a hearing on the Defendant's statement and trial counsel in the second trial did file a suppression motion, but when the Defendant went *pro se* he abandoned that motion. He wanted the full statement introduced. Venue was open for consideration by Judge Toliver. He specifically asked if venue would be raised and was told probably not. As to the wall writing, which is discussed herein, trial counsel did retain an expert to attack this evidence, but that expert basically agreed with the State's expert per Mr. Figliola and Mr. Veith's testimony. Finally, all counsel told Judge Toliver the handwriting/wall writing had been fully litigated.

Trial counsel did have an expert witness as to the shoe impression evidence but with the agreement of their expert they decided to attack the State's expert by cross-examination only. This was a strategy decision and it involved State's

evidence that was weak. Trial counsel will not be faulted for this decision under *Strickland*.

Judge Tolliver informed counsel that previous rulings by Judge Herlihy would be considered on an issue-by-issue basis, but if an evidentiary issue had not been contested in the first trial, it would not be the law of the case.

Hard fought evidentiary hearings took place on the wall writings, shoe/boot impressions, and voice recognition technology. All of these hearings took place well before the decision of first trial counsel, just before trial, to change strategy and go with guilty but mentally ill. In a written decision, Judge Herlihy ruled the wall writing and shoe/boot impression evidence was admissible but the voice recognition evidence was not reliable. The defense currently complains that trial counsel could have presented a better case attacking the wall writing and boot/shoe impression in the evidentiary hearings but they have not presented a persuasive attack on why Judge Herlihy was wrong or how he abused his discretion in admitting this evidence.

Present counsel, in their reply, cite *State v. Wright*, 131 A.3d 310, 321 (Del. 2016), arguing it says "….the law of the case does not bar the Court from revisiting prior rulings that are clearly wrong, produce an injustice, or should be revisited because of changed circumstances." Present counsel have failed to meet this burden.

Also, had there not been a rule change on changing the judge following a Supreme Court reversal, there is no doubt that Judge Herlihy would not have

revisited his evidentiary rulings.  So why should Judge Toliver revisit these rulings

when the usual practice was that evidentiary rulings are carried over to any retrial?

The law of the case claims are denied.

## VENUE

A change of venue motion was denied in the first trial. But because of the publicity of that trial and conviction it was not a law of the case issue in the second trial.

When Ms. Aaronson and Mr. Collins represented the Defendant, they received funding for a University of Kentucky polling study on the information that might be helpful on the venue issue. They learned that in New Castle County, the population was more familiar with Cooke's first trial than in Kent County and Sussex County, but the population in the lower counties was more conservative and leaned more toward the death penalty than in New Castle County. Mr. Collins testified that, had he stayed in the case, making a change in venue motion would have been a difficult decision to make.

When Mr. Figliola and Mr. Veith entered the case they answered Judge Toliver's venue motion inquiry with "probably not." They had the University of Kentucky study. In their postconviction affidavit they reported considering a venue motion but decided against it because of the opinion it would not succeed and the southern counties were more conservative.

This was a strategic decision made with the benefit of legal expertise and the Kentucky study. There was no violation of *Strickland* prong one. Nor was there any

prejudice as they reported in their affidavit that all jurors were questioned as to their familiarity of the media coverage of the case.

There has been nothing presented in these hearings to evidence a venue motion should have been filed. There are attacks on individual jurors or potential jurors, but nothing on which to base a venue motion.

Finally, when Cooke went *pro se* he did seek a change of venue, but this was denied and was not appealed. Since there has been no prejudice shown, ineffective counsel is not an excuse to overcome the procedural bar of Rule 61(i)(3). Venue is procedurally barred. Alternatively, it is denied for the aforestated reasons.

# INCOMPETENCY

## Chapter One
## Competency Evidence at the Trials

The motion opens with a claim that, if true, would trump and moot the remainder of the many claims for relief.

It is alleged that the Defendant is incompetent and always has been throughout this criminal case, from the date of his arrest and through the next sixteen (16) years.

Therefore, this claim alleges counsel in the first trial were ineffective for failing to recognize his incompetency. Counsel in the second trial, the one at issue in this motion, likewise were ineffective by failing to recognize his incompetency nor did appellate counsel in the first appeal recognize his incompetency. Appellate counsel went on to represent him on the second trial for eight months until she withdrew. Likewise, the judges presiding over his two trials failed to recognize and intervene regarding the Defendant's obvious incompetency.

While the State raises the procedural bars of Rule 61(i) as reasons this Court should not consider the merits of this claim, based on the nature of the claim, going to the fairness of the trial and verdict, the "ineffectiveness of counsel" and the blindness of the judges, the Court shall forego a discussion of Rule 61(i) and deal with the substantive claims. It is not new evidence of innocence under Rule 61(i)(5), but new evidence that no trial should have taken place.

The claim of incompetency is based on the Defendant's history of problems which were born from a childhood of severe abuse and neglect. The motion details same and it is unnecessary to review his sad upbringing as his history is documented in the reports and testimony of the defense mental health experts who testified in the first trial in 2007.

Noteworthy is that of the six (6) defense psychiatrists and psychologists who examined him over long periods of time, none opined he was incompetent. They did conclude he was mentally ill, hence the controversial plea of guilty, but mentally ill in the 2007 trial. While the defense experts did not opine as to competency, the State's expert did. He found that the Defendant was competent to stand trial and he found the Defendant to have an antisocial personality disorder.

In order to be competent to stand trial in a criminal case, the Defendant is required to have the capacity to understand the nature and object of the proceedings against him, to be able to consult with counsel and be able to assist in his defense. *Drope v. Missouri,* 420 U.S. 162 (1975); *State v. Shields,* 593 A.2d 986 (Del. Super. Ct. 1990) ("*Shields*").

An additional claim of incompetency involves the claim that he should not have been permitted to represent himself in the second trial. A higher standard of competency is required when one seeks to proceed *pro se* at trial versus competency to stand trial. *Indiana v. Edwards*, 554 U.S. 164 (2008) ("*Edwards*"). *Edwards* is

discussed later, but the Court notes it did not provide any specific guidelines other than a higher competency than competency to stand trial.

Prior to the 2007 trial, the Defendant was seen by more than six (6) mental health professionals, three of whom testified at his trial. One mental health expert testified for the State.

In a nutshell, the testimony for the defense was that Mr. Cooke suffered from a longstanding schizotypal personality disorder while the State's expert agreed that he had a personality disorder but identified it as an antisocial personality disorder. Antisocial personality disorder ("ASPD") is not a mental illness under the criminal code.[3]

Dr. Walsh interviewed the Defendant six (6) times. Ultimately, he determined the defendant to be mentally ill (i.e., a schizotypal personality disorder). He did not mention competency, but noted the Defendant was mostly cooperative, appeared to be of average intelligence, was well-groomed, and that the Bible and God were special to him.

Alvin Turner, PhD in the field of psychology, testified:

> A person with a schizotypal personality disorder is going to seem weird or strange. They are going to behave in ways that makes sense to them but don't make sense to anyone else.…..
> They tend to be more suspicious of others.…..They're going to behave in ways where you say what, what in the world?

---

[3] 11 *Del C.* § 401(c).

His opinion was that the Defendant was not psychotic at the time of the crimes *i.e.,* it was not "not guilty by reason of insanity." His opinion was that the Defendant was mentally ill, therefore at the time of his crimes he was mentally ill, thereby meeting the statutory criteria of guilty, but mentally ill.

Over the many interviews the Defendant talked about Ms. Bonistall:

- He smoked "wet" with her.

- Sex which he considered consensual

- Got angry with her because she wanted it like she wanted it and did not want to put her legs in the air

- Choked her and did not understand why he did it

- "I couldn't believe she was dead. I didn't plan for this to happen"

- Poured bleach on her

- Dragged her to bathroom tub

- Set her afire

At other times, the Defendant would deny any criminal involvement and say he was just joking. Later, he would revisit his admissions.

Dr. Turner testified Cooke was impulsive and there was severe acting out.

On cross-examination, Dr. Turner acknowledged the Defendant has been previously in trouble in New Jersey and had been diagnosed as having an antisocial

45

personality disorder. Also, of many diagnoses in the past, nobody suggested schizotypal personality disorder.

Finally, Dr. Turner acknowledged the Defendant admitted to similar criminal conduct involving home invasion/burglary in New Jersey after the crimes in Newark.

Dr. Lawson Bernstein also testified at the Defendant's first trial. He was a clinical and forensic neuropsychiatrist. His diagnosis of Mr. Cooke was that he had a mixed personality disorder: "personality disorder not otherwise specified with schizoid, schizotypal and paranoid features."

He testified that personality disorders tend to be constant over time. Personality disorders are a subgroup of psychiatric disorders in which a person's way of dealing with the world and other people is disordered in a way that does not meet the criteria for schizophrenia or manic-depressive illness. The person is chronically dysfunctional in dealing with the world but is not psychotic. As to "not otherwise specified" he said this means it is hard to pigeonhole the diagnosis. He testified schizoid people are loners who find it hard to form close relationships.

He found the Defendant cold, aloof and detached. He was not delusional but thought he was special in God's eyes.

The Defendant's mental illness did not rise to the level to negate his ability to premeditate, deliberate, and form the intent to commit a crime. The Defendant had a consciousness of guilt and took steps to avoid being caught.

Dr. Bernstein acknowledged Mr. Cooke is a very antisocial person, "no getting around it". But he did not think his substantial anti-personality features meant that antisocial personality disorder was the sum of what was wrong with Mr. Cooke. There was an overlap of personality disorders: schizoid, schizotypal, paranoid and antisocial disorders.

He acknowledged that Antisocial Personality Disorder ("ASPD") people tend to blame others for their problems.

He acknowledged the Defendant, in his younger years, was involved in criminal behavior resulting in a diagnosis of conduct disorder, a precursor to a diagnosis of ASPD as an adult. He also acknowledged the Defendant had been previously diagnosed with ASPD. He said in a vacuum the Defendant met the criteria for ASPD, but there was more to it.

As to the Defendant's report of smoking wet with Ms. Bonistall, he found the Defendant not credible since the toxicologist testified there was no PCP metabolite or embalming fluid metabolite in Ms. Bonistall. He said he was not the finder of fact but the Defendant's report of consensual sex was "fantastic, as in unbelievable."

Dr. Stephen Mechanick testified for the State. He is a psychiatrist. In a nutshell, he disputed the findings that the Defendant had a schizotypal personality disorder or mixed personality disorders. His diagnosis was that the Defendant had an antisocial personality disorder. Because of his ASPD, the Defendant's behavior

is certainly disturbed, and his thinking is disturbed, and the way he feels is disturbed, but Mr. Cooke did not have a psychiatric condition that substantially affected his thinking, feeling or behavior at the time of the crimes.

Finally, in his written report, this doctor did opine as to the Defendant's competency. He found him competent and that his behavior as a defendant was attributable to his antisocial personality disorder.

> It is my opinion that Mr. Cooke is currently capable of assisting his attorney in the preparation and conduct of his defense. It is my opinion that Mr. Cooke's expressed mistrust of his attorney and the legal system is typical of defendants in a criminal proceeding and is not indicative of any psychiatric condition other than his Antisocial Personality Disorder. It is my opinion that Mr. Cooke's expressed mistrust of his attorney is also related to his wish to get out of prison and his unwillingness to accept any defense that would not help him to achieve that outcome. It is my opinion that Mr. Cooke's current psychiatric condition is consistent with the finding that he is competent to stand trial.
>
> The opinions that I have expressed in this report have been stated to a reasonable degree of medical and psychiatric certainty.

The jury did not find the Defendant guilty, but mentally ill. They found him guilty. They rejected the defense testimony as to the mental illness of schizotypal personality disorder.

Mr. Cooke testified at his first trial in the narrative because defense counsel raised "*Shockley* concerns" with the judge. *Shockley v. State*, 565 A.2d 1373 (Del. 1989). He reviewed his many complaints about his counsel and their investigation.

He told the jury his lawyers "misrepresented me so bad" and that "they want you to believe that I am crazy."

Noteworthy was that he had the ability to name the "six doctors they brought to me": Dr. Griffin, Dr. Bernstein, Dr. Alvin Turner, Dr. Stevens, Dr. Barowsky, and a professor named James Walsh.

While the Defendant was argumentative to the extreme with the prosecutor and the trial judge who tried to keep the guard rails on as to what he could say to the jury, there is no evidence of incompetency missed by everyone. Basically, his behavior was the same as the Supreme Court commented on in the affirmation of his second trial. If Mr. Cooke did not like what was going on he behaved badly and/or threw a temper tantrum.

Counsel at his first trial testified in these proceedings they were of the opinion that Cooke was competent, but they believed he was mentally ill. That is why they entered the guilty but mentally ill plea. They believed the State's evidence was overwhelming. The Defendant also had made admissions to them of the murder, 911 call, wall writings, and fire, which he later recanted. It was their strategic decision to try to avoid a death sentence.

49

## In Between Counsel

The appeal resulted in a reversal because the Supreme Court ruled it was Defendant's call on guilty but mentally ill. Joseph Gabay, Esquire, one of the appellate attorneys, reported in his affidavit that he communicated with the Defendant in person and by correspondence. He reported the Defendant was "highly cooperative and interactive in the process."

Following the successful appeal, Cooke had new trial counsel for eight months, Kate Aaronson, Esquire and Patrick Collins, Esquire. Ms. Aaronson was lead appellate counsel who won the appeal. That meant little to Cooke.

During the months that Ms. Aaronson and Mr. Collins represented the Defendant, his relationship became increasingly hostile towards them. Reading the transcripts of the conferences with Judge Herlihy, one learns Mr. Cooke became oppositional as to their efforts to represent him. He was untrusting and exhibited a degree of paranoia, not only with his attorneys, but also with experts and mitigation specialists. His opposition to anything concerning his mental health boiled up to the point their mental health expert withdrew, followed by the attorneys.

As they were exiting the case, they were concerned about the Defendant's competency. Their expert orally informed them he questioned the Defendant's competency.

The State suggested and moved for the Court to order a competency review at the Delaware Psychiatric Center. Initially defense counsel had no objection, but before it could be done, the relationship with the Defendant deteriorated to the point they felt ethically they could not stay in the case. This resulted in *de facto* the Defendant being without counsel. Consequently, the Delaware Psychiatric Center hospital examination was shelved.

## Second Trial Counsel

Next came the appointment of Mr. Figliola and Mr. Veith. They were aware of the mental health evidence in the first trial. They were aware the jury rejected the mental health defense of guilty but mentally ill. At this time, the Defendant was adamant he was not going to cooperate with anything to do with mental health. If they attempted anything with mental health he would fire them. He was not going to undergo another mental health examination. The bottom line was mental health was off the table. It was not guilty or bust.

On April 18, 2011 there was a conference with the new judge and the new lawyers, Mr. Figliola and Mr. Veith. Cooke was in attendance and spoke on point and competently as to his previous attorneys, his housing, and his defense. He said two previous sets of attorneys violated his rights and he did not want the same from his new attorneys. Cooke informed Judge Tolliver "I chose not to take no, no psychologist test." Judge Tolliver told him that is his choice, but to make his choice

51

after reflection and thought. Throughout this conference, the Defendant was responsive and on point.

For the most part, per counsel's Rule 61 affidavit, Cooke and his attorneys got along and communicated well. Nevertheless, disagreements on housing and strategy ultimately lead to Cooke's desire to represent himself.

**<u>Findings</u>**

With the history of the case, the Court does not find that the Defendant's attorneys in either trial were ineffective for not observing obvious incompetency. The history of the two trials evidenced that Mr. Cooke understood the nature and object of the proceedings against him. He was being tried for multiple felonies, including Murder in the First Degree. He knew the State was seeking to have him executed if convicted of killing Ms. Bonistall. He was able to consult with his attorneys even if he made their jobs difficult. He was able to assist in preparing his defense. He opposed the strategy of guilty, but mentally ill in the first trial and won this issue on appeal. He informed counsel in his second trial he would not cooperate with any mental health defense. The Court has read hundreds upon hundreds of pages of the transcripts of both trials including the jury selection in the second trial when the Defendant was *pro se*. The Defendant may have been argumentative, but he always made his point. He communicated well and had his wits about him. The

52

fact that he had difficulty understanding the DNA evidence was not a sign of incompetence. He is no different from the majority of the population.

Trial counsel are faulted for not forcing a mental health examination. This argument ignores Cooke's adamant refusal to participate in mental health matters and trying to force the issue would have resulted in a destroyed attorney client relationship. Since I have found him competent, there can be no prejudice.

The aforementioned hundreds of pages of transcripts belie any claim of incompetence.

It was when Cooke could not get what Cooke wanted that his relationship with his attorneys deteriorated. Housing was a constant complaint. He did not want them to file a motion to suppress his statement. Eventually in November 2011, he went *pro se*.

Based on the trial records, his incompetency claim is a non-starter. However, there is more to come.

At the postconviction evidentiary hearings, the defense presented Melissa Lange, Dr. Steve Eichel and Dr. Bhushan Agharkar. The State presented Dr. Stephen Mechanick.

Much was presented to the Court.

## Competency-Witness-Melissa Lange

Melissa Lange, a mitigation specialist, worked with Kate Aaronson, Esquire and Patrick Collins, Esquire. From her testimony and notes prepared after her visits with Mr. Cooke the following is noteworthy.

- Does not seem to be fully grounded in reality

- Understands racism exists in death penalty cases but applies it irrationally to everything and everyone

- Was convicted because of racism

- Everyone is in a vast conspiracy to see that he is convicted, lawyers and judges included

- Attempts to inappropriately get close to Ms. Lange

- Complaints about current counsel, Ms. Aaronson and Mr. Collins: he cannot trust them and an expert on DNA must be a racist because he is from Texas so he is upset with Mr. Collins

- Very inappropriate language and comments to Ms. Lange, pushing boundaries.

- Fantasizing about her

- Suspicious and paranoid of everyone

- Series of IQ tests during his life; all low average IQ

- When he wanted to communicate with her, he did so articulately even if paranoid.

She discussed her concerns that he was not in touch with what was going on, but also perhaps she captured him better than everyone in this case by her note "resembles young child having temper tantrums or being manipulative."

Dr. Eichel was brought on the defense team by Kate Aaronson and Patrick Collins. He is a psychologist.

He collected the necessary background records and then the next step would have been clinical interviews and psychological testing. But the wheels came off with this defense team fairly early before any testing could take place.

His relevant recollections from his meeting with Cooke are as follows:

- "Perceptual impairment" was noted in the Defendant's early records. That references a learning disability

- Defendant could talk about things in a logical manner, but would connect them illogically; not logical at times

- Once he decided something he would not change his mind

- Thinks Aaronson running a scam with prosecutors even though she got first trial reversed.  She is not subpoenaing who he wants, cops and Woods, the prosecutor

- He had a pretty good memory

- He is innocent and everyone knows it but everyone conspiring to convict him because of racism

- Very suspicious; his thinking is a part of a paranoid process

- Complaints about prison housing ongoing

- Doctor's concern about thought disorder but cannot be conclusive

- At end of his time with Cooke he was looking at possible delusional disorder but only a speculative opinion

- At the end, no testing was done and Defendant refused to see him so left with only speculation

- Knows his attorneys were concerned about competency because of his conduct

- Cooke questions Eichel:  are you trying to use same mental health tactic as Mr. O'Neill, his first attorney?

- Finally, it is noted Defendant's letter in the Eichel package (Ex 41) is well-written, coherent, and spelling is fine.

My bottom line conclusion is that the Defendant communicated well with Dr. Eichel about what Cooke wanted to talk about. Cooke was concerned they were going down the same mental illness path as his first attorneys since Dr. Eichel was a mental health expert. Defendant was locked into certain beliefs and there was no changing his mind. Racism. Defendant believes it is everywhere and why they are after him. The fact that Cooke sees things his way and will not change raised the potential of a delusional disorder but this was speculative.

In the Defendant's reply filed on February 22, 2021, the report of Dr. Busham S. Agharkar is included. It is dated January 14, 2021. Interestingly, his first evaluation took place months after the motion was filed alleging delusions.

Dr. Agharkar met with Cooke twice and reviewed the great volume of materials touching upon Cooke's history and the legal proceedings. Dr. Agharkar did not agree with the opinions offered by the mental health experts in the first trial, that being Cooke had a long-standing schizotypal personality disorder. Dr. Agharkar concluded that Cooke was likely incompetent in 2012 because of brain damage or dysfunction in the frontal lobe of his brain and he suffers from a delusionary disorder, persecutory type. If he was incompetent to stand trial, he was obviously incompetent to represent himself.

I incorporate Dr. Agharkar's conclusion from his January 14, 2021 report.

> As a result of his Delusional Disorder and organic brain impairments, it is my opinion to a reasonable degree of

57

medical certainty, that the symptoms exhibited by Mr. Cooke negatively impacted his competency at the time of his trial. Due to the lack of a psychiatric evaluation for competency to stand trial around the time of this trial, I am unfortunately constrained by this lack of information. In my opinion, the persecutory delusions and his impairments in reading social cues and rationally weighing and deliberating options likely would have rendered him incompetent to stand trial, waive counsel and represent himself at the time of the trial, as well as rationally comprehend the proceedings against him and the Court's instructions. It is very unlikely he would have been able to rationally assist counsel. His custodial interviews and polygraph examination demonstrate how he misunderstands and misconstrues a great deal due to his major mental illness and brain impairments. Mr. Cooke appears to have misinterpreted his relationship with the alleged victim as no objective evidence supports his assertion they had a history together.

Dr. Agharkar testified that Cooke knew all the players at trial and their respective roles: judge, jury, prosecutor, defense counsel. But his difficulty in understanding the legal proceedings against him in a rational way was distorted because he believed all the players at trial were in a conspiracy together to make sure he was convicted. Since any rational understanding of the proceedings was impaired, his ability to assist defense counsel was impaired.

Dr. Agharkar and other defense witnesses testified that once Cooke latched on to something he stuck to it regardless of evidence to the contrary. This totally rigid thinking resulted in his inability to see the forest as he was fixated on the trees. Once fixated on a topic or subject he would keep bringing it up regardless of admonitions from the judge.

58

Dr. Agharkar opined that while the Defendant understood the process of what happens at a trial, his persecutory delusions and brain damage/dysfunction impaired his ability to understand the legal proceedings, impaired his ability to understand the evidence, and impaired his ability to interact with counsel.

The Court notes that impairment does not translate to incompetence. It is a factor to be considered.

What casts a shadow over Cooke's perception of being treated unfairly is his perception that everyone involved in his case was a racist, including Judge Toliver. The world is against Cooke; thus, his paranoia. If you believe everyone is out to hurt you then you trust only yourself; therefore, representing yourself was rational to him even if a poor decision. Thus, his paranoia is another factor in the opinion Cooke was incompetent.

On cross-examination, Dr. Agharkar acknowledged there had been no frontal lobe neuropsychological testing done. That could have better nailed down any brain damage/dysfunction diagnosis. He and Dr. Mechanick disagreed on the results of an MRI of his frontal lobe. Also, he acknowledged there was no testing done by him as that is the field of a psychologist, not a psychiatrist.

Dr. Agharkar acknowledged the Defendant was not delusional when he made the 911 call to the police. It was not a smart move but not delusional. For this judge, the 911 call was an example of the Defendant being manipulative; he

was playing cat and mouse, to throw off the police. Unfortunately for him, it backfired and was the key for the police to solve the crimes.

Also, the Court learned the Defendant is not "intellectually disabled." Many IQ tests in Cooke's life reveal a low average I.Q.

Cooke's paranoia grew out of his mistreatment as a child and teen. He was treated badly by those who were his caregivers. He was full of hatred toward his mother for failing him. This resulted in him not trusting anyone. Lack of trust combined with his view that the world is racist and against him translated to Dr. Agharkar's opinion of persecutory delusional disorder.

Dr. Mechanick had examined Cooke in 2006. He examined him again for the State as to Dr. Agharkar's current conclusions.

Dr. Mechanick's bottom line conclusion was that although it is probable that Cooke has some brain dysfunction, he was not delusional. Dr. Mechanick concluded again that Cooke has an antisocial personality disorder.

Dr. Mechanick agreed with the multiple diagnosis during Cooke's youth of perceptual impairment which was difficulty by Cooke of taking in information. This diagnosis was a learning disability, not otherwise specified. He reiterated that Cooke had a low average IQ.

The doctors disagreed as to an earlier MRI result. Dr. Agharkar was of the opinion it did not mean much as to brain impairment and Dr. Mechanick was of the

opinion that if there was a physical problem in his frontal lobe the MRI would have noted something but did not. Both agreed more specific testing may have provided better results. It is my opinion that Cooke's probable brain dysfunction contributed little to the incompetency theory. Cooke functioned well in society.

Dr. Mechanick noted the multiple diagnosis of conduct disorder as to Cooke. Conduct disorder while a youth is a necessary prerequisite to ASPD. Throughout Cooke's youth, it was noted he was aggressive, assaultive and had inappropriate behaviors. But there was no evidence of delusions or psychotic symptoms.

Dr. Mechanick agreed with others as to Cooke's paranoia. He was treated so badly he became mistrustful of all authority figures, including school figures and law enforcement. He became an angry, mistrusting person.

Dr. Mechanick continued to disagree with the defense doctors in the first trial. Cooke did not have a schizoid/schizotypal personality disorder. Such people are emotionally cold and detached. Cooke shows emotion, can be very animated. He is not a loner and has social skills to relate to women and father eleven (11) children. He called himself a womanizer. His long relationship, ten years, with Rachell Campbell would not be typical of a schizotypal diagnosis.

There was a consistent theme in both trials. Cooke felt he was treated badly because he is black and Ms. Bonistall was white. Everyone was racist, everyone. He was upset with his lawyers in the first trial because they became focused on

trying to save his life and did not pursue an innocence strategy. It is obvious his distrust of his lawyers was grounded in any of them looking at his mental health for the penalty phase.

Dr. Mechanick disagreed with Dr. Agharkar concerning whether Cooke had a delusional disorder in regard to Ms. Bonistall. Dr. Mechanick found no fixed belief in Cooke that he believed Ms. Bonistall wanted a relationship with Cooke. Cooke had denied early on any contact with Ms. Bonistall or Ms. Harmon and had an excuse as to why he had Ms. Cuadra's credit cards.

Dr. Mechanick noted that Cooke seemed to try on different defenses as the case moved toward trial. Initially, he did not know Bonistall at all. Then he did know her, had sex with her and did not know why he killed her. Finally, it was he knew her, had casual sex with her, but nobody could accept that she would have a relationship with a black man (i.e., all were racist). He had sex with her and then somebody else murdered her.

Dr. Mechanick testified this was Cooke's cogent and coherent defense. It was what he wanted. Because it did not fit the facts of the case does not mean he was delusional. As was his right, he denied the crimes.

Dr. Mechanick testified that Cooke's strange opinions about living in a racist world was not delusional, but unfortunately based on the experience of black men with this country's racist history. There exists a factual basis for Cooke's opinion.

62

Dr. Mechanick reviewed the McGarry factors noted in *State v. Shields*, 593 A.2d at 1000 n. 23, which were found to be helpful by Judge Norman Barron.

Dr. Mechanick noted that the McGarry factors are really only relevant if the individual has a mental illness and/or intellectual disability that may cause a loss of competency, but "if they don't have either then in a sense the McGarry factors aren't relevant". Therefore, since Cooke had no condition that would impair his ability to stand trial the McGarry factors were not really relevant.

Nevertheless, he reviewed these factors as they relate to Cooke.

- Cooke appreciated legal defenses and understood them; he wanted only innocence

- Cooke's behavior in Court was sometimes inappropriate but he could behave when he wanted. [Examples I cite are the lengthy colloquy with J. Toliver and 11-30-11 when he wanted to proceed *pro se*]

- Cooke was totally focused on a not guilty verdict

- Cooke could get along with his attorneys, but there were differences about what evidence could be presented and how. The differences were not because he was mentally ill. Dr. Mechanick testified that Cooke engaged and communicated with him so he was capable of doing likewise with his attorneys.

- Cooke was able to plan a legal strategy though it was not effective in light of the evidence

- Cooke understood court procedure. He knew the players and their roles. He simply chose to disregard court procedures and rulings when it suited him

- He understood the charges and penalties if convicted

- Because of his personality, Cooke had an exaggerated sense of his ability to prevail, which was somewhat fed by prevailing in the reversal of his first conviction.

- Dr. Mechanick was of the opinion that some of Cooke's outbursts in Court were due to a concern about losing

- Cooke was able to disclose facts of his innocence even if these facts may be considered inaccurate because his goal was to be found not guilty

- Cooke was not always effective but he could challenge state witnesses (Dr. Mechanick read the transcripts of both trials)

- Cooke was able to testify relevantly about his innocence

Dr. Mechanick wrapped up and repeated these factors usually are considered if a Defendant has a mental illness or intellectual deficiency that impaired his ability to go to trial, but Cooke had neither. Cooke only had ASPD and a strong desire to prevail.

Dr. Mechanick noted Cooke's manipulative conduct: his interplay with the police in his statement, the wall writings to throw off the police, likewise the 911 calls to point to someone else, and to feigning mental illness in prison but not sticking with it. This conduct was Cooke trying to control events to achieve his ends and was consistent with his ASPD diagnosis.

Dr. Mechanick was of the opinion that Cooke's outbursts before the jury was goal-oriented. Judges had ruled what was out of bounds, but through his outbursts the jury heard what Cooke wanted them to hear. So "what did he have to lose" by doing what Cooke wanted done.

Dr. Mechanick noted that in none of Cooke's previous encounters with the criminal justice system had his competency been an issue.

Cooke had a single goal and that was to be found not guilty. He wanted his lawyers to focus solely on his innocence. Any mental health evidence or mitigation evidence was taboo because that meant he had been found guilty with a penalty phase to follow. The death penalty or life in prison was not what he would accept. As noted by me earlier, it was not guilty or bust. This was not the best way to proceed but it was the Defendant's way. It was not an indicator he was incompetent. Cooke's desire to always run the show and do it his way was consistent with his ASPD, together with some narcissism as to his self-inflated perception of his abilities per Dr. Mechanick.

65

Dr. Mechanick opined he was competent in 2006-2007, in 2012, and now.

Dr. Mechanick also addressed the decision by Cooke to represent himself. It was Dr. Mechanick's opinion that no Defendant should represent himself nor should they waive their *Miranda* rights and talk to the police. But they do because at the time they think it is in their best interests.

Although Cooke was at a disadvantage in not knowing legal procedures or rules of evidence, his decision was based on his lawyers not doing or getting done what Cooke wanted.

So, Cooke took control. Probably he had unrealistic expectations, but he was not irrational. He got before the jury most of what the judge told him was not admissible. He pursued his innocence and did it his way.

Dr. Mechanick opined Cooke had the ability to represent himself from a psychiatric viewpoint per the doctor's review of the aforementioned (*McGarry*) factors.

### The Bottom Line

The Court previously has noted the *Shields* decision by Judge Barron. An observation by him is noteworthy:

> What is gleaned from the above authorities is that, from a legal standpoint, the competency threshold is quite low. It is neither very demanding nor exacting. The standard by which a defendant's competency is measured is not that of the reasonable person but rather of the average criminal defendant. (Citation omitted).

66

*State v. Shields*, 539 A.2d at 1012-13.

I have considered not only the conflicting opinions of the doctors and other mental health evidence, but also how Cooke conducted himself in the majority of the court proceedings. I do not agree with the defense that Cooke suffers from a delusionary disorder, persecutory type, that rendered Cooke incompetent in his first trial, now and certainly not in his 2012 trial.

I agree with Dr. Mechanick's opinion that he was competent throughout his legal journey in this case. Cooke's misbehavior can best be explained by the diagnosis of ASPD. Cooke was going to do it his way no matter what.

To me it is noteworthy that there was no psychotic disorder diagnoses in Cooke throughout his history until January 2021. Repeatedly, he was diagnosed as a youth with conduct disorder which then became ASPD.

None of his many doctors in the first trial opined he was incompetent. The defense now argues they were not asked about competency. We do not know that, but Dr. Mechanick testified that if he was incompetent those doctors would have seen signs of same and if so, they would have had a duty to communicate same to his attorneys.

While I have written much on this issue, I do not think my decision is close at all.

Mr. Cooke was fully competent from day one to be tried for murder and his other crimes. Mr. Cooke was fully competent to represent himself as was his right. When he wanted something, he communicated articulately and civilly. When a ruling was going against him, he behaved badly and threw a tantrum. He did not throw a tantrum because he was incompetent, but because he had lost control.

[PS] So why would COOKE behave the way he did with his attorneys and act out in Court?

In both trials, the attorneys had to deal with the evidence the State had which was powerful: DNA, vagina and her fingernails; photos of the Defendant at the ATM; his 911 calls. They had little to no evidence to support Cooke's chosen defense of I am not guilty of anything other than by his taking the stand and saying he did not do it. He told his first trial lawyers he killed her, then recanted.

Cooke was frustrated his attorneys could not block the State's evidence. He was frustrated he could not get in what he wanted: allegations that Bonistall was involved heavily in drugs, that he wanted to explore potential prior lovers and that he wanted polygraph evidence. He blamed his lawyers and the judges.

So, as was testified to at the hearings, "what did he have to lose?" His outbursts got before the jury what he wanted them to hear before he was shut down. The jury heard too much on racism and matters ruled inadmissible but from nobody but Cooke. Again, he did not want anything but not guilty. He did not

68

want life without parole or a death penalty.  Seeing what was unfolding against him, what did he have to lose?  His outbursts and behavior were not because he did not understand and was incompetent.  It was in his viewpoint the only card he had to play.  Perhaps illogical and stupid but that was how he chose to play it.  The fact that he thought it would work and he was doing well does not mean he is or was incompetent.

## COMPETENCY AND
## THE DEFENDANT'S SELF-REPRESENTATION

For three months before his second trial, through jury selection and three days of trial, the Defendant represented himself. Ultimately, his behavior before the Court and jury caused him to forfeit his right of self-representation, but that is not the issue. The issue is that present counsel allege that if he was incompetent to stand trial, he was obviously incompetent to proceed *pro se*. Alternatively, it is alleged, even if competent to stand trial he was incompetent to proceed *pro se*.

In *Indiana v. Edwards*, 554 U.S. 164 (2008) ("*Edwards*"), the U.S. Supreme Court held that one who is competent to stand trial may not be sufficiently competent to conduct one's own defense at trial. The Supreme Court began by noting the standard for competency to stand trial. A defendant must have the capacity to understand the nature and object of the proceedings against him, to be able to consult with counsel, and to be able to assist in preparing his defense. *Drope v. Missouri*, 420 U.S. 162 (1975).

As to self-representation, the Supreme Court noted the constitutional right to proceed to trial without counsel when a defendant voluntarily and intelligently elects to do so. *Faretta v. California*, 422 U.S. 806 (1975).

Finally, the Supreme Court addressed an earlier case where they had rejected an Appeal's Court ruling that required a higher standard than competency to stand trial when one wanted to waive the right to counsel in order to change a plea of not

guilty to guilty. *Godinez v. Moran*, 509 U.S. 389 (1993). But *Godinez* did not involve a trial and it did not involve an Order requiring representation by counsel over the objections of the defendant as was the case in *Edwards*.

The question in *Edwards* was that, assuming a defendant is competent to stand trial, may a State limit that Defendant's right of self-representation by insisting that he proceed to trial with counsel because he lacks the mental capacity to conduct his own defense.

The Court held there should be a different standard for competency to stand trial and competency to proceed *pro se* at trial. Trial judges may take a realistic account of a defendant's mental capacities in answering the question of whether the defendant is competent to represent himself at trial. Therefore, in circumstances where a defendant is competent to stand trial, but suffers from a severe mental illness, a judge may determine he is not competent to proceed *pro se*. With that said, the Court did not provide any specific guideline as to the standard to be applied. The Supreme Court rejected Indiana's request to adopt a more specific higher standard to proceed *pro se* to trial that would "deny a criminal defendant the right to represent himself at trial if he cannot communicate coherently with the court or a jury." *Edwards*, 554 U.S. at 178.

Ultimately, we are left with a higher standard than just competency to stand trial, but it is left to the trial judge to make this decision considering the

71

circumstances of the individual defendant's competency. Will allowing a defendant to represent himself by affirming the dignity of that right result in an unfair trial which results in an unfair conviction?

## MR. COOKE'S SELF-REPRESENTATION

Mr. Cooke's *pro se* hearing took place on November 30, 2011. The transcript of the hearing is over forty (40) pages long. It is the most comprehensive *pro se* colloquy this judge has ever read.[4] Judge Toliver knew the Defendant's history and took the time to explain everything necessary to Mr. Cooke including the pitfalls of not being trained in the business of a trial. Mr. Cooke acknowledged same. Mr. Cooke was warned that bad behavior could result in the loss of his right to conduct his own defense. The transcripts evidence Mr. Cooke's involvement in the colloquy. *Indiana v. Edwards* was discussed and the higher standard of competency for self-representation at trial was known to the Court.

Trial counsel were opposed to Mr. Cooke proceeding *pro se*. They desired a competency examination before the decision was made, but they also knew he had told them he would not undergo another examination. Counsel were of the false belief that any desire to proceed *pro se* was proof of incompetency. The Court notes that a request to proceed *pro se* does not trigger a competency evaluation.

---

[4] In Cooke II, 97 A.3 513 (2014), the Supreme Court reviewed the comprehensive colloquy as to Cooke's desire to proceed *pro se*.

The bottom line is that with the history of the case, including the Defendant being fully aware of the State's case at the first trial, and the Defendant's communications with the Court, there was nothing to suggest he was incompetent to represent himself. It was his right.

Mr. Cooke was permitted to represent himself, but Judge Toliver made sure he was not abandoned. Trial counsel were to provide Mr. Cooke a summary of their work product as to trial preparation. They were appointed as stand-by counsel and directed to actively assist Mr. Cooke. They were to consult with him on matters pertaining to the trial. They were to meet with Mr. Cooke as often as necessary to assist him, but in no event, less than three times a week.

Judge Toliver's ruling considered not only the Defendant's competency to exercise his right to represent himself, but also put in place an extraordinary safety net for Mr. Cooke to exercise his right of self-representation in a competent manner.

Based on the record, had Judge Toliver not permitted the Defendant to proceed *pro se*, he would have surely been reversed.

Following the Order granting self-representation, there is further evidence this was the appropriate ruling. A summary of this evidence follows.

i.   At a January 27, 2012 conference, Mr. Cooke complained that he needed more time to conduct research and determine his need for experts. He respectfully made his case and was involved in a give and

take conversation with Judge Toliver. At this conference, stand-by counsel stated Mr. Cooke wanted to be sent to DPC for an evaluation of his competency to represent himself. Mr. Cooke told Judge Toliver that was his attorneys' idea- "I didn't say that", Mr. Cooke recalled the discussion of *Indiana v. Edwards* at the November 30, 2011 hearing in which he was permitted to proceed *pro se.*

ii. Mr. Cooke was actively involved in communicating with the Court. On February 12, 2012 there was a discussion about the tape of the police interview with the Defendant following his arrest. At his first trial it was not completely played to the jury per a stipulation of counsel. Mr. Cooke informed Judge Toliver he wanted it all in, presumably to show the jury how badly the police treated him as a suspect.

iii. At a February 16, 2012 conference Mr. Cooke discussed "great weight" as to a jury recommendation if a penalty phase takes place. He made his position known as to the number of alternate jurors as compared to the first trial. Evidentiary matters were discussed and then the suppression of his statement. Prior to proceeding *pro se*, his attorneys had filed a Motion to Suppress, but he did not want it. He complained "it wasn't on my behalf".

iv.     Throughout days of jury selection Mr. Cooke's communications were on point. There is nothing in the hundreds of pages of the transcript of jury selection that points to incompetency.

Earlier communications with the Court that evidence Mr. Cooke's competency and ultimately the decision to permit him to proceed *pro se*, may be found by winding the clock back to the following conferences.

(i)     On April 18, 2011 the Defendant was clear and articulate in addressing what he felt was in his best interests. He explained what two prior pairs of attorneys had done and he did not want present counsel to do the same. He complained about where he was housed and that DOC restrictions interfered with meeting with his attorneys. Yes, he was argumentative, but he was clear and articulate.

(ii)     On November 10, 2011, there was a conference pertaining to where Mr. Cooke was to be housed. Housing was an angering issue based on his behavior and having him closer to his attorneys. He informed the Court he had a lawsuit against everyone because of DOC treatment. He was upset with his move back to Gander Hill. He was upset that he would not be placed in the general population. There is a vigorous exchange between the Defendant and Judge Toliver. The Defendant "fires" his attorneys. Judge Toliver basically says, "not happening" and whether

75

he chooses to cooperate was beyond the control of the Court. While the Defendant is frustrated and mad, he spoke well and on point as to his position. His communications evidence competency, not incompetency.

Further evidence of Mr. Cooke's competency is that he held to his defense throughout a vigorous cross-examination.

On direct examination he denied all allegations of the charged offenses. He testified he knew Ms. Bonistall and had voluntary consensual sex with her when he visited her apartment at 10:45 p.m. for an hour on the Friday before her murder in the early hours of Sunday. He testified she was drunk, having just come from a party. He said Michael Skogen, a friend of hers, was there.

He stuck to his defense through the following cross-examination involving evidence as to Ms. Bonistall's whereabouts that Friday evening.

-Michael Skogan reported that he had never seen the Defendant before.

-witness testimony that they had seen Ms. Bonistall working at
  Home Grown Café that evening.

-that Ms. Bonistall clocked in at Home Grown Café at 5:10 p.m.
 and clocked out at 11:20 p.m.

-that Ms. Bonistall made or attempted to make 6 cell phone calls
 between 11:26 p.m. and 11:38 per cell phone records, this being

76

while he said she was attentive to him.

Mr. Cooke articulated his defense and stuck to it throughout his cross-examination. This was the defense the Defendant wanted, not a mental health defense. There was no evidence of incompetence.

Based on the record of this trial there is nothing to suggest that Mr. Cooke exhibited conduct that was any evidence of incompetency, much less obvious incompetency. Mr. Cooke was familiar with the criminal justice system in New Jersey and had the benefit of a dress rehearsal by way of his first trial. When he elected to proceed *pro se* he was not set adrift but had the active participation and help from his stand-by attorneys. The transcripts evidenced that when he was *pro se*, he and his attorneys communicated prior to Mr. Cooke taking a position. Again, while Mr. Cooke could be argumentative, his memory was sharp, and he was articulate in making his positions known.

There is absolutely no merit to the multiple claims that everyone in two trials failed to recognize he was incompetent to stand trial. Likewise, there is absolutely no merit that he was incompetent to represent himself.

## APPELLATE COUNSEL WERE INEFFECTIVE FOR NOT RAISING THE DEFENDANT'S INCOMPETENCY TO REPRESENT HIMSELF UNDER *INDIANA v. EDWARDS*, 554 US 164 (2008)

Competency or incompetency is ultimately determined by the trial judge. Until deemed incompetent, a defendant is presumed under the law to be competent.

A judge does not make a competency ruling without having a competency hearing with the benefit of mental health experts. While his trial lawyers may have questioned the Defendant's competency to represent himself (this was only because he had just three (3) months to prepare), they had no mental health expert to pursue a hearing because the Defendant would not cooperate. With the record of the mental health opinions from the first trial and Cooke's emphatic position he would not cooperate with anything concerning mental health, there was no path to having a competency hearing.

One must remember the record has hundreds and hundreds of pages of the Defendant behaving himself and arguing his positions with authority as well as his getting upset at something and becoming uncivil and argumentative to the extreme. Behaving badly when one does not get one's way is not incompetency.

So, if an appeal issue must be on the record, there was nothing for appellate counsel to raise in regard to *Edwards* competency. This judge wonders whether present counsel think the Supreme Court would have conducted a hearing on competency.

Judge Tolliver ruled on what he had. Appellate counsel had no path to have the Supreme Court rule he was wrong based on *Edwards*.

Appellate counsel were not ineffective as to this claim.

## IMPROPER VOIR DIRE ALLOWED BIASED
## JURORS TO BE ON THE JURY

It is black letter law that a defendant is denied his or her right to an impartial jury if even one juror is biased, prejudiced, or improperly influenced. *Ross v. Oklahoma*, 487 U.S. 81 (1988); *Massey v. State*, 541 A.2d 1254 (Del. 1988); *Lovett v. State*, 516 A.2d 455 (Del. 1986).

An adequate voir dire is necessary to protect a defendant's right to an impartial jury by identifying those jurors whose bias or prejudice would disqualify them as jurors and the trial judge has the responsibility to remove biased jurors. *Morgan v. Illinois*, 504 U.S. 719 (1992).

In Delaware, the trial judge is responsible for conducting the voir dire. Over many years, voir dire questions in capital cases have been fine-tuned in an effort to reveal bias or prejudice. That occurred in this case in that a standard capital voir dire customized to the allegations in this case was conducted with follow-up questions, when needed, by the trial judge.

In this case, the Defendant alleges four jurors were empaneled who should not have been because of their bias and/or personal situations. The Defendant argues that implicit bias requires bias to be presumed.

A trial judge in Delaware conducts the voir dire process with an ear toward hearing answers that are potential minefields. Then, follow-up questions are asked.

Finally, the defense and State can suggest additional questions in areas that may concern them.

The purpose of the voir dire questions and the ability of the trial judge to observe juror reaction and demeanor is to allow the judge to have a basis to exercise her or his discretion. The trial judge has broad discretion in determining if a prospective juror should be excused for cause. *DeShields v. State*, 534 A.2d 630 (Del. 1987). Because the trial judge is in the best position to observe, he/she should be given great deference. *Id.* at 636.

With this in mind, a review of each complaint follows.

### Juror No. 4/Hawkins

The defense reports the following as to Juror #4. The juror informed the Court his niece had been murdered thirteen (13) years earlier. The person who committed the murder was found guilty and sentenced to life imprisonment. The juror indicated satisfaction with the outcome and he believed in forgiveness. Because he could remember the name of the person who murdered his niece and the trial judge's name, the defense argues it was fresh on his mind. He was a 5 on the 1-10 death penalty scale. He was a member of the Wilmington Peacekeepers, whose mission is to reduce crime. Although he stated he could be impartial based on the above and said he could evaluate the evidence without relating to his own personal experiences, the defense argues the Court should have *sua sponte* excused him for cause because of

implicit bias.  The defense argues Mr. Cooke did not challenge this juror because he is claimed to have been incompetent.  Having found Mr. Cooke competent, this excuse is unavailable.

The Court has reviewed the transcript of this juror in regard to the aforementioned claim of bias.  February 22, 2012, transcript at p. 118.

As to forgiveness, he reported that following the sentencing of his niece's murderer he was interviewed: "I was interviewed afterwards by some commentators. Their remark was how did I feel emotionally, and my thing was to be forgiving you have to forgive." February 22, 2012, transcript at p. 124.

He was previously a juror in a robbery case ten (10) years earlier in which the verdict was not guilty.  He was satisfied with that result.

As to being a member of the Wilmington Peacekeepers, he reported its goal is to reduce or avoid violent crimes in Wilmington.  They have no role in terms of victims or defendants.  He said being in the organization would not affect his impartiality and he would not treat one side differently than the other.

He answered he had no bias or prejudice against the State or the Defendant. He reported he could render a fair and impartial verdict without being influenced by feelings of sympathy, revenge, fear, or bias of any kind, and he could do so even if there was the possibility of later public criticism or praise of the verdict.

An inquiry was made about the trial of his niece. He reported the Defendant was Leon Perkins. He said the trial judge was Judge Jurden, and that none of the prosecutors or defense attorneys were involved in Mr. Cooke's case.

No cause challenge was made. Mr. Cooke was content followed by the State being content.

Noted earlier in this decision is the recognition that the jury selection process is not just about answers to questions. Everyone gets to see the juror's demeanor. Did they hesitate in regard to certain questions? Did they seem eager in their answers? Admittedly, it is necessarily a quick read, but you must have "eyes on" to make your judgments. That is why deference is appropriate versus analysis of the cold transcript.

In the Court's review of the cold transcript, the Court does not agree that implicit bias ought to jump off the page. Regardless of what happened to his niece, this person's reaction was forgiveness. He was a five (5) in regard to the death penalty. He was involved in a peace organization. Mr. Cooke was satisfied with him and raised no concern.

There is nothing to give rise to the Court *sua sponte* excusing him for bias.

This claim fails.

## Juror No. 11/Cole

The voir dire as to this juror took place on February 27, 2012 at page 177 of the transcript. Relevant to the Defendant's present argument is that she answered "No" on the question of whether anyone in their family had been arrested and/or convicted for a criminal offense or DUI.

At the conclusion of the voir dire, Mr. Cooke wanted her excused for cause because she claimed she never heard anything about the case, she was employed in the Health and Social Services Division of the Department of Justice, and she hesitated on several questions. Judge Tolliver corrected the Defendant as to her employment. It was the Division of Public Health and not the Department of Justice. Following the cause denial, the Defendant exercised a peremptory strike setting off another battle in the *Batson* wars. Ultimately, the Court determined Mr. Cooke had not provided a non-gender/race reason and the juror was seated as #11. Two days later she communicated that she had forgotten that her son had a DUI arrest followed by the First Offender Program six (6) years earlier. She explained to the Court she had forgotten about it and when she remembered, she reported same. Mr. Cooke renewed his cause argument based on the late reporting. The Court found it was truly a forgotten matter, she initiated contact to correct it, and had she not done so, everyone would not have known. The defense argues that her explanation of

forgetting was not credible giving rise to a bona fide cause challenge or at least a revisit of the denial of his peremptory strike.

The Court has reviewed the initial transcript as to voir dire and the transcript of her report two days later regarding her son's DUI.

As to the question at issue she was asked: "Have you, a relative or close friend ever been charged with or convicted of a criminal offense of driving under the influence of intoxicants?" She answered "no".

She reported being an alternate on a murder case fifteen (15) years earlier but did not recall a lot about it. She said that experience would not make it difficult to be fair and impartial in the present case.

The record reflects she worked for the State of Delaware Division of Public Health, not the Department of Justice as claimed by Mr. Cooke.

The Court notes that her hesitation in considering answers to some of the questions did not give rise to a cause disqualification.

Then, following his peremptory strike, the *Batson* arguments were made, and she was seated as a juror.

As aforestated, two days later, Judge Tolliver reported that this juror contacted the Court and reported matters concerning her son's DUI arrest five (5) or six (6) years earlier. She was instructed to come back to Court.

The Court addressed the juror concerning her son. March 1, 2012 transcript at p. 63. She acknowledged her incorrect answer saying she had "totally forgotten about it." Her son was thirty-five (35) years old putting him at 29 or 30 years old when the DUI occurred. He did not live with her at the time. He pled guilty and went through the First Offender Program.

She stated, "I just didn't want to mislead the Court in any way".

She was asked if there was anything about her son's case or experience that would make it difficult to be fair and impartial in Mr. Cooke's case. She responded "no." She commented on her son's foolishness and responded "not at all" as to his experience having any impact upon her ability to be fair and impartial to Mr. Cooke.

Mr. Cooke renewed his cause argument arguing she fabricated her response because it was impossible for her to have forgotten.

The Court kept her on the jury noting she answered all the questions put to her, brought her son up herself, and "we would have not known otherwise except she thought about it and said, oops, that was wrong. It does not change anything."

So, the bottom line on juror No. 11 is that she was fully vetted on February 27, 2012. She was the subject of a *Batson* fight and was seated because the Court found that Mr. Cooke had used his peremptory challenge in a discriminatory manner and her report of her son's DUI experience did not change anything.

Mr. Cooke argued she should be excused for cause and that was denied. He did not renew his peremptory challenge. That falls on him. Had he attempted to exercise a peremptory challenge, the Court would have had to reexamine its *Batson* ruling but that never occurred because of the inaction of the defense.

The Defendant is entitled to a fair trial and a fair and impartial jury. There is nothing to suggest anything but juror No. 11 being able to be a fair and impartial juror.

Could this have been raised on appeal? Yes, but it was not, and the Court does not find that appellate counsel were ineffective. The above analysis results in a finding of no prejudice as to the second prong of *Strickland*. That ends the claims as to this juror.

### Juror #6/Backous

This juror's voir dire took place on February 22, 2012 at pages 201-213 of the transcript. Following voir dire, there was no cause challenge nor peremptory challenge by the State or Mr. Cooke.

Now, the defense argues the Court should have *sua sponte* removed him for cause; *i.e*, implied bias. This argument is based on the defense perception that because he was a former University of Delaware student, had friends who were alumni, attended events there and much earlier lived in an area near Ms. Bonistall's

apartment, there existed implied bias. Also included in this argument is that he was upset about the fact his parents' home in New Jersey had been broken into.

In the voir dire, he reported attending the University of Delaware. He had friends who graduated, and he may attend an athletic event once a year. He was specifically asked if his connection to the University would affect his ability to be a fair and impartial juror. He responded "no". He reported there was nothing regarding the break-in of his parents' home twelve (12) years earlier that would make it difficult to be fair and impartial in Cooke's trial. Likewise, he said the fact he lived in the area of the victim's apartment twenty (20) years earlier would not affect his ability to act as a juror in this case. He knew nothing about the case.

The bottom line is there was a full voir dire including repeated questions if he could be a fair and impartial juror. To now argue that his connections to the University over twenty (20) years earlier and a break-in at his parents' home twelve (12) years earlier created an implied bias and the judge missed it is a real stretch. It has no legs and is denied as meritless.

## Juror No. 3/Rodriguez

This is the juror who is discussed in the Supreme Court decision affirming the Defendant's conviction. *Cooke v. State*, 97 A.3d 513 (Del. 2014).

When asked whether a relative had ever been charged or was under investigation, she answered no. That was not correct. A family argument turned

into a fight and her husband was charged with assaulting their daughter. Allegations were his adult daughter was hitting him in the head with a frying pan and he was choking her. The charges ended up in Family Court. After the guilty verdict, but before the penalty phase, she told the Court she needed to go to Family Court with her husband about the aforementioned fight. When asked why she had not reported these charges during voir dire, she claimed in her view he was not attempting to kill their daughter but to stop her from hitting him with the frying pan. She said she and her husband had thought her daughter had dropped the charges. She denied her husband's attempted strangulation affected Mr. Cooke's case. Mr. Cooke was convicted of strangling the victim with a T-shirt.

Defense counsel moved for a mistrial. Mr. Cooke had earlier forfeited his *pro se* status. The Court denied the application. Mr. Cooke did state he would have struck her because of the strangulation allegations.

There is no doubt that the matters concerning juror #3 were troublesome, but this issue was raised on direct appeal and addressed by the Supreme Court. The Supreme Court's decision reviews everything regarding this juror from the allegations, to her report to the Court, to her explanations to the Court, and the trial Court's determination not to grant a mistrial. Following the Court's refusal to grant a mistrial came the decision of whether to remove her as to the penalty phase. While

the penalty phase is now moot, the State argued to remove her, and <u>the defense argued successfully to keep her</u>.

After the trial was over, the defense sought a new trial based on bias, misconduct, and inaccurate voir dire answers. The Superior Court denied the new trial motion.

At the Supreme Court, Cooke argued that had she been accurate it would have given rise to a cause challenge or the exercise of a peremptory challenge.

The Supreme Court's bottom line was "[p]ut simply, Juror #3's honest but mistaken answers to the voir dire questions do not amount to a violation of Cooke's constitutional rights that would entitle him to a new trial." *Cooke v. State*, 97 A.3d 555.

Since this issue has been fully adjudicated in the trial court and fully examined and ruled upon by the Supreme Court, it now must be procedurally barred pursuant to Rule 61(i)(4). The present claim is identical to that decided by the Supreme Court.

As to the other jurors, the Court has determined there is no merit as to the allegations. Therefore, ineffective appellate counsel cannot be the excuse for "cause" under Rule 61(i)(3). Nor has prejudice been proven. This results in the procedural bar of Rule 61(i)(3) being applied to the claims involving these jurors.

Alternatively, these claims are denied on their lack of merit as discussed.

## EXCLUSION OF PROSPECTIVE JURORS WHO EXPRESSED CONCERN ABOUT DEATH PENALTY BUT WERE NOT ADEQUATELY VOIR DIRED TO DETERMINE IF "SUBSTANTIALLY IMPAIRED"

This argument is that the trial judge improperly ended voir dire as to three prospective jurors who were then excused without the trial judge conducting a full inquiry into whether their opposition to the death penalty would have substantially impaired their ability to follow the law.

While the Defendant sought a new penalty hearing, which is now moot, he also argues later that the removal of these jurors allowed for a jury that was inclined or biased to convict.

The voir dire conducted by the trial judge was time tested and Supreme Court tested. Including the questions asked in this decision is not necessary as they are part of the record and known to anyone interested in capital juror selection in Delaware. They are also now moot.

The purpose of the questions was to expose any bias or belief as to either a leaning toward the imposition of life imprisonment or a leaning toward voting for the death penalty. Answers provide the Court and the parties insight as to the prospective juror's thoughts and beliefs as to an appropriate punishment under the facts and law of the case if the Defendant was found guilty.

## Nellie Manlove
## February 21, 2012

Ms. Manlove was one of many jurors interviewed or partially voir dired because they had reasons for which they sought to be excused. The reasons include everything from pre-paid vacations, to health issues, to economic hardship. Her voir dire took place on February 21, 2012 at page 179 of the transcript. Ms. Manlove reported knowing the Attorney General, that her work for the New Castle County Council was important and the trial could get in the way of her responsibilities, and that she also had many responsibilities at home.

Judge Tolliver asked her to step outside. He noted she became very red and blotchy and wondered if there was an allergic reaction going on. He commented her conflicts did not amount to much and that she did not want to be here. Nonetheless, he brought her back in and asked if she had any other reasons she could not serve. The following took place:

Ms. Manlove:     Well, when you talked about the death penalty, I don't believe in it.

The Court:       Under no circumstances would you vote to recommend imposition of the death penalty?

Ms. Manlove:     No. I'm Catholic, so we don't believe in the death penalty.

She was then excused. Now it is argued the Court prematurely excused her without pushing her on her beliefs and ability to vote for death regardless of her beliefs.

The juror did not equivocate. She said "no" and why. No means no and it would be wrong to twist her arm on this important issue. The excusal was within the Court's discretion. There is no merit to this claim.

## Edna Smith
## February 20, 2012

Ms. Smith's voir dire took place on February 20, 2012 at page 141 of the transcript. Ms. Smith, who without being asked a question, stated: "I don't know if I could ever convict someone saying they have to have the death penalty. I don't think I could do it." She was immediately excused. This is true, but not complete, thereby a false impression is created. Ms. Smith was among many who had requested to be excused from the trial. These people were screened on February 20, 2012. She was asked why she came forward; *i.e.* why was she seeking to be excused. Her fifteen (15) year old son had a medical appointment that previously had been rescheduled. She worked during the day and had a part-time job in the evening. Then, she made the death penalty comment. She was excused for all of the above which is completely within the trial judge's discretion. There is no merit to this claim.

## Milton Perez-Munoz
## February 27, 2012

Milton Perez-Munoz was voir dired on February 27, 2012 beginning at page 95 of the transcript.

When asked on a scale of 1-10 about her feeling or opinion as to the death penalty, she replied: "I don't believe in the death penalty." Judge Toliver asked, "at all" and she said "no." February 27, 2012 transcript at p. 98.

Judge Tolliver then told her the judge makes the final call. He asked whether under that circumstance, could she recommend the death penalty. She replied: "No I don't believe in it." She reported it was her religious opposition as a Catholic. She started to equivocate, then said: "I just don't believe in the death penalty."

She stepped outside and the Court inquired about further questions on this issue. Mr. Cooke stated "I believe it ain't going to change her heart. She just don't believe in killing no one."

Mr. Cooke was correct. Again, it would have been wrong for the judge to push the issue and try to twist her arm. There is no merit to this claim.

The argument that the trial judge failed in his responsibilities by not coaxing another answer as to the death penalty is just plain wrong and meritless as to all three of the above jurors. A trial judge has broad discretion in voir dire. *Deshields v. State*, 534 A.2d 630, 634 (Del. 1987). These claims are procedurally barred because

of Rule 61(i)(3). Appellate counsel were not ineffective for not presenting a meritless appellate claim. Nor has the Defendant addressed the prejudice prong of this bar. Alternatively, it is denied on the merits for the reasons aforestated.

# THE *BATSON* WARS

The Equal Protection Clause of the United States Constitution protects jurors from the discriminatory exercise of peremptory strikes on the basis of race or gender. *Batson v. Kentucky*, 476 U.S. 79 (1986) ("*Baston*"). A *Batson* challenge may benefit the challenging party, but it is also about protecting citizen jurors from discrimination and thereby protecting the integrity and fairness of justice by jury trial.

A *Batson* challenge at jury selection breaks down into three parts. First, the objector must establish to the Court that a *prima facia* showing of racial or gender discrimination exists based on the evidence. If the Court finds a *prima facia* case has been made by the objector, then in part two, the burden shifts to the proponent of the peremptory strike to provide a race or gender-neutral reason or explanation. Then, third, the Court must decide if, based on all the above, the objector has proven purposeful discrimination.

If it is established that the prosecution exercised a single discriminatory strike against a single juror, reversal is required. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994). One bad strike does spoil the whole bunch. It is no excuse for the State to argue that other similarly-situated jurors were accepted and not struck. The Court should look at the whole picture of what has taken place during jury selection

in ultimately determining if the objector has met their burden. *Holloway v. Horn*, 355 F.3d 707 (3rd Cir. 2004), *cert. den.,* 543 U.S. 976 (2004).

Thus, much depends on what is said, but it also depends on a fair judge's observation of the demeanor and credibility of the prosecutor as well as the demeanor of the juror. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). Needless to say, such disputes are extremely fact intensive and an area of the law in which judges earn their pay. Fortunately, for our Courts and our State there has been an enlightened evolution since *Batson* was decided and *Batson* challenges have become rare.

At trial, Mr. Cooke raised a single *Batson* challenge to one of the seven (7) peremptory challenges by the State in the selection of jurors and alternate jurors. That challenge concerned Tysha Sheppard. No *Batson* challenge was raised on direct appeal. Now, the defense argues that the State exercised six (6) of its seven (7) strikes in a discriminatory fashion in violation of *Batson*.

The State argues that procedural bars end any review of these claims as Ms. Sheppard's challenge was adjudicated. Rule 61(i)(4). As to the remaining five (5) jurors raised in the motion, the Defendant did not object; hence, the Rule 61(i)(3) fault is his. He was *pro se* at the jury selection and being *pro se* is no excuse. I agree and the procedural bars are applicable.

Nevertheless, a substantive analysis will be done regardless of potential applications of procedural bars because the alleged ineffectiveness of appellate counsel is a difficult concept to apply in regard to the prejudice prong to the Defendant under *Strickland* because a *Batson* violation is not only about the Defendant but the jurors and the jury system. Therefore, the claims of discrimination will be addressed as to their merits.

The final composition of the jury was five (5) African Americans, five (5) white non-Hispanics, one black Hispanic and one white Hispanic, eight (8) were women and four (4) were men. During the trial, one African American female was replaced with a white female.

## BACKGROUND

Before addressing the individual jurors, the Court notes that as far as the gender of those not excused for cause, there had been seven (7) men and seventeen (17) women at the time the State exercised the fifth strike of a woman.[5] Simply put, the panel was weighted so heavily toward women that the Defendant complained about the lack of men.

In the voir dire of jurors, Mr. Cooke was *pro se*. For the most part he was respectful of the process and communicated his positions articulately. As an aside,

---

[5] We know this snapshot because it was noted in the transcript.

his conversation with the Court provides no hint of a basis to infer and or conclude he was incompetent to stand trial or to represent himself.

The jury selection process evolved into a *Batson* war with both sides attacking the other. Mr. Cooke admitted gender strikes and also racial strikes because his first jury was "so white". He understood *Batson* and made a challenge as to the State's peremptory strike of Tysha Sheppard. This precipitated a review of other peremptory strikes by the State.

In the present motion, the State is attacked for discriminatory strikes against six (6) of the seven (7) strikes used by the State. The grounds are that the State used their strikes against women and/or African Americans. The Court did not find any *Batson* discriminatory strikes by the State. The Court did not accept two of Mr. Cooke's strikes as being race/gender neutral and seated those two jurors over the Defendant's objection, but this is not a part of the Defendant's motion nor included in this decision. It is just the background as to my reference to the *Batson* wars.

A chronological review of the voir dire process and the reasons for the State's strikes, when challenged, follows.

Lovelean Moorer was the State's first peremptory challenge. Her voir dire was conducted on February 22, 2012 at page 149 of the transcript. She is an African American female.

The State's reason for their challenge was her difficulty in understanding the death penalty/life imprisonment questions or difficulty in communicating her position. The trial judge asked her these questions in many different ways and ultimately, she answered if convicted she could consider and impose either the death penalty or life imprisonment.

Towards the end of her voir dire, the Judge returned to the penalty issue. He said that in her previous answers "you kind of hesitated." Her response included "It is just that the, you know, I am kind of shaky on the death penalty, that's all." February 22, 2012 Transcript, pp. 164-165.

The Court denied the State's cause challenge but anticipated what the State would do next and said, "State will exercise a peremptory challenge number one?" The State replied "yes". Later, on February 23, 2012, the Court invited the State to provide its reasons. The State noted her difficulty with the death penalty questions and that when the Court returned to the question she paused and looked away. The Court asked why, and she made the "shaky" comment.

From the record before the Court, this was clearly a race/gender neutral decision. Her demeanor caught the judge's eye, and he anticipated the State's challenge. There is no merit to this claim.

Mary Riley is a Caucasian female. Her voir dire took place on February 22, 2012 at page 233 of the transcript. The State exercised their second peremptory.

There was no objection or discussion. In the motion the defense complains the State gave no reason for exercising a peremptory challenge. But, there was no reason for the State to offer a reason. There was no discussion that would have triggered the State laying its reason on the table. In her answers, she did report she was a five (5) out of ten (10) on feeling about the death penalty. She did report being a juror in Delaware years earlier in an odd circumstance. She said it was a child custody case, not criminal, and the mother retained custody. She said it occurred in Superior Court. These comments were quite unusual.

We are left with nothing to analyze other than she is a white female who, it is presently argued, would have made a good juror for the State. It is impossible for the Court to make a ruling when a record has not been made. This falls on the defense. There is no merit to this claim.

The State's third peremptory strike was against Adrienne Powell, an African American female. Her voir dire took place on February 22, 2012 at page 251 of the transcript. She stated she worked at Social Services. The State asked for additional questions as to what she did at Social Services. This was done and she said, "I do emergency service work, help people with past due rent, utilities, get them out of that situation".

The State then exercised its third peremptory challenge.

Because of a previous *Batson* challenge by the State as to a defense peremptory challenge, the trial Court stated, following the challenge against Ms. Powell: "Given your logic Mr. Wood, one might check on the next couple of challenges that the State has a problem with females, 2/3 of which are African American." The State offered to explain but the Court moved on. It arose the next day in further *Batson* discussions.

The next day when invited to provide their reason(s) the State responded that "I often try to avoid jurors in the helping professions;" that her answers were rapid yes or no and she "didn't reveal much of herself"; that she gave the impression that the State perceived as weak; and finally, her driving record evidenced a person unwilling to follow the rules. Nothing further was discussed as to Ms. Powell.

It is noteworthy that at this time in the process, the State previously had been "content" with two female potential jurors (Ms. Miller and Ms. Garnek) whom Mr. Cooke then struck.

Therefore, reviewing the entire record, the Court finds the State's explanation to be gender/race neutral as to Ms. Powell. The Court also notes that in the trial Court's comment about females, he may not have picked up on the fact that the State had been previously content on two females who were struck by the Defendant, nor may he have recognized at that time that the panel was so heavily populated with women, leading to more women being subject to being struck than men. The panel

does not sit and wait in the Courtroom where the judge is conducting the voir dire questions in a capital case. There was no opportunity to view the general make-up of the panel, gender or race wise. There is no merit to this claim.

The State's fourth peremptory strike was against Brian Johnson. His voir dire took place on February 23, 2012 at Page 190 of the transcript. He is an African American male. He reported that despite being told by the Court not to discuss the case with anyone or allow anyone to discuss it with him, he did. "I talked with my wife a little bit about it last night. She said she heard about a case that such and such happened. She did hear certain things." The State was concerned because he was told if the case was discussed he was to notify the bailiff or the Court, but he did not.

When asked if he had formed or expressed an opinion about the case he said yes, "only in gest." He said he had joked about getting out of here by saying the Defendant is guilty. This was explored extensively by the Court over concerns as to how his joke may have impacted other jurors. Ultimately, the Court did not grant the State's request for a cause excusal but said "I assume you will exercise a peremptory." The State exercised its fourth peremptory as to Mr. Johnson. He was excused.

The next day in discussing another juror that the State ultimately struck, Mr. Johnson came up again. The State reported "basically because he gave a number of answers that caused us to think he was more complicated and with us potentially

going to be a problem, he said something like, well, first thing was that he talk(s) to his wife the night before after being told by Your Honor not to discuss the case…. He also said that he was joking with jurors and would say I will say he is guilty to get out of here. He said, I don't want to stand in judgment of anybody's life."

What a transcript or record does not capture is the demeanor of a potential juror or a witness while on the stand testifying. That is why deference is given to those present.

As to Mr. Johnson, the Court recognized the issues he raised. In denying a cause challenge, Judge Tolliver said to the State "I assume you will exercise a peremptory." February 23, 2012 transcript, p. 224.

The Court finds the State's reasons gender and race neutral. There is no merit to this claim.

The State exercised its fifth peremptory strike against Tysha Sheppard who is an African American female. Her voir dire took place on February 27, 2012 at page 56 of the transcript. When she came into the Courtroom, Judge Toliver asked her "how she was doing" and then asked her to step back outside for a minute. He then told the parties he recognized her. He had not seen her since attending her great uncle's funeral the previous year. Judge Toliver reported his daughter attended daycare with her and he knows her mother, father, grandmother, grandfather, and was a close friend of her great uncle.

Following a full voir dire and denial of the State's application of a cause challenge, the State exercised its fifth peremptory challenge which Mr. Cooke immediately challenged. The State provided its reasons. It was concerned with the relationship between her, her family and the judge stating, "I don't know what that relationship means, but usually strange situations are not good ones." February 27, 2012, transcript, pp. 82, 83. She had religious opposition to the death penalty and while she stated she could follow the law, she also said she believed God is the final word. Finally, in explaining a question she may have misunderstood she stated, at page 76: "…and that opinions of maybe the other jurors won't sway me one way or the other is what I meant to say." The State considered this "a nightmare scenario because that is where hung juries come from." February 27, 2012 transcript, p. 83.

There was then a discussion of the then composition of the jury as compared to the general population of New Castle County; of the ten (10) seated jurors, six (6) were African American, one was Hispanic.

The Court found the State's explanation race neutral. The Court also stated it did not see an overall pattern given the number of minorities in New Castle County.

In the present motion, it is argued that the then composition of the jury was irrelevant, and the State's comments reflect discrimination in that the quota of persons of color had not only been met but exceeded. The defense argues that if only one potential juror is excluded on the basis of race or gender, then a new trial

is mandated. This argument is correct, but it does not mean that the trial court and this judge must ignore what took place in the jury selection process. *Batson* first requires evidence of a *prima facia* case of discrimination. It is not wrong to look at what has taken place in making this threshold decision. Also, trial judges will frequently conduct the whole *Batson* analysis even if no *prima facia* case is made by the opposition because it is better to inquire and create a record as to what is going on at that moment in the jury selection process. One must remember that Judge Toliver was in a *Batson* war with objections coming from both sides.

I agree with the trial judge that the reasons provided by the State negated any discriminatory intent in the peremptory challenge of Ms. Sheppard. There is no merit to this claim.

Barbara Carey is listed in the Defendant's motion at Page 150 as one of six (6) discriminatory strikes by the State, but she is not included in the argument portion of the motion. This Court therefore concludes any complaint as to Ms. Carey is abandoned.

Nevertheless, the Court will review what took place concerning her as a precaution. Her voir dire took place on February 27, 2012 at page 101 of the transcript. The Court is aware she is a female but does not know her race.

She discussed physical problems with her knees and that if she sits a long period of time it causes a lot of pain. There was discussion about this. Mr. Cooke

opposed a cause excusal and the State noted it was a "close call", but given the Defendant's position there was no State challenge for cause.

In the end, Mr. Cooke did not exercise a peremptory challenge, but noted her medical issues and she was "a little hesitant on a lot of questions". The Court noted "she was kind of all over the place." There was no complaint when the State exercised a peremptory challenge.

There is nothing to suggest any discriminatory intent in the State's peremptory challenge. So, abandoned or not, there is no *Batson* issue concerning Ms. Carey.

The Court has reviewed the voir dire of <u>all</u> of the potential jurors which took place over many days. There is no pattern of discrimination by the State. In looking at the complained-of strikes, the Court can find no purposeful discrimination. There is no merit in the claims of discrimination as to the aforementioned jurors.

Since the Court has found no discriminatory intent by the State and no error by Judge Tolliver, the Court does not find appellate counsel were ineffective for not pursuing *Batson* claims in the Supreme Court.

Had appellate counsel raised any or all of these *Batson* claims, the Court concludes the Supreme Court would have found no error. Therefore, the Court finds no ineffectiveness in not raising these claims in the Supreme Court and finds no prejudice.

The *Batson* claims against the State are all denied. The ineffective assistance of appellate counsel for not raising Ms. Sheppard in the appeal is procedurally barred under Rule 61(i)(3). Alternatively, all arguments are denied on the merits.

Finally, the Court denies the claim of ineffective trial counsel as it pertains to all of the above. During jury selection, Cooke was *pro se*. It is now alleged that when his *pro se* status was revoked and trial counsel took over, they should have attacked the State's peremptory challenges as *Batson* violations. What is being argued is nonsensical. The jury had been sworn. The openings were made and there were three days of testimony. To think that you could then revisit and rearrange the jury is unrealistic.

## DEATH QUALIFIED PROCESS RESULTED IN A
## JURY PREDISPOSED TO FIND MR. COOKE GUILTY

## AND

## TRIAL COUNSEL AND APPELLATE COUNSEL WERE INEFFECTIVE
## FOR NOT LITIGATING THIS ISSUE

The Court will start with a denial of this claim as well as a determination trial and appellate counsel were not ineffective.

First, the Court has not found that the voir dire process was tainted by the State by way of discriminatory *Batson* premptory strikes.

Second, the Court has not found the Court's excusal of potential jurors was improper.

Third, present counsel argue that social science proves that jurors qualified to sit on a death penalty versus life imprisonment case are predisposed to find a Defendant guilty. The United States Supreme Court in *Lockhart v. McCree* rejected the argument that the death qualification process of selecting a jury in a capital case produced a guilt-based jury. *Lockhart v. McCree*, 476 U.S. 162 (1986)("*Lockhart*"). The Delaware Supreme Court agreed. *Blount v. State*, 511 A.2d 1030 (Del. 1986)("*Blount*").

Fourth, the defense argument, if accepted, would result in revisiting every capital jury trial resulting in a conviction regardless of what happened in the penalty

phase, including those cases where defendants initially were sentenced to death prior to the determination our capital punishment sentencing laws were unconstitutional.

The Court does not find trial counsel ineffective because (i) at the time they were stand-by counsel and (ii) this is an argument that has no traction under *Lockhart* and *Blount.* The same applies to appellate counsel. Lawyers are expected to make their best arguments and not every conceivable argument.

This claim is denied on the merits based upon the law of the land in 2012 per *Lockhart* and *Blount.*

## THE 911 CALLS

The 911 calls by a person who Rochel Campbell identified as Cooke broke open the case. Rochel Campbell was his significant other who had known him for ten (10) years and had three children with him. Detective Rubin, who had spent hours interviewing the Defendant following his arrest, also testified it was Cooke on the 911 calls. The jury also heard the tapes and had the opportunity to hear the Defendant speak many times in Court.

## 911 CALL

**May 1st, 2005-a hang-up call at 12:44 p.m.** This is approximately the time Ms. Bonistall's body is found in the collapsed bathtub by the fire investigator. It is made from a cell phone later tracked to Alan Sentel's phone number.

## 911 CALL

**May 2nd, 2005-5:41 p.m.-The day after Ms. Bonistall's body is found. This call also came from Alan Sentel's phone number.**

The caller wants to speak to Detective Rubin who is not available, and the 911 call cannot be transferred so the caller tells the operator information that ties together the Harmon burglary, Cuadra burglary, and Bonistall murder. Below is a list of the information provided:

- Body at Collins (College) Park apartment;
- I could tell you who killed that girl;

111

- House broken into on Friday night; Miss Carolina owed us money for drugs. (Carolina was Ms. Cuadra's roommate; when told to take off her clothes Ms. Cuadra yelled "Carolina");

- Went into another house, but lady was not there. Her name was Cheryl. (Cheryl Harmon's rings were stolen. One had "Cheryl" on the band, the other was her high school class ring with her name on it);

- White power (white power written on Ms. Bonistall apartment wall);

- They wear gloves and hoodies;

- They tied the girl up and killed her;

- KKK ("KKK" also on Ms. Bonistall's apartment wall).

In this 911 call, the burglary of Ms. Harmon's apartment, the burglary of Ms. Cuadra's apartment, and the murder of Ms. Bonistall are apparently known by the caller; thus, this provides a lead tying the three cases together.

**911 CALL**
**May 7, 2005   10:44 a.m. (not Sentel's phone number)**

The caller provides the following information to the operator:

- Robert Selby from Chester is "invading" homes;

- Other guy is Jay Adams (a relative of Defendant has same name);

- Light-skinned black male involved;

- Guys live in Chester; work at Plus Food on Avenue of the States in Chester;

112

- Caller provides names that Newark PD would be interested in, all live in Chester;

- Caller says his name is "John Warn."

## 911 CALL
**May 7, 2005    3:43 p.m. (not Sentel's phone number and a different cellphone from 10:44 call)**

The caller identifies himself as John Warn and reports the following:

- I called earlier;

- Couple guys bragging;

- Detective Rubin informs caller of $10,000 reward;

- Caller says "something about a killer;"

- Caller says using pay phone at State Avenue and Wood Street;

- Detective Rubin says stay on phone;

- Caller says "ok" but hangs up.

The May 7 calls were tracked to a cell tower in Chester. The Defendant is placed in Chester by way of an unused Septa train ticket found on the Defendant when he was arrested. It could only have been purchased in Chester.

When the police heard the May 2nd call mentioning three (3) crimes occurring in the previous days, they concluded they were all connected. Therefore, the ATM photo of the intruder at Ms. Cuadra's apartment became the key to solving these crimes. That ATM photo was hours after the Cuadra burglary, not days later.

113

As noted earlier, several people who knew Mr. Cooke identified him as being the person at the ATM machine, including Ms. Campbell. Ms. Cuadra identified the person at the ATM machine as the intruder at her apartment. So, the 911 calls the Defendant made in an effort to point to white supremacists as the culprits backfired badly. The search for Cooke began.

## 911 CALLS AND CELL PHONE TECHNOLOGY

On May 1, 2005, there was a 911 hang-up call from 302-293-0223. It was determined it came through the call tower on Elkton Road, less than a mile from Cooke's residence. While there was testimony the closest tower might not always be closest to the cell phone being used based on signal strength, this tower was very close to Lincoln Drive. This 911 call was made at 12:44 p.m., just prior to Ms. Bonistall's body being discovered. It was made during the time the Fire Marshall had summoned Detective Rubin based on the wall writings. Their vehicles would have been visible from Cooke's residence.

On May 2, 2005 at 5:41 p.m. another call was made to the Newark 911 Center. This also came from 302-293-0223. This is the call that broke open the case in that the caller tied the Harmon, Cuadra, and Bonistall crimes together. So, whoever made that call was the prime suspect.

The police quickly learned that 302-293-0223 was for a Nextel cell phone assigned to a magazine distributor and that company assigned it to Alan Sentel, an

employee. The police immediately visited Mr. Sentel, but they were initially coy about their interest in his phone.

Mr. Sentel was cooperative. He turned over his cell phone. After a police investigation they could find no record of that physical phone having made any outgoing 911 calls. The investigation deepened and he agreed to a DNA test. His DNA was not a match to that found in and on Ms. Bonistall. Mr. Sentel and his family were interviewed as to his whereabouts the night of the Cuadra home invasion and Bonistall murder, both occurring approximately at 1:00 a.m. and one day apart. He had an alibi, *i.e.* home in bed at 1:00 a.m. in Wilmington.

So how could this be? The jury learned that cell phone numbers and internal ID numbers are owned by the phone carriers. These numbers are recycled into phones purchased by new customers when the former customers abandon their call service.

Also learned was that any out of service cell phone (if charged) is required to be able to make a 911 call and any nearby cell tower will pick it up regardless of whether the tower is operated by a different carrier. The number 302-293-0223 and the ID number had been previously assigned to other customers before it eventually landed in Mr. Sentel's hands.

The jury was informed that an out-of-service cell phone that had previously had these numbers would show 302-293-0223 (to the call center) if it made a 911

115

call.  Thus, it was determined an out-of-service cell phone made the May 1 and May 2 calls and NOT Mr. Sentel's physical cell phone.

Prior to the second trial, the Sentels divorced and it was not pretty.  Ms. Sentel changed her story and no longer supported Mr. Sentel's alibi.  The police interviewed her and provided their report to the defense's trial team.  They followed up and determined she was not credible and they did not call her as a witness.  In the post-conviction pleadings, this change by Ms. Sentel was revisited and an affidavit on same was filed, creating suspicion Mr. Sentel was involved in the crimes.  An attorney was appointed for her as a perjury charge was a potential possibility.  When she was to testify in the postconviction hearings, postconviction counsel met with her immediately beforehand.  The Court was then informed she would not be called as a witness and her affidavit was abandoned.  That ends these allegations and the alibi stands.

As an aside, Mr. Sentel is white.  Ms. Cuadra reported the intruder in her home invasion was a light-skinned African American with freckles.  The State alleged, and the jury found, that the same person committed all these criminal episodes and that was Cooke.

### IT'S NOT OVER
### The Technology Wrinkle

The defense presented a cell phone expert who opined it was wrong to conclude Sentel's physical cell phone did not make the May 1st and 2nd 911 calls.

Cell phone carriers have developed technology that tracks an incredible amount of data on each call that is kept in their internal records. A fraction of this data ends up on the customer's billing statement. The expert testified if an out-of-service cell phone with the internal ID number and phone number the same as Sentel's phone made the relevant calls, the data from those calls would not have shown up on the internal data in Sentel's customer records. But because data from the 911 calls did appear in Sentel's customer records, the witness claimed Sentel's physical phone was the phone used.

On cross-examination, this witness acknowledged what the call data records contain is dependent on the particular cell phone carrier and what records they want to retain. The witness had no personal experience with Nextel's record-keeping process and was never involved in developing protocols for generating Nextel records. He was just not familiar with what went on at Nextel.

The State's rebuttal expert was a Nextel employee during the relevant times of the calls, the Spring of 2005. He was familiar with the technology of Nextel's phone system. He testified about phone numbers being recycled and also an internal number owned by Nextel being recycled to future customers. If an out-of-service cell phone number makes a 911 call and that phone had either the phone number or the internal number the call would show up in Nextel's comprehensive call records for the current subscriber that has either number associated with their account. He

also testified that 911 calls do not show in billing.  The government does not permit any carrier to charge for 911 calls.

I accept the testimony of the expert who worked for Nextel and was familiar with their technology and record keeping.  I am satisfied Mr. Sentel's physical phone did not make the 911 calls.

Finally, the Court heard that if a 911 operator receives a hang up 911 call, that operator must immediately make a return call to the incoming phone number to make sure that caller is not in trouble.  If that protocol was followed and Sentel was the 911 caller the return call would have shown up on Mr. Sentel's phone and records, but there is no record as to a call back.  If that protocol was followed and the 911 call was made by an out of service cell phone, the call would not have gone through.  The out of service call phone can only make 911 calls.  It cannot receive any incoming calls.

The conclusion is that the technology, as well as the testimony,  evidence that Mr. Sentel is innocent.

Much time, energy, paperwork has been expended to point the finger at Mr. Sentel.

All of these claims have no merit and are denied.

Trial counsel are alleged to have been ineffective for not seeking to suppress Cooke's statement to the police on the grounds he was incompetent and therefore could not comprehend *Miranda*.

The Court has decided herein that Cooke was competent; therefore, this argument fails. Also, the Court questions how was counsel to accomplish this suppression filing if there was not, and would not be, any mental health evidence at all.

Trial counsel did file a motion to suppress. The Defendant abandoned it when he went *pro se*. He wanted the jury to hear his statements. In fact, his opposition to the suppression motion was one of the reasons he became upset with his attorneys which led to him deciding to proceed *pro se*.

Trial counsel are criticized for not renewing the suppression motion after day three when Cooke's *pro se* status was revoked. This would have been impossible because once Cooke said he wanted the jury to hear his statement they did learn about it in the opening statements. It was too late to close the barn door. Cooke does not get a do- over because of his strategy. Counsel did work with the prosecutors to clean up the statement so that prejudicial remarks by the police were omitted. Cooke originally wanted the entire 4 ½ hour tape presented to the jury. Counsel on both

sides pared it down to 1 ½ hours. See March 28, 2012 transcript at p. 167 where counsel informed Judge Toliver of their agreement.

**THE DEFENDANT'S TESTIMONY AND CREDIBILITY ISSUES**

The Defendant testified. He denied committing the Harmon burglary, the Cuadra burglary, and the rape and murder of Ms. Bonistall. He testified he knew Ms. Bonistall. He visited her at her apartment at 10:45 p.m. on Friday, April 29, smoked marijuana with her and engaged in consensual sexual intercourse with her during an hour-long visit. He left at 11:45 p.m. The sexual intercourse was on Friday night which would explain the DNA evidence found inside Ms. Bonistall after her body was discovered on Sunday afternoon.

As to Ms. Cuadra's backpack that was stolen in the home invasion of her apartment in the very early morning of Saturday, April 30th, he testified that he was home with Ms. Campbell, an accident occurred which he could see out the window because it was on Lincoln Drive, that he went out to see what was happening, and the police were talking to two young men. "At that time, they threw whatever, the bag out, whatever it was. I took the contents to the house." All of this was his explanation as to how he came into possession of Ms. Cuadra's backpack which was stolen an hour or two earlier. He further testified that there was no discussion with Ms. Campbell about the ATM card and he never attempted to use it. He acknowledged he told the police all of this happened at around 11:00 p.m., but testified at trial it could have been around 2:00 a.m.

121

He testified he never told Ms. Campbell to bring his clothes to his sister's house in Wilmington where two hoodies were seized by the police. He further testified he did not have any hoodies.

He acknowledged he told the police he did not know Ms. Bonistall. He denied knowing her a dozen times during his police interview. He testified when he visited Ms. Bonistall at 10:45 p.m. on April 29th, Michael Skogan was present, but left and that Ms. Bonistall was drunk having been out partying.

On cross-examination the Defendant's credibility was put to issue in numerous ways.

(a) In his June 6 police statement, he said the accident at Lincoln Drive was probably at 11:00 p.m. which conflicted with being with Ms. Bonistall from 10:45 to 11:45 p.m.

(b) In his June 6 statement, he denied having obtained a backpack at all but admitted a credit card was thrown out of the window and he took it. At trial he testified the backpack was thrown out of the car while the police were present, and he took it but got rid of it because Ms. Campbell said she did not want it in her house. He denied any discussion of the card with her or attempting to use it. This was contrary to Ms. Campbell's testimony and more importantly contrary to the ATM photographs of a person attempting to use that stolen card in the early morning of April 30th, not

122

long after the burglary of Ms. Cuadra's apartment.  Numerous people identified that person as Mr. Cooke, including Ms. Campbell, with whom he had lived for ten (10) years, as well as the managers at his place of employment.

(c) The person in the photograph attempting to use the ATM was wearing a hoodie and gloves.  Mr. Cooke denied owning a hoodie which he acknowledged was contrary to the testimony of numerous witnesses, including Ms. Campbell, Jim Jones, Latoya David, and Sonja Vidal.  He denied he had Ms. Campbell bring him two hoodies to his sister's house. Those hoodies were seized by the police.

(d) On cross-examination, he acknowledged that in letters that he had written, he used the word "are" instead of "our".  Also, he acknowledged he used "what" instead of "want" and vice versa.  The prosecutor then covered that the writings on the walls of Ms. Bonistall's apartment and Ms. Harmon's apartment contained "are" for "our" and "what" for "want".

(e) Finally, he stuck to his testimony that on Friday evening, April 29th, he visited Ms. Bonistall at her apartment and had consensual sex with her despite the following evidence the prosecutor reviewed with him:

(1) He told the police a dozen times in his June 6th statement he did not know her.

123

(2) Ms. Bonistall's cell phone records evidenced seven (7) calls attempted to be made, or were made, between 11:27 p.m. and 11:40 p.m. This was during the hour he said he visited with Ms. Bonistall and when he said she was being "attentive" to him.

(3) Mike Todd from Home Grown Café, where Ms. Bonistall worked, testified that the time clock records for Ms. Bonistall evidenced she worked on April 29th, having started at 5:10 p.m. and clocking out at 11:28 p.m.

(f) The Defendant acknowledged that none of Ms. Bonistall's friends knew of him.

While there was other evidence in the State's case that was contrary to what Mr. Cooke testified to before the jury, the aforementioned was highlighted while he was on the stand. His credibility was an issue for the jury to decide as well as the potential skepticism that he could explain his possession of Ms. Cuadra's stolen backpack by saying that while the police were investigating an accident and talking to two young men, one of them threw out a backpack to which he walked up, took, and walked away with.[6]

---

[6] Ms. Campbell reported her questioning Cooke as to this explanation of coming into possession of Ms. Cuadra's backpack.

# INEFFECTIVENESS OF TRIAL COUNSEL AS TO
# COOKE'S TESTIMONY (B)

Cooke testified that he visited Ms. Bonistall the Friday night before her murder on Sunday between 1:00 a.m. and 2:00 a.m. Present counsel acknowledge that the State took the Defendant's story apart by showing where Ms. Bonistall was during the 10:45 p.m. to 11:45 p.m. time period he said he visited, smoked wet marijuana with her, and had sex with her. They basically acknowledge that Cooke could not have visited Ms. Bonistall on Friday night, April 29, between 10:45 and 11:45 p.m.

Nevertheless, they argue that Cooke was with Ms. Bonistall, but he was confused and the date was really Saturday night before she was murdered between 1:00 a.m. and 2:00 a.m. If trial counsel had gotten Cooke evaluated by a mental health expert they could have put forth the theory of his poor memory and then argued it was Saturday night he visited her.

But had Cooke testified he visited Ms. Bonistall between 10:45 – 11:45 p.m. on Saturday to smoke wet marijuana and have sex with her, or had his attorneys argued it was really Saturday night, the State would have taken this apart, also.

First, I review below what he told the jury as to his visit on Friday night:

- Mike Skogan was there when Cooke got to the apartment. Skogan then left. (Skogan denied this, testifying he never met the defendant).

- Was there 10:45 – 11:45 p.m.

- Smoked with her: wet marijuana (*i.e.,* laced with PCP or embalming fluid).

- Said Ms. Bonistall was drunk before he got there. She had come from a party.

- He had sex and he went home.

What the jury heard as to Ms. Bonistall's last night on earth, Saturday night:

- She was the hostess at Home Grown Cafe that night and had to be "dressy"; *i.e.*, no sweats or ball cap.

- Mike Todd worked there also that night.

- She clocked in and out of work that day: in at 5:11 p.m. and out at 9:45 p.m.

- She gave Mike Todd a ride to his apartment. She smoked marijuana with his roommate(s). She hung out ½ an hour to ¾ an hour. She dropped Mike Todd off at his destination on Cleveland Avenue. He thought it was probably at 10:45 p.m., about an hour after clock-out.

- She went to her apartment and changed clothes because when she arrived at the Harrington dorm on campus to visit her girlfriends she had on sweats, a ball cap, and flip flops. She had received a call at 11:09 inviting her to the dorm. She said "Ok" but would finish eating her chicken. In the Defendant's Motion it is argued, she was home by the 11:09 call and, given

126

she made something to eat, she likely arrived earlier. She does not tell her friends she has a visitor. She finished eating and drove to the dorm. That drives takes about ten (10) minutes. At 11:42 p.m., she arrives at the dorm and calls her friends because she forgot to bring a movie. They say come on up. She did.

- At the dorm, her friends say no drinking and no pot. She had a project to work on the next day, Sunday.

- She left after Saturday Night Live is over at 1:00 a.m.

- The drive back to her apartment takes about approximately ten (10) minutes.

Had Cooke testified, or his attorneys argued, his rendezvous with Ms. Bonistall was Saturday night, not Friday night, the State would have taken that apart, also.

She goes to her apartment after dropping Mike Todd at his destination on Cleveland Avenue at 10:45 p.m. The drive time back to her apartment is unknown exactly but must be considered. She prepared something to eat. She gets the invite to the dorm at 11:09 p.m. In that approximately twenty-four (24) minutes, she drives home and prepares food. There is not any time to do what the Defendant says was done. She finishes eating and drives to the dorm, arriving at 11:42 p.m. There are thirty-three (33) minutes for her between 11:09 and 11:42, minus the drive time to

the dorm of approximately ten (10) minutes (*i.e.,* leave her apartment, go to her vehicle, and drive to the dorm across town).

There was no 10:45 – 11:45 p.m. rendezvous Friday or Saturday. There was no coming home drunk from a party. There was no Michael Skogan. There was no wet marijuana in her at the autopsy. At trial, Cooke was emphatic it was Friday night and on cross-examination was certain eight (8) times the rendezvous with Ms. Bonistall was between 10:45 p.m. till 11:45 or 11:48 p.m.

We have nothing from Cooke establishing that he somehow mixed up Friday with Saturday. The psychiatrist who evaluated Cooke for this postconviction motion said nothing about a poor memory. Dr. Eichel reported he "had a pretty good memory." In the first trial Dr. Mensh tested him and found his memory within normal range.

Present counsel are grasping at straws. Lawyers just cannot suggest that Saturday night would work better than Friday night without evidence. The fact is his story does not work for either night.

The testimony from the trial witnesses supports that Ms. Bonistall had no prior contact or relationship with Cooke other than what he says.

Trial counsel were not ineffective for failing to suggest Mr. Cooke had Friday and Saturday mixed up.

# ROCHELLE CAMPBELL
## VOLUNTARY STATEMENT TO POLICE
## VOLUNTARY CONSENT TO SEARCH

On June 6, 2005, Ms. Campbell spent a great deal of time with the Newark Police Department. When they came to her home and asked to search it, she told them to get a search warrant. She was peeved with them because previously they had held her and her children up when she was walking home from an errand. She was upset that she had to wait on the sidewalk with her children for half an hour.

While waiting for the warrant, she and Det. Rubin talked and it turned out to be many hours of conversation about Mr. Cooke and the weekend of multiple crimes. After the warrant was obtained, the conversation voluntarily moved to the police station in order to be recorded.

She testified that Det. Rubin and she got along fine, but that the FBI agent (Ross) basically told her that he thought she was holding back and not fully cooperative. His comments were threatening. For example, he asked if she wanted to have her baby in jail and he stated she could potentially lose custody of her children. In the suppression hearing on February 1, 2006, she testified about her conversations with the police and her statement. Judge Herlihy found that regardless of the FBI agent's threats and abrasiveness, she voluntarily talked with the police. A theme was that the allegations of what Mr. Cooke had done overwhelmed her and she had a difficult time wrapping her head around it.

When they were finished at the police station, they returned to her home where the search was still ongoing. There were items the police had found that were outside of the permission granted in the warrant. They asked her for consent to take the items. She was cooperative and voluntarily consented. Judge Herlihy conducted a lengthy hearing on February 1, 2006 to explore the issues of whether her recorded statement was voluntarily given as well as whether her consent for the police to take items from her home was voluntarily given. He had the opportunity to observe her demeanor and he also asked his own questions. He found that her statement was voluntary and her consent given at her home was voluntary. The Supreme Court affirmed this ruling in *Cooke v. State*, 977 A.2d 803 (Del. 2009).

These issues were primarily fact-driven but ultimately, the judge applied the law to the facts and adjudicated the issue. There is no reason, legal or otherwise, to revisit his decision sixteen (16) years later. It was the law of the case from the Supreme Court. The police did not coerce her.

As an aside, had the Courts not made a rule change necessitating another judge be assigned, does anyone think Judge Herlihy would have wiped the slate clean and conducted the same evidentiary hearings again? Of course not, and likewise Judge Toliver could rely on Judge Herlihy's ruling.

Therefore, the issues raised in the motion as to the voluntariness of Ms. Campbell's statement and her consent are procedurally barred pursuant to Rule

130

61(i)(4). Rule 61(i)(5) does not provide a path to revisit the decision. There is no new evidence pointing to innocence.

In regard to digesting the allegations concerning Rochelle Campbell, the Court has studied the transcript of her statement at the police station given on June 6, 2005, the transcript of the evidentiary hearing in 2006 before Judge Herlihy in regard to the voluntariness of her police station statement and her consent to search, her testimony in the first trial in 2007 and her testimony in the second trial in 2012.

In these four events her recollection varied in some ways but was fairly consistent. Her statement in 2005 is more favorable to the Defendant. But she explained her reluctance to initially believe his involvement in these crimes.

## TRIAL COUNSEL'S EXAMINATION OF ROCHELLE CAMPBELL-2012

Trial counsel had the benefit of knowing to what she had testified in the first trial and in an evidentiary hearing prior to the first trial. Rochelle Campbell had a relationship with the Defendant over a 10-year period. She had three children by the Defendant and was pregnant with his child at the time of the weekend crimes and the interview five weeks later by Newark Police at her home and at the police station.

At the trial the defense questioned her about her statement at the police station on June 6 versus her in-court testimony.

Ms. Campbell testified that she was under a lot of stress the evening of the police interview. She had left her children in the care of a female Newark Police

Officer. At the police station an FBI agent made threats that if she was not truthful/cooperative she could lose her children and have her baby born in jail. The defense was able to point out variances in what she told the police before versus after the threats.

At trial, the defense focused on her first trial testimony[7] which was more damaging to the Defendant than her police interview statements, by reviewing what she told the police in 2005.

What is important is that trial counsel focused on the discrepancies, thus putting Ms. Campbell's credibility at issue. The jury, as the fact finder, knew of the differences in what she told the police in 2005 and to what she testified in 2012. Human nature being what it is, the fact that what she recalled varied in some areas is almost to be expected. Nevertheless, the variances were exposed to this jury.

The significant variances are as follows:

(a) At the police station she told the police that the Defendant did not leave the house Saturday night into Sunday morning, when Ms. Bonistall was raped and murdered. "I would honestly say he didn't go out that night".

At trial she walked that back with the explanation that because she was pregnant her sleep was on and off and that she could not have been awake the entire night. If she was sleeping, the Defendant could have left the house unbeknownst to her. She also

---

[7] Obviously the jury was not told there had been an earlier trial but a previous hearing.

testified that when the interview at the police station took place, she could not get her head around and accept the accusations the police were making about the Defendant. The fact is the jury heard of the discrepancy because of the Defendant's lawyers.  They were effective.

(b) The Friday night early Saturday morning Cuadra backpack burglary produced another variance in her recollection.  One version is that she was awake with the Defendant and around 2:00 a.m. Saturday she heard tires screech, saw police lights or flashing lights across Elkton Road and the Defendant went to investigate.  He returned 10-15 minutes later with a backpack.  The other version is that she was asleep, woke up, and came downstairs and the Defendant was sitting in a chair with the backpack beside the chair.

Regardless of whether she was watching TV with him and something occurred outside which he investigated, or whether she was awoken by tires screeching and found the Defendant sitting in a chair with the backpack, she was consistent as to the contents of the backpack/bookbag and her conversations with the Defendant about same.

What is important is that she established that the bag and its contents belonged to "Amelia" (Cuadra).  That bag had been stolen from Ms. Cuadra shortly before Ms. Campbell saw the bag and her conversation with the Defendant about it.  She

133

was consistent about a name tag or paperwork with the name Amelia.  She was consistent with the contents of the bag-diet pills, credit cards, iPod, cell phone.  More important than the name Amelia was her testimony about the credit cards.  He wanted to use them to get money at a nearby ATM.  She warned against it including cameras and not knowing the PIN.  She told him to get the bag out of the house.

He left and returned without the backpack and contents except for an iPod he intended to sell.  He told her he tried the card but was unsuccessful.  What is important is that the credit card company issued an attempted use alert on the victim's credit card because the victim reported it as stolen.  This resulted in the police getting film of a person trying to use the card at a nearby ATM.  Photos were made for posters which broke the case when the May 2nd 911 call tied the Caudra home invasion to the Bonistall murder as well as the Harmon burglary.  So, while there is a discrepancy as to whether he left and returned with the backpack, or had it already when she came downstairs, this is of minor consequence as compared to the balance of what took place concerning the contents of the backpack and the ATM photos.  The jury was aware of the variances because of trial counsel.  They were effective.

(c) At the police station she said she did not recognize the sweatshirt the person in the ATM was wearing, but later said she recognized the tag looking like a "Jams Sport" [sic] tag.

134

The change in her recollection was after the FBI agent's threats. The jury was aware of this because of trial counsel's cross-examination. Trial counsel was effective in revealing to the jury the variances in what she told the police.

(d) At the police station she told the police she saw no injuries on the Defendant following the weekend murder.

At trial, she testified that she saw scratches on his back when he was in the shower. This was significant because fingernail scrapings were taken from Ms. Bonistall in which DNA testing produced a very significant statistical probability it was the Defendant's DNA.

Her explanation as to why she did not tell the police about the scratches was similar to her earlier explanations: she just could not take it all in. "Maybe my mind wasn't open for all this stuff." The jury was aware of the variances in what she had initially said versus her later recollection and trial testimony. "I seen scratches on him." Also, she testified she asked him where he got the scratches and he said from one of the kids. Again, by way of her cross-examination, the jury was aware of the differences on this issue as to what she said in the recorded interview and what she later told the police and told the jury. One must remember the jury knew about the Defendant's skin/DNA being recovered from Ms. Bonistall's fingernails.

(e) While present counsel note that trial counsel did not cross-examine

135

her in regard to police officers providing some diapers and baby wipes as well as assisting her getting her electricity back on, the Court does not find that in the entirety of their examination, they are to be faulted for this.

This is discussed later in this decision.

Nor does the Court find the fact that counsel's failure to introduce a letter she wrote the Defendant shortly after the police interview was a critical omission because she was cross-examined on her communications with the police.

Shortly after Cooke's arrest and incarceration, Ms. Campbell wrote to him lamenting that she had told the police information that was potentially incriminating. She said in her letter she was pressured and coerced by the police to say what they wanted. Trial counsel had this letter but did not introduce it when Ms. Campbell was cross-examined. Therefore, trial counsel were allegedly ineffective. I will assume a *Strickland* prong one breach has been established in that it was reasonable to impeach what Ms. Campbell told the police with her own letter. But the prejudice prong of *Strickland* has not been established because trial counsel did cross-examine Ms. Campbell about the threatening police conduct concerning her potential arrest and losing her children. Counsel were not ineffective. The letter would have been cumulative. This claim is denied.

In closing, Mr. Figliola argued about how the police pressured Ms. Campbell in their efforts to get her to corroborate that it was Cooke in the ATM photo and his voice on the 911 call.

In summary, with what defense counsel was able to put before the jury, the Court cannot find prejudice to the Defendant. Counsel have discretion in the method and manner of cross-examination. Like Tide, it can always be improved but trial counsel cross-examined her on the variances in her police station statement and what she said at trial. Trial counsel cannot be faulted for not making a silk purse out of a sow's ear. The Court does not find trial counsel to have committed *Strickland* ineffectiveness in how they handled Ms. Campbell's testimony.

Finally, Ms. Campbell testified in the postconviction hearings. She was not all that helpful because in the many years that have passed she was unsure as to her memory versus her recollection being shaped by what she had read and what she has heard. She did testify her memory was better in 2005.

In response to a leading question of whether the police told her they would help in regard to the status of her section 8 housing, she answered: "I think I remember something to that effect." This was the first reference I can locate about any section 8 housing issues. We know nothing more or if this even occurred. Was her housing at risk because Cooke was not supposed to be living there? We do not

know. So, we are again left with nothing more than speculation as to this potential issue.

She confirmed she packed the containers containing Cooke's property which is discussed herein.

She testified Cooke did not ask her to bring the two hoodies she delivered to his sister and which the police seized. She said he asked for a coat which she could not find so she decided to take the hoodies.

She testified when the Division of Family Services contacted her, it was not about her parenting but about Cooke's relationship with the children.

She acknowledged writing the Defendant the letter discussed herein defending her police statement, *i.e.,* they pushed and coerced her to say things on things of which she was not sure. We also learned the Defendant and her family were upset with her for helping the police.

She testified about the events following the Cuadra home invasion and how Cooke came into possession of Ms. Cuadra's backpack/bookbag. In his communications with her, the Defendant said there was an accident involving the drunk boys running up on the curb and the police were investigating same. She testified she questioned him if the accident really happened: "… more so I was questioning him as to how if the police were out there only you know they were detaining the boys, how he was capable of walking away with the bag, basically".

This comment is telling as herein the Court expresses skepticism about his explanation to her about how he obtained possession of very recently stolen property.[8]

Finally, I note she was never questioned about the accuracy of the incriminating portions of her trial testimony.

All in all, we learned a bit of new information from Ms. Campbell. She also confirmed some old information. But nothing points to innocence. Nothing points to *Strickland* prejudice. Nothing points to revisiting Judge Herlihy's and the Supreme Court's rulings.

---

[8] Herein also is discussed the lack of any documentation of a police investigation of a vehicle or accident at this time and place.

## ROCHELLE CAMPBELL'S TESTIMONY WAS A
## PRODUCT OF POLICE COERCION

This is a repackaging of the previously denied attack that her statement and consent to search was not voluntary. The defense now argues that the police coercion resulted in false testimony by Ms. Campbell. I do not agree and repeat the jury was fully informed of Ms. Campbell's statements variances.

She did not say it was Cooke in the ATM photo used for the wanted poster just to please the police. She had immediately recognized him in the wanted poster at the Rite Aid drug store, this being prior to identifying him to the police, although reluctantly at first. She said she told Cooke to go to the police and explain how he got "Amelia's" backpack/bookbag.

She held her ground and refused to let the police search her home without a warrant.

She warned Cooke not to try to use the credit card at the ATM because he had no PIN number plus there were cameras.

On June 22, 2005 she told the Public Defender's Office investigator that she was upset because Cooke "put her in this situation and she was going to tell everything she knows," leading that investigator to conclude "I don't think this is going to be good for the defendant."

I do not conclude she was coerced to make a false identification of the Defendant in the ATM photo nor to falsely identify the Defendant's voice on the 911 tapes. More important is that these factual issues were before the jury.

This repackaged coercion attack is denied.

## COUNSEL FAILED TO INVESTIGATE AND PRESENT EVIDENCE MS. CAMPBELL'S TESTIMONY WAS A RESULT OF POLICE COERCION - STATE "SUPPRESSED" THIS COERCION

Dr. Deborah Davis, Ph.D., a professor in the Department of Psychology at the University of Nevada, is an expert in the field of eyewitness identification, memory, suggestion and false reports. She reviewed Ms. Campbell's police statement, suppression testimony and her testimony at both trials. She opined on the potential influences upon the testimony of Ms. Campbell that may have led Ms. Campbell to make false statements about Mr. Cooke or a false identification of Mr. Cooke.

She opined that Ms. Campbell's testimony was less probative because of the police tactics to get her to open up to them when she gave her lengthy statement at the police station.

She testified that Ms. Campbell was a vulnerable young lady when the police questioned her. She was pregnant with her fourth child with Mr. Cooke. She was tired and the interviews at her residence and the station went on for many hours. She was being questioned about "her man's" involvement in a horrible murder. She was uneducated.

She noted that Ms. Campbell's statements concerning Cooke as to identifying him in the ATM photo and identifying his voice on the 911 tape were initially less certain but became more certain after the police and FBI agent made threats. Those threats consisted of statements such as "do you want to have your child in jail," "do

you want to lose custody of your children," and "we don't want to arrest you but you may leave us with that choice." I agree these are powerful threats to a mother. I also am aware that Judge Herlihy was fully aware of her statements and the police tactics when he ruled that what she told the police and her consent to search the residence was admissible evidence and was not coerced. The Supreme Court affirmed this ruling. In my review of her statements and the testimony of Dr. Davis, the Court does not find Ms. Campbell's will was overborne.

While it is true that her inculpatory identifications of Cooke grew firmer after these threats, it is important to review why she was initially reluctant to open up. She did not want to get him in trouble, it was difficult to wrap her head around the accusations of murder, he was her man, her economic circumstances and what would she tell the children.

So, the bottom line from Dr. Davis was "maybe." Maybe her testimony is less credible if influenced by these threats and tactics of the police, but ultimately Dr. Davis admitted she could not opine on Ms. Campbell's veracity. It was not her job.

She is correct. That was the jury's job. Defense counsel brought out through cross-examination that what she told the police changed and became more certain following the police threats about her children and the potential of being arrested.

An expert was not needed to inform the jury of the impact such threats would have on any mother. The Court does not find that trial counsel was ineffective for

not having a witness such as Dr. Davis testify at trial. Also, it is a close line as to whether what she testified to at our evidentiary hearing would have been fully admissible at trial. This covers prong one of *Strickland*. As to prong two, prejudice, the Court notes that much of Dr. Davis' testimony was couched in maybe this and maybe that; thus, I do not find prejudice for not presenting such a witness. The most important part of Campbell's testimony, the threats, was known to the jury and argued in closing.

The Court does not find that the police tactics resulted in Ms. Campbell's identification of Cooke from the ATM photo nor her identification of his voice on the 911 tape. She was certain it was Cooke when she saw the photo based on the hoodie, gloves, shoes, facial features and being up on his "tippy toes."[9] She had known Cooke for ten (10) years. She had phone conversations with him. She was not a stranger whose identification could be more easily attacked.

To the extent present counsel argue she supported their claim that the police suppressed their coercion of Ms. Campbell, the Court finds Dr. Davis' testimony in no way supports this allegation.

This claim is denied.

---

[9] Cooke was identified by others based upon his distinctive tippy toe walk. He was severely burned as a child resulting in this signature walk. A witness that did not know his name at the basketball court called him "tippy toe man."

## THE STATE "CONCEALED THE NATURE AND EXTENT OF POLICE EFFORTS TO INFLUENCE MS. CAMPBELL'S TESTIMONY VIOLATING *BRADY*"

Ms. Campbell was Mr. Cooke's long-time significant other. Over ten years, they had three children and in June 2005 she was very pregnant with their fourth child. There was a lengthy recorded statement by Ms. Campbell at the Newark Police Station. There was an FBI agent present who made threats to Ms. Campbell about her children. This was known to the defense.

The police provided some diapers and baby wipes to her in the early weeks of the investigation. They helped get her electricity turned back on because it was necessary for one of her child's health (asthma). They did not pay her electric bill because it was paid by HUD. They did make phone calls to the housing authority. Whether done as acts of kindness or to ingratiate themselves to her it was known to the defense per the Public Defender's Office Memo of July 18, 2005. This was not concealed.

What she said in her statement and her trial testimony at times varied but the defense had her statement and she talked with defense investigators and most importantly, the defense had her testimony from the first trial on her relationship with Mr. Cooke. Her testimony covered the events of the evening of the Cuadra burglary, her voice identification of the Defendant on the 911 calls, and her identification of Mr. Cooke at the ATM machine shortly after the Cuadra burglary.

145

The criticism of trial counsel as to how they used what they had available is taken up elsewhere in this decision, but the Court does not find that the State withheld *Brady* material concerning Ms. Campbell.

This claim is denied as there is no factual basis for the allegation.

# BOUGHT AND PAID FOR

At some time in the weeks following Cooke's arrest, the police returned photos to Ms. Campbell that they had taken at the time the search warrant was executed. Additionally, they gave Ms. Campbell some wipes and diapers. Later, when Ms. Campbell came to the police station complaining that her electricity had not been paid by HUD, an officer made some phone calls, to get her power restored because her son had asthma. The Newark Police Department did not pay the bill. This was known because it was documented in a July 18, 2005 Public Defender Office memo.

Present counsel allege Campbell was bought and paid for. Also, alleged is that trial counsel did not make an issue out of this at all. The subject did not come up.

Whether the police helped her out of kindness or to ingratiate themselves to her is unknown.

Ms. Campbell's incriminating statement was made the first week of June. The Public Defender Office interviews with her evidenced she was upset with Cooke and not going to be helpful.

I do not find the assistance provided by the Newark Police Department was a motivating factor in her ultimate cooperation. I do not find that assistance created a

bias in favor of the police that trial counsel were ineffective for not exposing to the jury.

With the cross-examination by trial counsel of the threats made to Ms. Campbell during her statement, I do not find the failure to bring up the diapers, wipes, and electricity caused any prong two prejudice.

This claim is denied.

# INEFFECTIVE COUNSEL AND *BRADY* VIOLATIONS

At the 2012 trial, Cooke testified about the Cuadra backpack.

The Defendant lives at 9 Lincoln Drive.

He was watching TV and "my chair is faced towards the window." "Two young men ran up on the curb" "I looked up, I seen it". "I went out for like five or seven minutes, eight." "Officers were there talking to the two young men." "They threw the bag out and I took it." Where? "Right on Lincoln Drive" and he marked it on a map.

Detective Rubin testified that if you look out of the living room window at 9 Lincoln Drive, you see Lincoln Drive and out to Elkton Road. The window is at the front of the residence.

The defense now claims that trial counsel were ineffective for not investigating police reports as to the accident and the State committed a *Brady* violation for not providing records to corroborate this accident.

Much energy and time has been spent by the State in these hearings to address this issue. Discovery was ordered as to this claim.

The simple and complete answer is there was no accident in front of the Defendant's residence. At trial Detective Rubin testified there were no incidents or call outs for a Lincoln Drive accident or traffic stop in the Newark Police Department computer for the relevant time frame; i.e., 1:18 a.m. (the call in for the Cuadra home invasion) to 5:00 a.m.

149

With the allegations in the motion the Court learned that whenever an accident or incident occurs the police must "call in" the stop, location, etc. The computer then assigns an incident report number. Nothing was located on Lincoln Drive.

During the hearings we learned about a police pullover on Elkton Road but it does not fit the Defendant's testimony. The police observed a vehicle pull out of the Sunoco gas station which is closer to downtown and it proceeded on Elkton Road in the direction of Elkton. The vehicle had not turned on its lights so the police pursued it and it was stopped at Elkton Road and Short Street. Short Street is south of Lincoln Drive and therefore one cannot see it from the front of the Defendant's house out his front window. There was no accident involved in the stop.

This is not horseshoes and hand grenades and this stop does not corroborate the Defendant's sworn testimony it occurred on Lincoln Drive in front of his residence.

Rochelle Campbell, who was with the Defendant, did not see the accident, but did see flashing lights from the direction of Elkton Road. That is in the direction of Ms. Cuadra's residence where we learned many police cars had responded to her home invasion. Mr. Figliola closed noting there were flashing lights due to the police investigating the home invasion.

150

Ms. Campbell also pours water on what the Defendant said about the accident when she said she told him "James are you sure of the accident?" (A1233).

The bottom line is that there was not an accident involving the Newark Police on Lincoln Drive. Mr. Cooke had to generate a reason for his possession of the recently stolen property. There is nothing to corroborate his testimony.

Therefore, his attorneys were not ineffective for not locating corroboration of the Lincoln Drive accident. The State did not commit a *Brady* violation as there is nothing in the Newark Police Departments records of the police investigating an accident on Lincoln Drive.

These claims are denied.

## MULTIPLE CLAIMS AS TO MS. CUADRA

The night prior to Ms. Bonistall's murder, Ms. Cuadra was awoken with a flashlight shining in her face. Initially, she thought it was "Carolina," her house mate, but with the demand "Give me your money or I'll kill you" she knew there was an intruder. She gave him $45.00. Then he told her to give him her credit cards or he would kill her. She complied. Then, he told her to take her clothes off or he would kill her. She screamed for "Carolina," and the intruder ran. She discovered he also stole her bookbag or backpack.

She described the intruder as a light skinned black male with freckles. He wore a gray hoodie and gloves.

Numerous claims are made as to the photo lineup subsequently shown to Ms. Cuadra.

At the 2007 trial she testified she was shown a photo lineup to see if she could identify the intruder. She focused on two men. In her mind, her "first guess" was apparently the Defendant. After she thought about it, she went with another man. She said she was told afterwards that her first pick was James Cooke.

At the 2012 trial she said she had looked at the photographs and thought to herself about how light skinned the person was. One particular photo stood out (the Defendant). "The one that stood out to me, like here in my heart, was his, but I

second guessed myself and picked someone else." She had not been told the Defendant's name at that time.

Then it gets interesting. "Once I identified another photograph and they told me I was incorrect, I was like yep, it's this one. Then I went with my gut."

So, the summary from her testimony is she looked at the array, focused on the "light skinned" photo and thought it was the intruder, second guessed herself, and picked another photo, was told it was incorrect, and then picked her first choice, which was determined to be the Defendant's photo.

Now, as would be expected, the Judge was upset and called for a sidebar. Judge Toliver asked, "Did she say what I thought she said?" Obviously, the testimony that she was told she was wrong, and she picked another photo was what the Judge was upset about. The State attempted to say the defense knew the above because it was the same as the first trial testimony. The defense noted not exactly. In her first trial testimony there was no mention of the police telling her she was wrong, and then she went on to point out the Defendant's photo. This was not developed at the sidebar with Judge Tolliver and counsel. No ruling was made other than the denial of the State's suggestion that they be permitted an in-court identification.

Next came cross-examination which included questions concerning her entirely separate identification of the person in the ATM photo as being the intruder

153

in her bedroom.  Ultimately, as to the ATM photo, she was a nine (9) out of ten (10) that the photo at the ATM depicted her intruder.  This identification of the person at the ATM as being her intruder took place days after the home invasion and murder of Ms. Bonistall.  It was by way of the ATM photos that wanted posters were published and many people identified Mr. Cooke.

As to the photo lineup, which took place five weeks after the burglary, she reiterated on cross that she studied the photos, picked out someone, was told she picked out the wrong guy, then picked someone else (the Defendant).  She said she was not told which one to pick.

On redirect all of the photos at the ATM were again reviewed with Ms. Cuadra.  She was positive all the photos were of the man in her bedroom.

On recross as to the photo lineup, she testified that after she made her first pick and was told she was wrong, the police did not tell her to try again, nor did they ask her to look again.  She did it on her own.

Then the detective who conducted the photo lineup testified.  He turned her testimony upside down. He said he did not suggest to her who "was the right person" and that she did not pick anyone out of the lineup.  Neither did he identify who in the lineup was James Cooke.  Nor did she say anything about "I should have gone with my gut instinct."

The jury was left with two factual versions as to the photo lineup: Ms. Cuadra's recollection that she initially did not pick the Defendant, but when told she had not picked him, immediately, on her own, picked a photo of the Defendant versus the Detective who said she did not pick anyone.

In the Defendant's Appendix at A1159, the police report as to the photo lineup notes the following: the officer wanted to conduct a photo lineup prior to the Defendant's photo being published in the news media (he had just been arrested). Ms. Cuadra studied the array for at least four (4) minutes and said she could not pick anyone out; then she pointed to some of the photos and discussed why they could or could not be the suspect, but she was unable to positively identify any suspect. She was told of the recent arrest of a suspect but given no further information nor was the Defendant's photo identified to her.

The factual determination as to the photo lineup was up to the jury, but the Detective's testimony that no identification was made, coming from the Chief Investigating Officer, was the weightier of the versions in my opinion. It was the State telling the jury she was wrong. Although the jury did not have the police reports, those reports support his testimony and are evidence that the photo lineup was not conducted in the manner that concerned Judge Tolliver. The police reports and officer's testimony are evidence that the police did nothing wrong.

Nevertheless, the jury heard the competing recollections and made their own decisions.

Trial counsel are faulted for not having interviewed Ms. Cuadra prior to trial because if they had they would have known she identified someone other than Mr. Cooke as the intruder. This argument makes no sense at all because the motion also states trial counsel did know this. Her misidentification is in the transcript of the first trial. The Court does not find that counsel are to be faulted for not interviewing Ms. Cuadra.

Counsel are faulted for inadequately addressing Ms. Cuadra's identification as being a product of improper police influence. This is also meritless because nothing points to the police prompting her and asking her to try again. On recross she said she did this on her own. The jury heard the detective say she did not pick out anyone. The jury heard all of this. There was no *Strickland* ineffectiveness. Trial counsel could reasonably rely on her testimony at the first trial.

Finally, counsel are faulted for not seeking "to strike Ms. Cuadra's apparently corrective testimony belatedly identifying Mr. Cooke, or a curative instruction to the jury to disregard her trial identification in light of Detective Rubin's interference." The Court does not find that the officer "interfered" in the photo lineup and the police report supports his testimony that she did not pick out the Defendant at all.

The circumstances of how all of the above could have triggered counsel to successfully move to strike her second identification is unclear. It is a rare day that counsel could craft a reason to get only part of the testimony of a witness's recollection before the jury. I do not find trial counsel failed as to the *Strickland* prong one analysis. Sometimes it is necessary for the jury to hear it, warts and all.

Assuming after all of the testimony trial counsel are to be faulted for not moving to strike Ms. Cuadra's photo ID testimony involving Mr. Cooke, the analysis then goes to the *Strickland* prejudice prong.

The Detective's testimony to the jury that she did not pick out anyone was as good or better than having her testimony struck. Also, the jury heard her say her first pick was not the Defendant in the photo lineup.

The real problem for the defense was this witness identified her intruder from the ATM photo when that person tried to get cash with her cards. Her testimony was based on the gray hoodie, the gloves, the puffy cheeks and the body build. The ATM photo was taken just hours after the burglary/robbery of Ms. Cuadra. The person in the ATM was dressed as the intruder was dressed. She identified the person in the photo as the intruder. Ms. Campbell, the mother of his children and significant other, identified Mr. Cooke as being the person in the ATM photo. Others he knew and/or who worked with Mr. Cooke also identified him from the ATM photo. In

this manner, Mr. Cooke was identified regardless of Ms. Cuadra's photo lineup testimony.

The next part of the Cuadra allegations is that a *Brady* violation took place because the State concealed the fact that Ms. Cuadra picked someone other than Mr. Cooke in the photo lineup.

This allegation is factually not correct. The motion alleges in the first trial Ms. Cuadra was unable to pick one of the photos as her attacker. At the first trial she testified she initially picked someone other than Mr. Cooke, but then discussed her "second-guessing" and ended up with Mr. Cooke. So, the defense knew she had picked out someone else. There was no *Brady* concealment.

Turning back the clock to the first trial, if defense counsel relied only on the police report, they could have been surprised at her testimony and perhaps argued a *Brady* violation. This is moot because in the second trial all was known. The jury heard her say she initially picked someone other than Mr. Cooke and on her own picked Mr. Cooke's photo when told "wrong guy."

Factually, the defense in the second trial was not blindsided. This claim has no merit and is denied.

Following the filing of this postconviction placeholder motion in 2015, the defense obtained an affidavit from Ms. Cuadra. It is dated November 16, 2016. As to the photo lineup she stated:

> I was asked to pick the person who I believed had burglarized my home, but I second guessed myself and chose the wrong person. After my initial selection, Detective Rubin told me that the person I picked was the wrong person and he pointed to the photo of James Cooke and told me "this is the guy who did it."

> My initial feeling was to go with Mr. Cooke's photo, but I second guessed myself and went with someone else. I believe the incorrectly drawn composite sketch affected my memory and as a result, my decision when picking out the photo from the line up.

The aforementioned conflicts with her 2012 trial testimony of the dynamics of what occurred at the photo lineup. It is another version of her recollection of the photo lineup that occurred eleven (11) years earlier i.e., 2005.

In 2022 she testified as a witness in this motion. Her testimony was similar to her affidavit.

The aforementioned is the problem with the years and years delay in the prosecution of this motion. The Court has considered her affidavit and 2022 testimony. The Court is satisfied her testimony in 2012 captures her recollection of the 2005 lineup. The jury knew she picked someone else and picked whom she thought was Cooke.

The jury heard from the detective that she did not pick out the Defendant, although she did talk about the photos.

A common jury instruction is when the jury hears conflicting testimony they should try to harmonize the testimony to make one harmonious report if that can be done.

It is my opinion that both witnesses may be correct and that what the officer's contemporaneous report on her pointing to photos and discussing why they could or could not be the suspect is what Ms. Cuadra's subsequent recollection is based on. That report concluded she could not identify any suspect.

The Court's conclusion is that her varying recollections do not change the Court's opinion that in 2012 the jury heard about her difficulties at the lineup and that the jury heard the detective testify she did not pick out anybody. The more recent recollections do not give rise to granting relief to the Defendant.

In summary, all claims involving the testimony of Ms. Cuadra are denied. There was no ineffectiveness of defense counsel nor any *Brady* concealment. Also, the Court does not find that the police officer interfered in the photo lineup process. His report was that she did not make an ID, but that she discussed with him several of the photos. The jury heard him say under oath no ID by her in the photo lineup.

Finally, once again this has been much, very much, to do about nothing.

In closing the State conceded that Ms. Cuadra did NOT pick Cooke at the photo lineup. The prosecutor told the jury "Mr. Figliola pointed out correctly that

Amelia Cuadra could not identify the defendant's face when she was shown a photo

lineup.  That is true."

This claim is denied.

# POLICE IGNORED, LOST, OR DESTROYED EVIDENCE

It is correct that there was a mistake concerning the police reports involving the laptop computer taken from Ms. Bonistall's apartment. The inventory references one IBM laptop. A search warrant application states a Dell laptop owned by Ms. Bonistall. The defense alleges there were three computers, an IBM laptop, a Dell laptop, and a Dell desktop. Only one was seized, hence, the police carelessness resulted in the loss of evidence the defense claims had the potential to exculpate Cooke. The State counters that the police reports document two computers, one was Ms. Bonistall's and one was her roommate's. The police had no probable cause to take and examine the roommate's computer. The Newark Police Department did have the State Police High Tech Unit examine Ms. Bonistall's computer and nothing helpful was found.

There is nothing to support the claim that the police error in documenting the laptops resulted in lost exculpatory evidence.

This claim is denied.

## WHY DIDN'T THE POLICE USE COOKE'S CELL PHONE TO TRACK HIS WHEREABOUTS DURING THE CRIMES?

The defense alleges the Federal Marshalls arrested the Defendant by "tracking" his cell phone and knew where to find him. The State says not so and that he was arrested near his sister's house in Wilmington because they had surveillance on that location.

The defense further argues that by tracking Cooke's cell phone there would be proof he did not commit the Harmon, Cuadra and Bonistall crimes.

The simple answer is Cooke did not have an in-service cell phone. When he became a suspect and left Newark, he took Ms. Campbell's phone. The 911 calls were determined to have been made from out of service cell phones.

I also note that if the defense is that Cooke had an in service phone that could have been tracked the defense has not presented any evidence to support this. If Cooke had such a phone he could have said so. He has not.

This claim has no factual basis.

# GINA DICONSTANZA

Ms. DiConstanza lived in an apartment across from Ms. Bonistall's apartment. The night of the murder she was on her balcony talking on her cell phone. She saw no one enter or leave Ms. Bonistall's apartment by way of the balcony. The defense faults the police for not getting her cell phone data to know exactly when she was talking on her phone. This is another "so what." If she did not see anything, she did not help the investigation.

This claim is denied.

## THE FAILURE TO INVESTIGATE THE "MYSTERIOUS BRAZILIAN MAN"

In the investigation there was information that a "Brazilian man" had worked at one time as a dishwasher at the Homegrown Café where Ms. Bonistall worked. There is no evidence one way or the other if they were working over the same time period.

He also was said to have worked at an Indian restaurant on Elkton Road and road a distinctive bike.

When Ms. Romeo was cross-examined she was asked about the Brazilian man. She said it was definitely not a Brazilian on the bike she saw in the ally prior to the fire trucks arriving. How she could say a person is Brazilian or not I do not know, but she was asked the question by the defense. The bottom line is this is another speculative theory that someone other than Cooke murdered Ms. Bonistall.

Based on the paucity of the allegation, the Court does not find the Newark Police Department dropped the ball in not investigating and locating the Brazilian man. Nor has the defense brought anything to the table regarding the "Brazilian man" in the seven (7) years since the postconviction motion was filed.

This claim is denied.

# THE MURRAY ROAD FIRE

The police thought a fire set in an outbuilding on Murray Road may have been arson to divert attention from the apartment fire.

There was a photograph of a man watching the fire from the street. Postconviction counsel alleges if this was so, the police did not follow up to try to identify this person. But this is incorrect. The Court heard testimony that the police did canvass the neighborhood to try to get an identification of the fire watcher. They had no success. There is no evidence that the fire watcher committed the relevant crimes.

This claim is denied.

# ALLEGATION:  MS. BONISTALL WAS KILLED
# FOR REVENGE

The motion raises many, many claims.  Many are speculative and border on the outrageous, such as Ms. Bonistall had a "life she kept secret from her college friends" thus, leading to her death.

One is that Ms. Bonistall played chat room games by setting up dates on chat rooms and then not showing up, thereby creating a motive for her rape and murder. There is no proof she did this and such grasping of straws is wrong.

This claim is denied.

# THE DEFENSE INVESTIGATION OF THE
# POLICE INVESTIGATION

Postconviction counsel presented the testimony of Robert Tressel. He was an experienced homicide detective and forensic investigator for the Medical Examiner, all in Georgia. Now he does consulting on police investigations. The majority of his work has been for defense counsel.

Much of his testimony was spent reviewing the possible suspects and tips that the Newark police investigated. He agreed that one must follow the evidence and "hone in" on where the evidence leads, but one should not get tunnel vision.

While he criticized the Newark Police Department, he provided no evidence that someone, other than Cooke, committed Ms. Bonistall's murder. His chief complaint was that there was not sufficient documentation when it was determined a lead or tip was not viable. He was of the opinion that more vetting should have been done of those persons who caught the Newark Police Department's initial interest.

Examples of what he said were shortcomings included:

- Failure to vet Ms. Bonistall's marijuana provider (a University of Delaware student)
- Not having a condom tested for DNA that a civilian said came from a person of initial interest, Warren.
- More vetting on Ms. Bonistall's male friends
- More investigation into the yellow rose
- Failure to follow through on a purse stolen at a party attended by Ms. Bonistall days before her murder. (It was not her purse and police had no suspects).

He thought Mr. Sental had been properly vetted and my impression is that he was of the opinion that the Newark Police Department should have done similar vetting and documentation with other potential suspects. I note a very hard look at Mr. Sental was necessary based on his cell phone number.

He was critical of the Newark Police Department for what he thought was moving too quickly on Cooke after the ATM photo and DNA results. But this evidence came late in May. During May the police were doing due diligence on tracking many potential leads.

The fact that the Newark Police Department did not meet his standards does not mean Cooke is innocent and that the real killer got away. Mr. Tressel's criticism of the Newark Police Department's investigation in no way supports granting the Defendant's motion.

Finally, as to the Newark Police Department's investigation, the defense alleges there was racial profiling and/or institutional closed mindness resulting in a focus only on Mr. Cooke and other leads were ignored. The evidence involving the dragnet and the many suspects, leads, and tips that were investigated puts an end to this allegation. Ms. Bonistall's murder needed to be solved and the investigation was widespread. Herein I have noted that work. However, when the ATM photo and the DNA was known of course the focus was on Cooke. Nevertheless, other leads continued to be investigated.

There is no basis to the claim that Mr. Cooke's arrest and conviction was a result of racial profiling.

## THE SEARCH OF THE CONTAINERS FROM COOKE'S HOUSE-MULTIPLE ALLEGATIONS

In Cooke I, the Supreme Court reversed the conviction because of the fractured relationship between Cooke and counsel regarding the plea of guilty but mentally ill. *Cooke v. State*, 977 A.2d 803 (Del. 2009). The Supreme Court ruled counsel could not change the plea to guilty but mentally ill over the Defendant's objection. However, the Supreme Court affirmed the trial Court as to the search and seizure of items from Cooke's residence at 9 Lincoln Drive. The Supreme Court ruled the search warrant as well as a valid consent to take items not included in the warrant were legal and valid reasons for the police to take the items from the Defendant's residence.

Despite being adjudicated by the Superior Court and affirmed by the Supreme Court, the present motion alleges trial counsel from both trials as well as appellate counsel on the first trial were all ineffective for failing to raise the point that Ms. Campbell could not consent to the search of plastic containers that had Cooke's property in them because he had an expectation of privacy as to the items in the containers.

Frankly, this is a stretch as the Supreme Court's ruling was broad, covering all items seized. I note that the warrant gave the police the authority to search for Cooke's property. Therefore, they could look into the containers for items which were the target of the warrant. Being adjudicated, it is barred by Rule 61(i)(4). It is

not saved because there is no new evidence creating a strong inference of innocence. It is dismissed.

Alternatively, the merits are discussed. It is difficult to conclude that Cooke had any expectation of privacy in the property he left behind when he knew the police were looking for him. He knew through Ms. Campbell they were coming to the residence looking for him. No testimony or affidavit by Cooke has been presented as to his expectation of privacy.

The Court made an inquiry as to who put his property into the containers. Defense counsel reported the only evidence that it was Ms. Campbell who packed the containers came from Detective Rubin, who testified that Ms. Campbell "pointed out where she had put Mr. Cooke's belongings into some plastic containers and pointed those out to us." (B-183).

The Court reviewed her statement at the police station. In it, she stated she put his things in a plastic container, a tote. "I packed his stuff and put it in the tote." (A-94). Therefore, he could have no expectation of privacy as to the containers.

Since he cannot establish an expectation of privacy, the issue is dead. There is no need to research what may have been in the container that may have been inculpatory.

In summary, the claims of ineffective counsel made against all six attorneys is denied. It is denied as procedurally barred because of the adjudication in Superior

Court and the Supreme Court and there is no new evidence even inferring innocence. Alternatively, the container argument fails because the only evidence we have is Ms. Campbell put his belongings in the container and thus, the Defendant had no expectation of privacy.

# HANDWRITING ON THE WALLS

In the early morning of April 26, 2005, Cheryl Harmon returned to her apartment that was near the Defendant's home as well as Ms. Bonistall's apartment. She discovered it had been burglarized and written on her walls in fingernail polish was "I what [sic] drug money," "Don't mess with my men," and "we'll be back."

Upon the discovery of Ms. Bonistall's body, the investigators found writings on her wall made with a marker. These writings were made just days following the Harmon burglary. "KKK" was written in several places. Other writings included "WHITE Power," "We want are [sic] weed back," and "More bodies are going to turn in [sic] up dead."

The State's handwriting expert opined Cooke probably made the Bonistal writings.

Prior to the first trial, there was a full hearing as to the qualifications of the State's expert on the handwriting as well as her methodology and conclusions. Additional attacks were made on whether her methodology was properly one of an expert. Finally, an attack was made on the Fifth Amendment grounds because the expert dictated to Cooke certain things to write down.

A comprehensive written decision was made by the Court. In a nutshell, the expert was found to be qualified and her opinions were ruled relevant and admissible. However, portions of what the expert had Cooke write were found to

have violated his right against self-incrimination and could not be used in her testimony before the jury.

At trial, the expert opined there was a strong indication that the Defendant "probably prepared" the Bonistall apartment writings. As to the Harmon apartment writings which were written in nail polish, she could not reach a conclusion whether the Defendant made the writings because of the dipping of the nail brush, but also, she could not rule him out.

In admitting her testimony, the Court noted: "Carter's evidence is but one piece in the larger puzzle which will assist the jury in deciding the issues of this case. At the same time, her testimony will not create unfair prejudice, be confusing or be misleading to the jury. It must be viewed in the context of all the evidence in the case."

The context of the case is important in determining the potential relevance of this evidence. The day after Ms. Bonistall's body was discovered, a 911 call came in and the caller's comments discussed three crimes: the Harmon burglary, the Bonistall murder, and the Cuadra home invasion which occurred the night before Bonistall was murdered. Information by the caller included wall writing. When the police believed the three crime scenes were linked by the caller, they focused on the caller as being the suspect in all three events. Hence, the Defendant was identified

175

by an ATM photo and his long-term girlfriend, and mother of three of his children, identified him as the 911 caller. Thus, the wall writings were tied to Cooke.

Also relevant was whoever wrote the wall writings used "are" for "our" and "what" for "want." Known writings or letters from Mr. Cooke evidenced that he had, in the past, mixed up the spelling of these words. There was testimony that a person who uses a misspelled word continuously does not know they are misspelling the word. Thus, there was another reason that the wall writing evidence was relevant.

In this claim, the first judge is faulted for making the wrong decision, first trial counsel are faulted for being ineffective, and appellate counsel are faulted for not appealing this issue. The second judge is faulted for adopting the earlier ruling and finally, second counsel and second appellate counsel are faulted for not doing more to revisit the handwriting ruling.

The Court finds that it was a reasonable judgment call made by second trial counsel to attack the wall writing evidence by attacking the expert's qualifications and her methodology. The expert whom second trial counsel retained informed them he agreed with Ms. Carter, the State's expert, which was an excellent reason not to call him as a defense witness.

Mr. Khody Detwiler is a handwriting comparison expert[10] called by the defense to testify in the postconviction hearing. He agreed with Ms. Carter as to the wall writing at Ms. Harmon's residence. The constant dipping of the fingernail brush in the nail polish bottle resulted in a writing that was impossible to compare. As to Ms. Carter's opinion on the Bonistall wall writings, Mr. Detwiler agreed that it was more likely than not that Cooke had written the same. He criticized her opinion on "KKK" (Q 5-7) but agreed that the unknown (Q 1-4) were more likely than not written by Cooke. He disagreed with the terminology Ms. Carter used on how certain she was that it was Cooke's handwriting.

Overall, there is some criticism by the current defense expert, but the reality is had he been hired before trial, he would have basically agreed with Ms. Carter. That is what trial counsel learned from the expert they did retain. Thus, the State's expert, trial counsel's expert, and post-conviction counsel's expert were all on the same page. Trial counsel's decision to attack the State's expert by cross-examination only was therefore reasonable. Trial counsel were not ineffective under prongs one or two of *Strickland*.

This claim is denied.

---

[10] Postconviction counsel also presented the testimony of Professor Mark P. Denbeaux. He is a professor of law at Seton Hall University. He studies deficiencies of forensic document examiners, among other things. His opinion was that nobody can offer reliable handwriting analysis. I disagree as it is contrary to the rulings of the Delaware Courts.

# OTHER BURGLARIES IN NEWARK

The defense makes a flood of allegations concerning burglaries going on in Newark in April and May 2005. It is alleged police ignored any connection between these other burglaries and the Cuadra/Harmon/Bonistall burglaries.

The police were led to the connection of these three crimes by the 911 caller. They did not know it was Cooke until they obtained the ATM photo of the person whom Cuadra identified as the intruder trying to use her credit card hours after the home invasion and then Ms. Campbell and three others identified Cooke in the ATM photo.

The claims that had the police linked other burglaries to Bonistall they would have found who really killed Bonistall is just pure speculation and conjecture. One could likewise speculate that Cooke did these other burglaries, but that is not proof. Likewise, the defense has failed to connect any of these other crimes in Newark to the Cuadra and Harmon crimes, much less Ms. Bonistall's murder. Therefore, it is unnecessary to catalog these claims.

The claims that the police failed to connect other burglaries to the three in this case fails for a lack of proof and are denied.

## <u>DEFENSE COMPLAINTS OF POLICE REPORT</u>
## <u>REDACTIONS</u>

Throughout the postconviction motion, the defense repeatedly complains of redactions to the police reports the State provided to the defense.  The defense complains trial counsel should have raised and forced the State to provide unredacted police reports.  Simply put, the defense is not entitled to any police reports per Superior Court's discovery rule.[11]  The fact that the State did agree to provide redacted reports does not create a right to unredacted reports.   When provided, police reports are helpful for the defense, but the fact they are provided at all does not translate into a right to have everything.  Nor does the State have to disclose the names of its witnesses to the defense.  *Liket v. State*, 719 A.2d 935 (Del. 1998).

Brendon O'Neill, Esquire, first trial counsel, confirmed all of this when he testified.  You just cannot force the State to give you unredacted police reports.

Also, the State is correct that the Victim's Bill of Rights protects victim and witness identifying information.

The only exception to the rule that both parties in a criminal case can hold their cards and witnesses close to the vest is the *Brady* obligation imposed on the State.

---

[11]*Super. Ct. C  Rule 16(a)(2).*

Finally, Mr. Figliola testified that the State never declined a request for more information when he asked for it, including redacted information.

As to *Brady*, on July 9, 2021, this Court conducted an all-day hearing in regard to the defense 88-page discovery motion. Counsel for the State affirmed the State's compliance with *Brady*.

Defense counsel does not get to review the State's file for compliance. *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). The Court does note that since the July 9, 2021 hearing, the State has been cooperative in providing more information for the defense, but some difficulties have arisen based on potential records being sixteen (16) years old. The Court is appreciative of the efforts to obtain that which the defense sought, and the Court is satisfied that the information provided to the defense in the course of these hearings was not *Brady* material.

# DNA – COUNSEL'S INEFFECTIVENESS

The defense alleges that trial counsel "failed to adequately challenge the State's DNA evidence." There are numerous claims as to why counsel were ineffective.

A claim is that since the Defendant testified that he had a sexual relationship with Ms. Bonistall two days before her body was found, the defense should have had a DNA expert testify that his sperm would have been detectable for several days.

But, there was no evidence that had the Defendant had intercourse on Friday night his sperm would have been undetectable at the autopsy. The defense called a medical examiner at these Rule 61 hearings. His testimony about the vitality of sperm in a living female and a dead female raised a question of whether any sperm would have survived from Friday night to the autopsy on Monday afternoon. This argument has minimal traction, and an expert could not testify as to when the sperm was deposited into Ms. Bonistall's vagina. It was the Defendant's testimony of his relationship with Ms. Bonistall that the defense relied upon and I do not find trial counsel to have committed a *Strickland* prong one error by not calling an expert for this purpose. As to *Strickland* prong two prejudice, the defense now basically concedes the State took apart the Defendant's testimony of the one-hour Friday night rendezvous at Ms. Bonistall's apartment, but seemingly blame trial counsel for not

having testimony Cooke was mistaken and it was Saturday night before she went to the dorm to visit her friends.

Another claim the defense argues is that the DNA results evidenced consistency with Mr. Cooke being the contributor of the sperm found in the vagina, but that low level peaks in the DNA profile may represent proof that an unknown third party contributed to the sperm.

There are several problems with this allegation. One is that it ignores Mr. Cooke's testimony that he had intercourse with Ms. Bonistall. The defense argues had an expert been retained he would not have been "forced" to testify. This present claim ignores the fact that he chose to testify against trial counsels' recommendation in both trials to say he had a relationship with Ms. Bonistall. He told trial counsel in the second trial from the get-go he was going to testify and ignored their advice not to testify. He was emphatic he was going to testify to consensual sex. No circumstances forced the Defendant to testify and with his position known, it was not unreasonable for trial counsel to not present a DNA expert. Therefore, there is no *Strickland* ineffectiveness as to this claim. The Defendant basically told the jury his sperm would be in her based on his Friday night visit. The jury was aware from the expert testimony his DNA was in Ms. Bonistall. They concluded it was from him raping her, not consensual intercourse. This claim fails.

The defense argues that the mixed sample of DNA found from Ms. Bonistall's fingernail scrapings do not necessarily point to Mr. Cooke, and the jury was not informed of same. This is not correct. The mixed sample contained Ms. Bonistall's DNA and the DNA of another person. This mixed sample produced a statistical analysis that basically said 1 out of every 1.64 billion African Americans would match the profile obtained in the DNA analysis as to that other person. Mr. Cooke's profile matched that analysis on the DNA, so the jury knew he was included as a potential contributor along with 1 out of 1.64 billion others.

The DNA laboratory protocol had empirical standards that require a mixed sample to have a probability that excluded 99% of the population in order to make an analysis and report same. The State's expert testified this threshold determination is consistent with *State v. Roth,* 2000 WL 970673 (Del. Super. May 12, 2000). The sample on the Defendant's testing excluded 99.9999994 of the population; therefore, the testing and statistical analysis was proper. The jury did hear that a DNA analysis and statistical results could not be made on seven other individuals because they did not meet the 99% threshold. The jury heard the expert say he could neither include nor exclude these individuals as a source of the DNA in the fingernail scrapings. This claim fails because it is factually inaccurate. These other individuals were excluded in the single source sperm DNA taken from Ms. Bonistall's vagina.

In another claim, the defense attacks the Office of the Chief Medical Examiner's lab methods and quality control. The State's expert at trial acknowledged that a test run was faulty because the samples were switched. But the expert further testified the error was discovered, the results were not used, and that test was re-run. Humans make mistakes. This one was acknowledged and remedied. Therefore, the jury did not get bad information. The defense further argues that because of the aforementioned, not only should this sample have been re-run, but also every sample should have been redone. This is an argument only; there is no evidence to support a complete re-run was required.

At the evidentiary hearings, the defense presented Dr. Daniel Krane, a DNA analysis expert. He began his testimony by noting the medical examiner's report identified some errors but he could not opine on whether they were properly addressed and corrected because he did not have the full laboratory protocols.

At that time, the State asked the Court if defense counsel could briefly join him outside the Courtroom. They returned, advising the Court that the State had provided trial counsel with the protocol disc but apparently it did not get to postconviction counsel or was somehow lost. All agreed the expert should have same so we pushed this matter out. The expert was to get the necessary data and return the following week to testify.

When their expert returned, he was satisfied the errors noted had been addressed and did not negatively impact the conclusions as to the State's DNA report and testimony.

Of greater importance to this judge was my question about the analysis of the skin cells found in Ms. Bonistall's fingernails.

The trial testimony was that the DNA analysis of what was recovered from Ms. Bonistall's fingernails contained a mixture of her DNA and the Defendant's DNA. Statistically, the Defendant's profile would occur in the population once per 1.64 billion people. This was damning evidence because Ms. Campbell testified she saw scratches on Cooke's back which he told her was from their children. The scratches also raised the inference Ms. Bonistall fought her murderer.

In the Defendant's motion, it is alleged that there would be evidence presented that the DNA testimony would establish there was a third person's DNA in that fingernail evidence. When I asked the defense DNA expert about this, he stated "I do not see any indication of a third contributor." More specifically he said "I do not see any affirmative indication of a third contributor or anyone other than these two individuals" [Bonistall and Cooke]. The mixture was just Ms. Bonistall's DNA and the Defendant's. Their own expert put the allegations in the motion to rest.

The DNA evidence presented to the jury was accurate. The claims made in the motion are denied.

# THE HAIR ON THE SALEM COUNTY SWEATSHIRT

A hair was found on one of the two hoodies Ms. Campbell delivered to the Defendant's sister for the Defendant.

Before the trial, the prosecutors and second trial counsel did not discover that the hair came from the Defendant's hoodie and was examined with other hairs. This hair was determined to be "microscopically similar" to known hairs of Ms. Bonistall.

All were caught off guard. There was a discussion with Judge Toliver.

The defense considered having their own test done during the trial. Judge Toliver noted that since the defense was consensual contact, the hair did not raise the problem it would have if the defense was no contact.

Because the defense acknowledged they "missed" this, as did the prosecutors, a *Strickland* prong one mistake is established. But as Judge Toliver noted, since the defense was consensual intercourse, the finding of a hair microscopically consistent with Ms. Bonistall was not prejudicial and thus, no *Strickland* prejudice exists.

Finally, in closing, the State said "microscopically consistent" which is accurate as it was not said to be Ms. Bonistall's actual hair.

The defense now argues that more accurate mitochondrial DNA testing could have been done by the State and that the defense missed the opportunity to do so.

But, as noted above by Judge Toliver, what would have been the point? Consensual contact was the defense. DNA already proved contact and more would not have moved the ball for either side.

This claim is denied as there is no prejudice.

# FOOTPRINT IMPRESSIONS

Inside Ms. Bonistall's apartment, near sliding doors, a partial footprint mark was found on a notebook. When arrested, Cooke's boots were seized. Other footwear was taken from his house. An FBI examiner issued an opinion that was maybe, maybe not. "However, due to the limited detail of the impression, no determination was made as to whether or not the Q8 or Q9 boot is the source of the impression." In other words, the impression was insufficient to conclude it was or was not from Cooke's boot. Judge Herlihy, in exercising his discretion, ruled the examiner's opinion admissible and this was followed in the 2012 trial. *State v. Cooke,* 914 A.2d 1078, 1098 (Del. Super. 2007).

The aforementioned decision covered a number of evidentiary issues. Specifically discussed was the "CSI effect" in jury trials. In 2007, because of that television show, there was a real concern that a jury would expect science to have answers as to all evidence seized.

If evidence was seized and the jury heard nothing, then there was a concern the jury would speculate "why not?" Judge Herlihy noted this concern as well as a view that evidentiary decisions are made in full context of all the evidence. Noting that caselaw does not require an expert opinion to be conclusive to be relevant and admissible, Judge Herlihy admitted this evidence. To the extent this decision is

attacked, the Court does not find that Judge Herlihy abused his discretion as to this evidentiary decision.

Basically, my read is that the expert's opinion helped neither the State nor the Defendant. The jury was aware millions of boots could have made the partial impression. But it did inform the jury the evidence was not ignored and why no conclusions could be reached.

This ruling was not appealed after either trial but postconviction counsel argue it is now a ground for reversal.

At trial, the State's expert testified that another impression found on toilet paper at another scene was not from any shoes or boots taken from the Defendant or his home. He testified that one impression on a notebook could not have been made by any of Cooke's footwear but as to the second impression, the subject of Judge Herlihy's ruling, he could not make a definite determination one way or the other.

Before the second trial, counsel consulted an expert on footprints who concluded that the footprint impression determined to be inconclusive by the FBI was not from Cooke's footwear. He noted the notebook was covered with soot and had characteristics of possibly having been made by wet boots, i.e., the firemen.

At trial, counsel elected not to call their expert but use his information for cross-examination of the State's expert, especially since boots that make such

189

impressions are popular with emergency response personnel. Postconviction counsel fault trial counsel as to this decision.

It is noteworthy that twice in the cross-examination of this expert, the expert noted that he eliminated one foot impression from being made by any of Cooke's footwear. He then acknowledged that the impression at issue could have been made by the same shoe/boot as that one he eliminated. He just did not have enough of an impression to make the call.

The Court does not find trial counsel committed a *Strickland* objective error. Having their expert's opinion, they chose to use it in cross-examination. This was a strategic decision and such decisions are difficult to fault. It was their call based on all they knew. The Court also notes that previous counsel, Patrick Collins, Esquire, had also planned to attack the foot impression expert by way of cross-examination.

Just as important is that the Defendant cannot show any *Strickland* prong two prejudice. The State's expert did not point his finger at Cooke and the jury was aware there are millions of similar boots. The jury knew the apartment was entered by firemen and they needed to get ventilation into the apartment. They knew a fireman felt his way to the sliding glass door to open it for ventilation. They knew the notebook boot impression was found in that area.

Also, the jury knew the Defendant had been in Ms. Bonistall's apartment by way of the DNA and the Defendant telling them he was there. The shoe impression evidence was not prejudicial.

The Court does not find Cooke has proven his counsel were ineffective.

# THE YELLOW ROSE
## Ineffective Counsel

In Ms. Bonistall's apartment, investigators found a single yellow rose. Ms. Bonistall's roommate had left Newark for the weekend and reported the rose was not there when she left on Friday. There was speculation on who brought the rose to the apartment. Ms. Bonistall, a friend, or, as in the defense's theory, the murderer. The defense introduced the rose in the 2012 trial and Mr. Figliola in closing referenced it; *i.e.,* whoever brought the rose raised reasonable doubt.

Who brought the rose was never answered but postconviction counsel allege trial counsel were ineffective for not investigating the places that sold roses in 2005. If they had found out who bought the rose they would have a lead on who murdered Ms. Bonistall, assuming she did not buy it.

It is completely unreasonable to think that trial counsel, who were appointed in 2011, could locate where a single rose was purchased six years earlier and that the seller would remember or have a record of the purchaser. This is beyond speculation. It is just not believable. Trial counsel were not ineffective for not going on a fool's errand.

Mr. Figliola testified an initial defense theory was that a University of Pennsylvania boyfriend or an ex-boyfriend brought the rose, that he interrupted the Defendant and Ms. Bonistall having sex, and he killed her in a jealous rage, but their

investigation found any ex-boyfriends were not in the area at all nor did Cooke support this potential theory. This speculative theory did not fit the known movement of Ms. Bonistall before she was murdered  Nevertheless, counsel did argue the rose in closing.  This is just speculation which is not evidence.  Counsel were not ineffective.

# INEFFECTIVE TRIAL COUNSEL FOR NOT ENGAGING A PATHOLOGIST OR MEDICAL EXAMINER

Rule 61 counsel presented Dr. Jonathan Arden, a medical doctor and pathologist who criticized the medical examiner who performed the autopsy of Ms. Bonistall. He disagreed with the opinion that the discoloration around Ms. Bonistall's eyes were a result of blunt force injury. He attributed the discoloration to the fact that after she was murdered, she was placed face down in the bathroom tub and remained face down for a lengthy period of time. Because of this he testified the discoloration was due to blood pooling. This testimony was presented to support the postconviction allegation the jury should "have learned that Ms. Bonistall was not beaten before she was strangled."

Quite frankly, this presentation is puzzling to this judge. If Cooke did not kill her, he has no dog in the fight as to the autopsy. If he did kill her, and I agree with the jury he did, bruising around her eyes or not is a "so what" in view of the violent death this young lady suffered. Hopefully, I am the last Judge or Justice that has to examine her autopsy photos. This testimony was not helpful.

Dr. Arden also said the bruising on her chest was not so bad to rise to a beating and seemed to infer it could have been consensual rough sex. Again, in light of the violence inflicted in her murder, this too is puzzling to present as a Rule 61 issue.

On both of these claims, it is the Court's opinion that for trial counsel to have hired an expert to criticize the medical examiner at trial it would have backfired badly.

Trial counsel were not ineffective.

Dr. Arden also provided testimony that was troubling. He said that the lack of trauma in her vagina was indicative of consensual intercourse, but on my questions, he backed off and said that no trauma was not an indicator one way or the other.

He said Cooke's skin DNA found under Bonistall's fingernails was indicative of consensual sex, but again retracted his comment because it could be rough sex or her fighting off her rapist. This testimony did not move the ball at all for the defense.

Finally, he testified as to the vitality of sperm in the vagina. In a live person, the vitality is up to twenty-four (24) hours, give or take. In a dead person, the usual vitality is twenty-four (24) to thirty-six (36) hours, give or take.

The autopsy took place on May 2nd. If she was raped at the time of her murder as alleged, that was on Sunday, May 1st, between 1:00 a.m. and 2:00 a.m.

If Cooke's explanation of how his sperm came to be in her vagina is to be believed, then the vitality of the sperm would be questionable if the rendezvous was Friday before her death on Sunday, but possible.

But the jury heard the timeline of Ms. Bonistall's whereabouts on Friday night as has been reviewed herein. The jury rejected his testimony. Rule 61 counsel concede the State's evidence took Cooke's Friday night rendezvous testimony apart. Herein, the timeline of her whereabouts on Saturday night is reviewed in this decision regarding the claim counsel were ineffective for not  suggesting that Cooke was mistaken as to the date he had consensual sex with Ms. Bonistal. His one-hour rendezvous to smoke "wet" marijuana and have sex is not credible whether Friday night or Saturday night. It is not believable. And the toxicology report as to Ms. Bonistall belies the claim she smoked "wet" marijuana.

The bottom line is that the evidence supports Cooke's sperm entered her when she was raped on Sunday between 1:00 a.m. and 2:00 a.m.

That is what the jury found. I do not find that Dr. Arden's testimony moved the ball in favor of Cooke nor do I find trial counsel should have hired their own medical examiner to critique the State medical examiner.

This claim is denied.

## THE BICYCLE EVIDENCE

At trial, the State called Judith Romeo who testified she lived in the vicinity of Towne Court Apartments and Dickey Park. There is an alley behind her home from which she can see Dickey Park and Towne Court Apartments.

On May 1, 2005 she was up late with her son, Jessie Sitz. She went out to her car in the alley to get cigarettes. A motion detector light came on. She observed a person pedaling a bicycle very slowly down the alley to her left, like in slow motion and she said it was weird, creepy. The person passed by her approximately twenty (20) feet away. She described the person as a light-skinned black man wearing a gray hoodie with the hood up, but she could see his hair which was in braids or corn rows. She described the bike as a beachcomber type, red with a big white seat. The person looked at her when he pedaled by toward Madison Street. About twenty (20) minutes later she heard sirens and saw smoke pouring out of Towne Court apartments.

She testified she provided the aforementioned to the police and was eventually shown pictures. She said she picked out the person she believed was on the bike at a 75% certainty.

Her testimony was interrupted pursuant to 11 *Del. C.* § 3507 to present Detective Rubin and the picking of a photograph by Ms. Romeo. He said he showed

her photos but first asked her if she had seen photographs of the person charged with the Towne Court crimes. She had not. She pointed to one of the photographs as the person who rode past her on the bicycle. She said she was 75% sure it was the Defendant. On cross-examination, Det. Rubin said the aforementioned was not recorded. He took notes and wrote a police report.

On cross-examination of Ms. Romeo, defense counsel made several points, including that all of this occurred a long time ago. She was asked if the person could have been a light-skinned Hispanic (i.e., potentially the Brazilian man). She said no, "definitely not Hispanic" and volunteered it "was very lit". She acknowledged she may have told an officer she did not get a good look at the person on the bike, but she also said she remembered his face and the way he looked at her.

She also acknowledged she heard a vehicle squealing its tires. This was not earlier in the evening but at the time the bike was leaving. She acknowledged, after having her recollection refreshed, the squealing tires caused her to turn from the bike as it was leaving the area. She described the bike she saw and said a bike the police showed her was definitely not the same bike.

In the motion it is alleged Ms. Romeo apparently identified someone other than Cooke. There is no evidence of this claim.

Then her son, Jesse Sitz, testified that his mother came into the house and told him she had seen a person who looked very weird and gave her the "creeps". She

thought it was strange the way he looked at her.  He testified he thought the person in the ATM wanted poster was familiar.  He had seen him around the Madison Drive area including Dickey Park, where he was with kids.  He had seen him on the number 6 Dart bus several times.  That bus goes to the College Square Shopping Center and to Prices Corner.  The jury was aware Cooke worked at both places.

He testified he also saw that person riding a classic style bike, almost a beach cruiser.  He thought the color was "red and white, or something along those lines." He said later, after wanted posters went up, he saw the bike on the corner of Elkton Road and Route 4 with a cardboard sign that said "free."

On cross-examination he was asked how far 11 Lincoln Drive was in relation to his house at 184 Madison Drive.  He said it was directly across from Dickey Park, about 300 to 400 feet.  To get there you could walk across the park or follow the road around that makes a horseshoe.  He also said he saw the bike with the free sign less than two (2) months after the fire.

In the motion, trial counsel are alleged to have been ineffective for failing to undermine the evidence pointing to Mr. Cooke leaving the scene of the crimes on a distinctive bike.

The defense now argues that the path of the person on the bike was irrational as to a journey from the murder scene to the Defendant's apartment.  Therefore, if it had been Cooke the manner of flight was "nonsensical."  Trial counsel are criticized

199

for not making this point. The Court does not agree. First, the conduct of the person who committed these crimes against Ms. Bonistall was nonsensical. Second, all of this took place in a relatively close area and distances were based on whether one traveled across the park or on the horseshoe shaped road. The Court cannot find trial counsel committed a *Strickland* prong one mistake on this issue, nor does the Court find prejudice has been established.

Trial counsel are faulted for not having Cooke's supervisors at Payless testify that they did not see Cooke on the bike described above. The jury heard this and did not need to have it repeated. Also, the jury knew from Ms. Campbell that the Defendant had several bicycles. There is no *Strickland* violation as to this complaint.

Trial counsel are criticized because they knew a "Brazilian man" regularly road a distinctive bike on Elkton Road and that he worked at Home Grown Café where Ms. Bonistall worked. The failure to present this as evidence to the jury was therefore ineffective. Had trial counsel presented evidence of this it would have been speculative at best. It also faced the problem that Ms. Romeo, on cross-examination, when asked if the bike rider could have been a light-skinned Hispanic, replied no, "definitely not Hispanic".

All of the above complaints are speculative in weight and cannot form a basis to find trial counsel ineffective.

Finally, present counsel complain that the police reports were heavily redacted and trial counsel did not get recordings or reports of Ms. Romeo picking out Cooke from a photograph array. The Court concludes this is mistaken as Det. Rubin testified about the photograph array, her picking Mr. Cooke to a 75% degree of sureness and that no recording was made. Also, trial counsel would have known she testified in the first trial her certainty as to picking the photo of the person on the bike was 75% - 80%.

In conclusion, the Court does not find the allegations leveled at trial counsel concerning the testimony of Ms. Romeo and/or her son carry any weight at all. They are of the kitchen sink variety. They have been addressed and found lacking. This claim is denied.

## **OTHER SUSPECTS IGNORED**

Rule 61 counsel allege the police were biased against the Defendant and did not follow through with investigating that others were potential suspects of Ms. Bonistall's murder. Up until Cooke became the main focus of the investigation on May 31, and even afterwards, the police did follow leads. Those leads were not productive.

Also, counsel are alleged to have been ineffective for failing to investigate and present evidence of "multiple alternative suspects."

It is pure speculation to allege that the real killer slipped away because of a poor and biased investigation. Others were investigated and persons of interest who were eliminated by DNA testing were Jeremy Campbell, Jason Bromwell, Patrick Brecklin, Jeffrey Robinette, Eric Warrington, Jermaine Jervey, Jeffrey Butz and Alan Sentel. The police hit DNA bingo on June 6th with Cooke.

The following alternative suspects are named in the postconviction motion.

(a) **Mark Warren**. The defense reports Mr. Warren lived near Ms. Bonistall's apartment and that he had a history of committing burglaries in the area. He allegedly "stole DVD's and other items similar to what was stolen from Ms. Bonistall's apartment."

Mr. Warren went to Pennsylvania where he had warrants for burglary and theft charges. Allegedly he left Newark "to get away from some problems"[12] and his leaving Newark was "shortly after Ms. Bonistall's murder." He was alleged to have committed burglaries in the Newark area.

Police investigated Mr. Warren and learned he sold DVDs and other items at a pawn store in Pennsylvania. He arrived in Bloomsburg, Pennsylvania carrying a JanSport backpack, the same brand as the backpack stolen from Ms. Cuadra. The police did interview him at Columbia County Prison and sought to extradite him for crimes in Delaware. Counsel had this information but allegedly conducted no investigation.

Had trial counsel investigated him, it is alleged they would have learned from his ex-girlfriend that he resembled the wanted composite sketch posters placed around Newark, that he attempted to rape her, that he was dangerous and she "believed" he murdered Ms. Bonistall.

Counsel are faulted for failing to get Mr. Warren's criminal record and police "interactions," failing to request the titles of the DVDs pawned in Pennsylvania, failing to get the probable cause sheet on the extradition warrant, and failing to get a summary of the police interrogation.

---

[12] There was evidence his ex-girlfriend was accusing him of rape.

The State responded that the police did look at Warren as a potential suspect in this case and other burglaries. They went to Pennsylvania and checked pawn shops and Warren's relatives' homes but found nothing to connect him to the Bonistall, Cuadra, or Harmon crimes.

The police investigated him in regard to a party he attended that Ms. Bonistall also attended. They learned of nothing that would further their murder investigation.

As to the ex-high school girlfriend, the State argues Warren looks nothing like the composite sketch that Ms. Cuadra stated looks nothing like the intruder in her apartment (per Cuadra a 5-6 out of 10). The State argues she is an ex-girlfriend with her own personal agenda. Her belief he murdered Ms. Bonistall would have been inadmissible.

I note that DVDs are commonly stolen and pawned. Tracing and tracking them to a particular burglary or theft is darn nearly impossible. The JanSport backpack is irrelevant because we know Cooke had Ms. Cuadra's backpack. The bottom line is nothing came up to make Warren a viable suspect. Also, Warren is described as 5' 6" and skinny. In considering Warren as a viable suspect, it is reasonable to infer he would have had great difficulty in over-powering Ms. Bonistall and doing what was done to her.

Rule 61 counsel offered no evidence on these allegations nor why and how they believe there existed admissible evidence that Mr. Warren killed Ms. Bonistall.

This is mere speculation.  Speculation does not equal evidence nor prejudice.  This claim fails.

(b) **<u>Jermaine Jervey</u>**.  In one of the 911 calls the police attributed to Cooke, the caller reported an African American maintenance worker at Towne Court Apartments provided a master key to the killer.  Jervey was the only African American worker at Towne Court and he resided there.  The Newark police interviewed Mr. Jervey shortly after the 911 call about the master key allegation.[13] Subsequently, Mr. Jervey appeared at the police station inquiring about the investigation.  Then he hired an attorney. Hiring an attorney is argued a reason to suspect him of murdering Ms. Bonistall.  Hiring an attorney was not unreasonable as he was accused of providing a key to the murderer. Then, three months later, he quit his job.  It is now alleged that since the police reports trial counsel received were redacted, details were unknown to trial counsel and they failed to follow up on Mr. Jervey as a suspect.

Additionally, just prior to the second trial, a storage unit rented by Mr. Jervey's ex-girlfriend was sold at auction.  Based on its contents, authorities were contacted. In the unit, Newark Police found women's underwear, auto-erotic toys,

___

[13] Based on an impression of a glove with dimples on it which was found on the balcony of Ms. Bonistall's apartment, the police theory was entry was gained through the balcony sliding glass door not through the entry door.  Cooke was known to wear such gloves.

including a homemade sex doll, a loaded handgun, and newspaper clippings about Ms. Bonistall's murder and a murder in Wilmington.

The police interviewed the ex-girlfriend who told them some of the underwear was hers, as well as the sex toys, except for the doll. She knew nothing about the gun. The other underwear was tested for DNA and checked against Ms. Bonistall's DNA profile. The tests were inconclusive. Trial counsel were informed of the aforementioned but conducted no additional investigation of Mr. Jervey nor did they request a copy of the interview with the ex-girlfriend, contenting themselves with the redacted police reports.

In the police interview with the ex-girlfriend, she reported Jervey did not know Cooke or Ms. Bonistall, and he was disgusted by the crimes. Towne Court employees told the police when he abandoned his job, his apartment was cleaned out and nothing unusual was found.

The State argues there is nothing to connect Jervey to these crimes except what Cooke said in the 911 call. Jervey was not a viable suspect.

The failure to investigate the possibility Mr. Jervey murdered Ms. Bonistall is alleged to constitute deficient performance by counsel; but, no admissible and relevant evidence ties him to these crimes, including the contents of the storage unit.

In these proceedings, Jervey's boss testified that the night of the murder he had a birthday party at his Towne Court apartment. There were seven (7)

206

maintenance workers.  Six(6)  attended the party, but not Jervey because he was on duty.  The defense argues that since he did not attend the party he was available to murder Ms. Bonistall.  The next day I noted that this witness was not asked when the party was over.  Ms. Bonistall was murdered between 1:00 a.m. and 2:00 a.m. and it was doubtful all six co-employees would have remained that late.  But all of this is nothing more than speculation. Speculation does not equal evidence nor prejudice.  This claim fails.

(c) **Patrick Brickin**.  Mr. Brickin was arrested hours after Ms. Bonistall was murdered for allegedly being a peeping Tom.  He was arrested approximately two miles away.  While incarcerated, he collected news reports on the murder.  He allegedly confessed to her murder to his cell mate, Eric Duckery.

The police became aware of this information and both the police and FBI interviewed Brickin, but Brickin never admitted anything.  Counsel were provided this information.

His phone calls from prison had been taped per standard procedures and the police heard him discuss the case but there were no admissions or anything to tie him to the case.  Also, Brickin was excluded as a contributor to the DNA found in Ms. Bonistall.

Counsel interviewed Mr. Duckery prior to the second trial. Mr. Duckery told them about Mr. Brickin's unusual "infatuation" with the case, that he said he knew

and/or had seen Ms. Bonistall working at the restaurant and said he believed Mr. Brickin was involved in the murder. They also knew he was a sex offender involving university students. But Brickin had not told Duckery he murdered Ms. Bonistall.

After they conducted their investigation, trial counsel did not follow up further nor did they present evidence at trial that Mr. Brickin "confessed" to the murder because their evidence did not support same.

The bottom line is that no investigation, state or defense, led to the possibility that Brickin murdered Ms. Bonistall and the defense counsel had the ethical duty to not try to present a defense that had no truthful basis.

In these proceedings nothing more is offered by the defense that suggest Brickin is the murderer or that had trial counsel done a more thorough investigation they would have had admissible evidence pointing to Brickin. Mr. Figliola testified that with Brickin's reported body build (5'8" and greater than 450 pounds) there was no way he could get over the balcony railing. Duckery was listed as a proffered witness but was not called by current counsel.

Again, all we have is speculation which is not evidence. This claim fails.

(d) **<u>Robert Figgs</u>**. Mr. Figgs was a convicted sex offender who lived near Ms. Bonistall. Rule 61 counsel allege he knew Ms. Bonistall through a mutual friend. He had violated his probation for choking and restraining his girlfriend.

In their dragnet, the day after the murder, the police obtained a writing sample from his probation officer and directed the officer to interview Mr. Figgs. Mr. Figgs was on a home confinement Level IV ankle bracelet. Probation confirmed it had not been tampered with nor did it record that he left his residence. Although the authorities had his DNA profile as a sex offender, counsel did not request it nor the results of the DNA comparison with the DNA found in Ms. Bonistall.

Therefore, they allege trial counsel's failure to further investigate Mr. Figgs constituted deficient performance, even though the police were satisfied that the report on the ankle bracelet eliminated Figgs as a suspect.

The defense counters the ankle bracelet report from the State by arguing its range and sensitivity are unknown and perhaps he could have gone to Ms. Bonistall's apartment and murdered her without the ankle monitor recording that he left his residence. The defense offers nothing to support this theory. The Court has conducted many, many violation of probation hearings involving Level IV monitoring by a home confinement bracelet. The devices are extremely sensitive. It does not record where a person is but it records when the person is out of range. It will record a person not being at their residence if they go out on their front porch, yard, or driveway. Finally, Rule 61 counsel offered nothing to support their claims as to the range or the ankle bracelet.

Again, present counsel just make allegations that are only speculative. Speculation is not evidence. This claim fails.

(e) **Alan Sentel**. He is discussed elsewhere in this decision involving the 911 calls. He was eliminated by both alibi and DNA testing.

The defense concludes that had the jury learned that the aforementioned individuals committed all or some of the Harmon, Cuadra, and Bonistall crimes, the trial result would have been different. Of course, that is true, but the aforementioned individuals did not commit these crimes. This is "made up" speculation. The tactic is to see how much can be thrown against the wall to see if anything sticks. Juries learn through admissible relevant evidence and that is where these allegations fail, as to both the police and defense counsel.

Finally, it is alleged the police "ignored numerous leads, tips and suspects." These allegations go on page after page after page. Magazine sellers, former romantic partners, suspicious individuals seen around Towne Court Apartments, the "Brazilian man," a "weird person in a maroon vehicle parked on Thorn Lane," a Baker's dozen list of sex offenders, burglary suspects, Ms. Bonistall's "drug connections," thefts at a party attended by Ms. Bonistall, Ms. Bonistall's alleged secret life, lost evidence, etc.

An example is the "bar glass." A civilian gave the police a bar glass used by a person that the civilian said looked like the person in the artist sketch poster of the

Cuadra intruder. The State is criticized for not having DNA testing done on the glass. The Court does not find the State to have been negligent. First, Ms. Cuadra said the sketch did not look like the intruder (5-6 out of 10). Second, what was the State to do with any DNA analysis? The DNA from Bonistall was Cooke's. Although the motion alleges there was a third contributor to the skin/DNA under Ms. Bonistall's fingernails, this allegation failed at the evidentiary hearing. How would DNA from an unknown person's bar glass help solve the case if there was no other DNA to compare it to? This is a frivolous claim.

Similar allegations go on and on, page after page. Nothing sticks against the wall. It is more of the speculative allegations **with no proof**. We know the police did try to investigate tips but they were dead ends. Some examples follow. The "weird" person who parked outside the apartment building was waiting for his girlfriend. The magazine selling team was investigated and determined not to be in Newark at the times of these crimes. Another tip- it was reported that a fellow with a "hillbilly" accent looked like the composite sketch. This occurred at a Shore Stop that had no cameras. A dead end, in especially in view of Cuadra saying the sketch was a 5/6 out of 10.

Claims that prior boyfriend(s) could have murdered her were investigated by the police and they were cleared. The defense also considered this, but their investigation reached the same result. Rule 61 counsel know what the rules of

211

evidence require.  Speculation, opinions, and possible other suspects do not get before the jury without relevant, admissible evidence.

At the hearings, nothing helpful was offered and therefore, it is unnecessary for the Court to discuss these claims in greater detail.  Perhaps one could argue trial counsel should have investigated alternative suspects more thoroughly because the fingernail DNA suggested a third person's DNA was found in Ms. Bonistall's fingernails, but that allegation failed.  The defense expert conceded the fingerprint DNA was a mixture of only two people:  Cooke and Ms. Bonistall.

All of these claims are summarily dismissed.

# INEFFECTIVE COUNSEL FOR NOT REQUESTING A LIMITING INSTRUCTION AS TO COOKE'S IN-COURT BEHAVIOR

Trial counsel are faulted for not requesting a jury limiting instruction so that the jury might understand some of the Defendant's in-court behavior was due to Defendant's mental health – "Had the jury been made aware of Mr. Cooke's mental health …"

An instruction is based on the law and/or the evidence. So, the short answer is there was no mental health evidence on which one might consider the possibility of such a unique instruction. As the reader is aware from this decision, the Defendant wanted nothing to do with mental health or allegations of mental health presented to the jury.

Therefore, his lawyers cannot be faulted for not requesting any mental health instruction.

This claim is denied.

## CLAIMS OF INEFFECTIVE COUNSEL
## FOR NOT CALLING EXPERT WITNESSES

Mr. Figliola testified that experts who did not help the defense were not asked to produce a report because expert reports would have had to be exchanged with the State. And why would you want a report for something that will not help? So, no report was requested from NMS on the DNA analysis nor from the defense handwriting/wall writing expert.

The shoe/boot impression expert was helpful but counsel made the decision they could effectively cross-examine the State's expert. The defense expert agreed. As an aside, that was also the strategy of Patrick Collins, Esquire, previous counsel. It must be remembered that counsel knew Cooke was going to testify he was in Ms. Bonistall's apartment. Presumably he was wearing footwear so why produce an expert on this matter.

Nor was a report requested from Dr. William Manor, a forensic medical expert, because his opinion did not help the cause.

Counsel were not ineffective as to either prong of *Strickland* as to the decisions concerning their experts.

## CLAIM-THE STATE FALSIFIED, SUPPRESSED AND DESTROYED MATERIAL EVIDENCE IN ORDER TO CONVICT MR. COOKE

A. "The State knowingly presented Det. Rubin's false testimony at the Suppression Hearing and throughout trial."

In the first trial, the defense attacked the search of Cooke's house. Items were seized by way of a search warrant and the consent of Rochelle Campbell, who was the sole person on the lease and the Defendant's significant other (3 children and pregnant).

On appeal in 2007, the Supreme Court affirmed the Trial Court in regard to the search.

As a preface, the Court must comment that these allegations against the detective and the State are quite extreme. It is alleged that in order to get the search warrant, the detective lied and the State knew this. Without the search warrant the conviction would have been in doubt. Such allegations are taken seriously by the Court and are addressed in detail, but why they are characterized as extreme will be explained. This discussion deals with the merits of the claim, which is procedurally barred, but those details are discussed only because of the extreme allegations.

In a nutshell, it is alleged that the detective lied when he swore in this affidavit to certain details of the crimes that were not widely and publicly known. Those details were revealed by the 911 caller which resulted in the conclusion by the police

215

that the caller was involved in three crimes over four days.  All of the crime scenes were within ¼ mile of Cooke's residence.

A summary of the crimes is necessary.

Four days prior to the murder, Cheryl Harmon's apartment was broken into when she was not there.  Of the items stolen were two rings, a gold band with "Cheryl" engraved on the outside, and her high school class ring with her full name engraved on the inside.  Writings on the wall were made with nail polish and a nail brush.

> I WHAT [sic] My drug money
>
> DON'T Mess With My Men
>
> we'll be back

At approximately 1:00 a.m. on Saturday, the day before the murder, Amelia Cuadra was awoken with a flashlight shining on her.  The intruder/burglar demanded money and got it.  Then credit cards were demanded and given.  Finally, she was told to take off her clothes or he would kill her.  She screamed for her roommate, "Carolina" and the burglar fled with her bookbag/backpack.

Ms. Bonistall was raped and murdered between 1:00 a.m. and 2:00 a.m. the following day, Sunday.  She had been gagged and tied.  Her dead body was placed in a bathtub with flammable items put on top of her and it was set on fire.  Writings on the walls were made with a marker

KKK was written at multiple locations

WHITE Power

We Want are [sic] weed back

Give us Are [sic] drugs back

More Bodies Are going to be turn in [sic] up Dead

Because the bathtub and surrounding wall was plastic which melted and folded on top of Ms. Bonistall, the firemen who extinguished the fire did not see her. The investigating Fire Marshall arrived at approximately 12:30 p.m., noticed the wall writings and called Detective Rubin. Later they discovered Ms. Bonistall's body.

The police had no leads. The crimes were not yet linked.

The next day in the late afternoon, a 911 call came into the Newark Police Department. The caller wanted to speak to Detective Rubin, who was not available. There was a lengthy conversation with the 911 operator. Included was "white power will kill"; "that people that owe us money we coming to come get it"; "more bodies gonna pile up;" "I could tell you who started them fires," "I could tell you who killed that girl;" "it started on Friday, a house was broken in;" "we went there for another lady named Miss Carolina that owed us money for drugs;" "we went in another house but the lady wasn't there;" "Her name was Cheryl;" "we went to go get our money, collect our money;" "we're coming to get our money;" we're called white

Superior;" "But we called white power when we kill;" "more bodies gonna show up;" "they tied the girl up and killed her;" "they be writing on the walls. Talk about KKK, whitepower;" "I can tell you where they hid the evidence, the burning clothes they had on;" "some girl named Carolina."

Detective Rubin listened to the tape that evening at 6:30 p.m. With the references to Cheryl, Carolina, and the killed girl as well as references to the writing on the walls at the Harmon and Bonistall apartments, the detective concluded the caller was involved in these overlapping crimes that occurred over a four-day period in close proximity to each other. Subsequently, Cooke was identified as the person at a nearby ATM trying to use Ms. Cuadra's credit cards. The initial identification was by the store managers where the Defendant worked. Also, Cooke's significant other, Ms. Campbell, identified his voice as the 911 caller as well as being the person at the ATM machine.

The crux of the complaint against Detective Rubin is the allegation that the details revealed by the caller were known in the community. Yet in the affidavit, he said the caller revealed details of the crimes that had not been made public; thus, he lied. As will be discussed below, this is an extreme allegation.

One must remember the relevant 911 call came in approximately 27 hours after Ms. Bonistall's body was discovered. The police had not linked the three

crimes until that call. Detective Rubin was ignorant of the Harmon burglary until the call came in.

Yes, firemen saw the wall writings at Ms. Bonistall's apartment, but not the body. Yes, an apartment complex employee changed the locks so he could have seen the wall writing. But the police had not released anything about her being tied up. Nor had the other two crimes risen to the level that anything was released to the public on the Harmon apartment wall writing, nor the names "Carolina" and "Cheryl." This information was not public but known to the 911 caller 27 hours after the police discovered they had a homicide.

Detective Rubin did not lie or mislead the Court in his affidavit and testimony.

This claim must be procedurally barred as it was addressed in 2006 when similar allegations were made and a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) took place. In other words, these allegations were fully vented and argued but they failed. The Court ruled Detective Rubin's statement was made in good faith. He did not make misrepresentations recklessly or otherwise.

Nothing was presented at the evidentiary hearing as evidence of proof the 2006 ruling was wrong.

Being adjudicated, it is barred pursuant to Rule 61(i)(4).

The exception to the bar of Rule 61(i)(4), as found in Rule 61(i)(5), is not applicable. He has not presented with particularity new evidence that creates a

strong inference Cooke is actually innocent. In the allegations aforementioned against Detective Rubin, he is merely rearguing and repackaging what was ruled on in 2006. Accordingly, this claim must be procedurally barred.

Alternatively, it is barred on the merits because the 911 caller did state important information not known by the public. To allege the detective lied and the State went along with it is just plain wrong in light of the aforementioned.

## MISCONDUCT BY THE PROSECUTOR IN THE GUILT-INNOCENCE PHASE OF THE TRIAL

(a) While Ms. Cuadra was testifying about the intruder demanding money, credit cards and an order that she take off her clothes, she was asked a leading question that included the description of the intruder, but Rule 61 counsel allege she had not yet described him. Later, she did describe him but did not mention his height or body build so this information allegedly came from the prosecutor alone. There was no objection. Counsel argue defense counsel were ineffective and the prosecutor committed misconduct.

The State responds that the transcript evidences Ms. Cuadra was asked questions in regard to the intruder's description prior to the leading question. Specifically, she answered he was a "light skinned black male," "he had a lot of freckles," she gave her height as 5'3" and said he was about two to three inches taller, and said his build was stocky when given the choice of average, thin, or stocky.

Therefore, while the leading question did summarize the description of the intruder, it did not inject anything in addition to the description the jury heard from the witness. It was harmless and it is understandable why there was no objection. I find that there was no misconduct by the prosecutor and there was no prong one *Strickland* violation by defense counsel for not objecting nor any prejudice shown. This claim is denied.

(b) In closing, the prosecutor assumed the role of a linguistics expert when he compared the way Newark is pronounced in New Jersey (one syllable) versus the way it is pronounced in Delaware (two syllables). The 911 caller used the New Jersey pronunciation and Cooke is from New Jersey. Trial counsel did not object.

At the evidentiary hearing, trial counsel stated what the Court notes, *i.e.,* the difference in how Newark is pronounced is common knowledge. So, there was no harm no foul. The Court does not find misconduct nor ineffective counsel. It clearly is not plain error. *Derose v. State*, 840 A.2d 615 (Del. 2003).

Mr. Cooke was identified as the person on the 911 call by Ms. Campbell and Detective Rubin. There was no prejudice even if the prosecutor exceeded the bounds of closing argument.

(c) The prosecutor argued that Cooke denied owning any hoodies in his statement to the police because he knew the forensic examiner had found a hair linked to Ms. Bonistall on a hoodie linked to the Defendant; *i.e.,* one seized from his sister's residence. Postconviction counsel argues Cooke could not have known what the forensic expert would find later in the investigation. The Court agrees. But this argument was tied into what the Defendant did say in his statement; he knew the ATM photos in the wanted posters had a man wearing a hoodie so he distanced himself from wearing hoodies. Again, this is closing argument. It does not constitute misconduct when the entirety of what was argued is considered. Nor was

trial counsel ineffective for not objecting nor appellate counsel ineffective for not appealing this.

(d) It is argued that in closing, the prosecutor manufactured non-existent evidence that it was a fact that the 911 caller on May 2nd referenced Ms. Bonistall's body being found in the bathtub when there was no mention of this by the 911 caller.

But, the State properly notes this was closing argument where the State argued the 911 caller knew the body was in the bathtub because the 911 caller was the murderer. The prosecutor noted that the 911 hang up call on May 1 at 12:45 p.m. was before Ms. Bonistall's body was found. It was made from the same phone number as the May 2nd 911 call in which the crime was discussed. The prosecutor argued that the caller who hung up was the same caller as on May 2nd and knew the body was in the bathtub. This was argument and fair argument. It was not a manufactured fact. The defense, in closing, stated the 911 caller was the murderer, but it was not Cooke who made the calls. Of course, the murderer knew she was in the bathtub. This claim is denied.

(e) Following defense counsel's argument as to Ms. Carter's wall writing testimony, the prosecutor acknowledged her investigation and opinion was not peer reviewed. Then, he said it was equally true that the jury heard no expert testimony that she was wrong.

Trial counsel did object to the aforementioned as impermissibly shifting the burden of proof to the Defendant. The State countered that Supreme Court precedent allowed such a comment in closing. There was no ruling or mitigation by the trial judge.

The State was correct but nevertheless this old trial judge notes this is a slippery slope and recommends that prosecutors stay out of this minefield.

In *Benson v. State*, 636 A.2d 907 (Del. 1994), following defense counsel's closing in which he criticized the State's fingerprint expert, the State then argued "where is the defendant's expert?" to tell you the State's expert is wrong. There was an objection for burden shifting that was overruled and the Supreme Court agreed.

> The general rule in Delaware is that "[t]he law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence." *Boyer v. State*, Del. Supr., 486 A.2d 1118, 1125 (1981). This right is protected by the Due Process Clause of the Fourteenth Amendment of the United State Constitution and serves as a prohibition to certain prosecutorial conduct in a criminal case. *See also* Del. Const. art. 1, § 7.
>
> It is clear that the State may not invite an inference of a Defendant's guilt merely from his own failure to testify. *Griffin v. California,* 380 U.S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965); *State v. Winsett,* Del. Super., 205 A.2d 510 (1964). Such an inference is a violation of a defendant's Fifth Amendment right of freedom from self-incrimination and is forbidden. Nevertheless, "unless the prosecutor's comment uses the defendant's privilege as evidence against him, it is not objectionable." *U.S. v Sblendorio,* 7th Cir., 830 F.2d 1382,

1391 (1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988).

Benson did not possess the expertise necessary to testify on the issue of fingerprint analysis, or to rebut the testimony of the State's expert. His privilege not to testify was not infringed upon by the prosecution's comment on the failure of the defense to call an expert witness. Therefore, the prosecutor's comments did not implicate Benson's Fifth Amendment right not to testify.

Benson contends that the prosecutor's comment on the absence of a defense expert witness impermissibly shifted the burden of proof from the State to the defense. The weight of authority on this issue supports the State's right to comment on the absence of an *available* witness without shifting the burden of proof. In *U.S. v. Gomez-Olivas,* 10th Cir., 897 F.2d 500 (1990), the Court stated, "As long as evidence can be solicited other than from the mouth of the accused, it is proper to comment upon the failure of the defense to produce it." *Id.* At 503 (citing *U.S. v. Mitchell*, 10th Cir., 613 F.2d 779, 782 (1980), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 604 (1980)).

*Benson v. State*, *supra* at 910.

What is known is that Cooke's lawyers had expert witness funding and did have an expert on handwriting and wall writing. We know now he was not called because he agreed with the State's expert. So based on *Benson*, the State could argue the lack of an expert without shifting the burden of proof.

The wall writing evidence as to the probability that Cooke wrote what was in Bonistall's apartment was not as important as what was written was known by the 911 caller who was identified as Cooke. Also important was the spelling

225

mistakes: "Are" for "our" and "what" for "want". These same mistakes appear in the known writings of the Defendant.

If the Supreme Court disagrees as to the application of *Benson*, then the *Hughes* factors are to be considered. *Hughes v. State*, 437 A.2d 559 (Del. 1981). The case was not close. The opinion of Ms. Carter was not central to the evidence pointing to Cooke. Independent of her opinion, the jury was aware of what was said by the 911 caller tracking what was written on the walls. They also knew of the unique misspelled words in the wall writings attributed to Cooke. Finally, the Court notes there were no steps to mitigate. Based on the overwhelming evidence supporting the Defendant's guilt, the Court finds any error to have been harmless. Substantial rights of Cooke were not prejudiced.

(f) When Cooke testified he was asked on cross-examination by the State if he had written the known handwriting samples used by the State's expert. Postconviction counsel argue Cooke was not required to admit any of the State's evidence just because he chose to testify.

The State counters that Cooke was not required to admit any of the State's evidence, but the State could ask questions surrounding the evidence in order to challenge Cooke's credibility. Cooke did not admit to writing the samples used by the State's expert which had his signature and which Ms. Campbell testified he wrote.

226

The State argued why he would not admit to writing the known samples; they contained the same misspelled words as were on the walls at Ms. Bonistall's and Ms. Harmon's apartment. It is evidence connecting him to the crimes. This is the same reason he denied owning hoodies: the man in the ATM photo wore a hoodie and Cooke knew that.

This was fair argument by the State. This claim is denied.

Finding no merit in any of these many, many claims, there is no cumulative error.

## **WHY NO CONTACT WITH PRIOR COUNSEL**

A point has been stressed that neither Mr. Figliola or Mr. Veith reached out to prior counsel or their team to assist them in preparation for representing Mr. Cooke.[14] Such action seems reasonable; it would be a passing of the baton.

However, since Mr. Cooke's relationship with everyone prior to Figliola and Veith was "so bad" and he thought they all had been in a conspiracy to convict him, why would they initiate their representation of him by poisoning the well in their relationship with him? Counsel should remember Cooke said, "they treated me so bad" and they would not do what he wanted, so he acted out.

Finally, on this point, the defense has not shown anything that was missed because of this; *i.e.,* no prejudice is established. This is a throw-away argument and there is really nothing to discuss. Nonetheless, whatever the claim is, it is denied.

---

[14] Mr. Figliola and Mr. Veith recalled general conversations with first trial counsel but could not recall anything specific. Eleven (11) years had passed.

# THE REASONABLE DOUBT INSTRUCTION VIOLATED
## DUE PROCESS

Cooke argues that the reasonable doubt instruction given by the trial Court did not pass constitutional muster.

It was not challenged at trial nor was this an issue on appeal. Therefore, it is procedurally barred pursuant to Rule 61(i)(3). Ineffective counsel cannot be an excuse to avoid the bar because the instruction was the Superior Court pattern instruction which had been approved by the Supreme Court.

This claim is denied.

## THE COURT ERRED WHEN HE WAS DENIED A CONTINUANCE AFTER GOING *PRO SE*

On November 30, 2011, when Cooke elected to represent himself, he was warned that if he went *pro se* there would be no continuance of the scheduled trial. He acknowledged this but then requested continuances. They were denied.

This was an issue on appeal and the Supreme Court affirmed the Superior Court rulings.

Repackaged or not this claim has been adjudicated and therefore is procedurally barred pursuant to Rule 61(i)(4).

## OVERWHELMING EVIDENCE

The evidence of Cooke's guilt is overwhelming. It is understandable why his first pair of attorneys reached the conclusion he was guilty beyond a reasonable doubt and embarked just prior to trial on the guilty but mentally ill path.

This is my summary of the most incriminating of the State's evidence.

1. Cooke's manipulative cat and mouse conduct resulted in a 911 call the day after Ms. Bonistall's body was found. While the community was aware of the murder and some wall writing, the details provided by the caller could not have gotten into the community in such a short time. The Cuadra and Harmon cases were relatively unknown and names had not been released nor had information about the wall writing at Ms. Harmon's apartment been released. Even Det. Rubin, working on the Bonistall murder case, was unfamiliar with the Harmon burglary case. But, by giving details and names, the caller informed the police what they did not know – all three crimes were most likely the conduct of the same person. That person was probably the caller. The jury heard the call as well as Rochelle Campbell, mother of four of Cooke's children, who testified that it was absolutely Cooke on all the recorded 911 calls. Detective Rubin, who spent many hours with Cooke, likewise testified it was Cooke on the 911 call. That the detective could offer an opinion was affirmed in the Supreme Court.

2. Linking the crimes resulted in the police immediately seeking the ATM

video of a person attempting to use Ms. Cuadra's credit cards just hours after she was burglarized, threatened, and robbed. Still photos were made and many wanted posters circulated around Newark. Two of Cooke's store managers came forward and identified him as the person at the ATM. Likewise, a witness from the local basketball court identified him. Ms. Cuadra identified the person at the ATM as the intruder in her bedroom. Rochelle Campbell identified him from the photo. She also knew he told her he unsuccessfully tried to use the credit card to get money from an ATM machine.

3. The handwriting expert testimony was not strong. What was revealing was the unique misuse of certain words. The jury had letters and other writings of Cooke that contained the same misuse of these words. Also, the 911 caller had revealed details of the wall writings.

4. A person matching Cooke's description wearing a grey hoodie was observed approximately 20 minutes prior to the fire alarms pedaling a bicycle in the vicinity of Ms. Bonistall's apartment. The witness picked out Cooke's photo with a 75% degree of certainty. Testimony established Cooke regularly wore grey hoodies. Rochelle said so. Ms. Cuadra said so. He is wearing a grey hoodie in the ATM photo. Romero says so. And grey hoodies were seized at his sister's house that Rochelle said she took for him because she could not find the coat he wanted.

5. The strongest evidence was the DNA results. The match of the

Defendant's DNA from Ms. Bonsitall's vagina was a statistical overwhelming number. The statistical probability of another person with the same DNA profile was 1 in 776 quintillion (i.e., 776 followed by 18 zeros). Though a lesser statistical match, the match of the Defendant's DNA taken from Ms. Bonistall's fingernails was about as incriminating as any evidence can be. That statistical probability was 1 in 1.64 billion in the African American population. The African American population in the United States in 2005 was approximately 38 million per Google.

## THE CUMULATIVE EFFECT OF COUNSELS INEFFECTIVENESS

"Counsels' acts and omissions amount to a single over arching claim: They failed to conduct any reasonable investigation into the weaknesses of the State's case or evidence that would corroborate their client's case."

Many, many, many allegations are made in the motion as to the ineffectiveness of trial counsel. One gets the impression that the more claims that are made, the better the chances. But quality trumps quantity.

Much time has been devoted to examining all of the allegations. The bottom line is none have been proven. The sum total is zero so there can be no cumulative effect.

This claim is denied.

In summary the Motion for Postconviction Relief is denied for the reasons stated herein.

**IT IS SO ORDERED.**

*/s/ T. Henley Graves*

# **ADDENDUM**

On August 15, 2022 the Court granted the Defendant's August 12, 2022 motion requesting a fourteen (14) day stay of this Court's ruling on the Defendant's Motion for Postconviction Relief to allow the defense the opportunity to review materials recently received from the FBI pursuant to a Freedom of Information request.

On September 2, 2022 a 39-page motion with attachments was filed by the defense seeking to have the attachments supplement the evidentiary record and arguing why. The defense specifically stated they did not seek leave to call any witnesses.

The State filed its answer on October 14, 2022. The defense reply was filed on October 21, 2022. Both the State and the defense agree the attachments should supplement the record. The attachments now supplement the record. But, they strongly disagree about the weight and value of the information. Oral argument took place on November 16, 2022

While some of the information is new and some is old, this information together with that in the body of this decision does not change my verdict-the Rule 61 motion, as supplemented, is denied.

I shall take up and consider each attachment.

## Attachment 1:  Timeline

Attachment 1 is a three-page timeline of the activity and whereabouts of the last three days of Ms. Bonistall's life.  It was compiled by the FBI from the information gathered by the Newark Police Department ("NPD").  It is dated May 26, 2005 *i.e.,* twenty-five (25) days from the murder.

(a)  The defense argues that this timeline has never been produced hinting at a *Brady* violation.  The Court does not find it was required to be produced. It is a summary of their work product.  Nevertheless, for the most part, the defense received this information in the materials provided by the State with the exception of more details about a party Ms. Bonistall attended on Friday, April 29, 2005 approximately twenty-six (26) hours before she was murdered early Sunday morning.

In the reply the defense agrees that the information in the timeline was basically known to trial counsel by other reports.

(b)  The timeline reports Ms. Bonistall attended a party after working on Friday night.  There were fifteen (15) to twenty (20) people there and two (2) to three (3) were unknown.  This is the party mentioned in the body of this decision in which a purse was reported stolen which was not Ms. Bonistall's purse.  The next day Ms. Bonistall told a friend that two males at the party were "competing" to get her phone number and she was "uncomfortable."  No names are provided as to those males.

The defense states Mark Warren was one of those two males. Mark Warren is believed to have attended the party.

If Mark Warren attended the party there is no evidence he was one of the two men competing for Ms. Bonistall's attention. It is not "now accepted" he was one of these two men. There is no evidence to support the defense's allegation that she was "harassed … [by Warren] to the point she had to leave the party to get away from them." The timeline is that she was at the party from 11:00 p.m. to sometime after 1:00 a.m.

Because the defense alleges Warren was harassing her the defense further argues he had the motive to kill her Sunday morning.

These are allegations only and to argue a motive to kill existed is a very real stretch. The allegations are not based on evidence.

In the body of this decision Mr. Warren is discussed. He was not the murderer and the defense had no viable evidence to show he was an alternative suspect after he had been vetted. The defense police investigation expert testified he had been property vetted. Speculation of counsel is not admissible evidence.

The argument that trial counsel were ineffective for failing to present Warren as an alternative suspect fails because the evidence fails to point to him and the defense expert witness basically eliminates him as a suspect, *i.e.,* no prejudice.

(c) The timeline is a compilation of information learned in the twenty-five (25)

237

days following the murder. It is a summary of the police work product. It is not the primary source of this information which the defense received in the police reports and materials provided by the State. The timeline is not an admissible exhibit.

(d) The defense revisits their opinion that the DNA evidence was untrustworthy. This is not a part of the timeline and this argument has been addressed in the body of this decision.

(e) The defense argues the timeline confirms his Rule 61 argument that Cooke had time to visit Ms. Bonistall on Saturday night, have consensual intercourse two (2) to three (3) hours before her murder, leave her alive and thus she was murdered by someone else. This theory is found to be not credible in the body of this decision. The timeline only recites what was known to all as to her last hours of life. It is not exculpatory. I must repeat this is only an idea, an argument created by Rule 61 counsel.

Mr. Cooke's sworn testimony was adamant that it was Friday night that he had consensual sex with Ms. Bonistall. He stated many, many times it was 10:45/10:48 to 11:45 on Friday. Nothing has been presented by the defense from Cooke to contradict his sworn testimony. No testimony, no affidavits.

(f) Finally, the defense argues the timeline is material because from it the

State recognized that Mr. Cooke's exculpatory versions of events was possible *i.e.,* consensual sex on Saturday night instead of Friday night. Again, this is pulling arguments out of thin air for the following reasons:

(i)　Cooke's 2012 testimony as to the details of his rendezvous with Ms. Bonistall on Friday night between 10:45 and 11:45 p.m. was not known to the State until his 2012 testimony. Little was revealed when he testified in 2007. Then, he said he knew her; he had consensual sex with her but nobody would accept that; and that when I handed her the "wet weed" she knew it was not weed and did not inhale or puff. That is the heads up the State had before Cooke testified in 2012. No dates, no times. So how could the State "conspire" to withhold evidence supporting the Defendant's 2012 testimony?

(ii)　How could the State know that seven (7) years after Cooke testified his attorneys would create the theory that the rendezvous was Saturday night and not Friday night. As an aside, his trial attorneys recognized the weakness of Cooke's testimony on the rendezvous and argued it could have been ten (10) hours earlier, between work shifts on Friday, instead of Friday night.

(iii)　There is nothing in the timeline that trial counsel did not know as to Ms. Bonistall's whereabouts on Saturday night. It was well known by the jury.

(iv)　The Saturday night rendezvous is the creation of Cooke's present

239

attorneys. Cooke has not presented any testimony or affidavit to support his attorney's present argument.

## Attachment 2: FBI Laboratory Report
## Dated November 10, 2005

(a) There are two FBI reports contained in the Attachment 2. One is a summary report with evidence listed. The evidence included gloves with plastic dots, shoes, sheets from the victim's bed that showed prints from dot-gloves because of the soot from the fire, and other prints of the crime scene made by dot gloves.

The report states that testing is to be done on the shoes and gloves looking for any residue of a fire, any residue of bleach, a toilet paper roll for any shoe print, and a comparison of the latent dot-glove prints on the sheet and at the crime scene against the two pairs of dot-gloves recovered from Cooke's residence and workplace.

The sheet evidence was to be examined only for the prints apparently because "a trace evidence examination is not required as NPD screened the sheets for trace evidence prior to turning them over to Wilmington RA." [R.A. is presumably Resident Agent]. No DNA testing of the sheets was requested in the document.

Nevertheless, per the November 10, 2005 FBI lab report, DNA testing on the sheets was discontinued per communications with an FBI Special Agent. No reason

for discontinuing the test is given in the report and we know nothing else after seventeen (17) years.[15]

The defense argues the testing was discontinued because of the bias of law enforcement. More likely it was discontinued because of the trace element testing.

Detective Maiura was the evidence technician for the NPD in 2005. He testified at length as to what was collected and what he did. On March 15, 2012 at Page 177, he reported he examined the sheets for the presence of biological evidence (body fluids) using a forensic light source. He found no biological evidence.

I cannot conclude the testing ended because the FBI and/or the State was massaging the available evidence because of bias. I can reasonably infer that the lack of a biological sample on the sheets was why whatever testing that may have been considered was discontinued.

(b) The defense alleges that Attachment 5 is an FBI report that concludes the dot gloves seized from Cooke did not match the glove prints at the scene. Therefore, Cooke is not the murderer.

Trial counsel are attacked for not using the evidence at trial. But they did at page 104 of Mr. Figliola's closing on April 11, 2022 he notes "the State allowed

---

[15] The State notes that because DNA testing was conducted by the Medical Examiner's Office it is unknown why the FBI considered any DNA testing on the sheets especially in light of no biological samples being found.

(reports) to come in by stipulation, which means that what is on those reports is not disputed." Then he states, "Gloves were no match."

This follows the State's closing at Page 71, where the State said to be sure the dots on the lifted dot glove prints do not match the gloves seized from Defendant *i.e.,* the gloves in evidence.

Why else would the State argue the gloves worn by Cooke were burned or destroyed by Cooke and remind the jury the 911 caller identified as Cooke said the suspects burned the clothes. This argument fails.

(c) The Court feels compelled to address arguments made in Attachment 2 that have been addressed in the body of this decision. Postconviction counsel argue that Detective Rubin lied or gave false testimony when he said the records of call-outs by the NPD do not corroborate Cooke's testimony as to finding Cuadra's backpack at a scene where the police were investigating two drunk boys who had driven up on the curb. I disagree. Cooke testified the accident scene was right in front of his residence *i.e.,* Lincoln Drive. It could be seen from his front window. Detective Rubin testified there was no NPD call-out to that place. The callouts were the subject of much digging by the State during the post-conviction hearings. A map entered into evidence by the defense proves none of the call-outs could be seen from the front of Lincoln Drive except the police lights from the many police vehicles

242

responding to the Cuadra home invasion. Defense counsel, in closing, said the lights seen by Rochelle Campbell would have been from the Cuadra police responses.

Detective Rubin's testimony was not false. I repeat, this evidence is not about horseshoes and hand grenades. It was Cooke who said the accident scene was right in front of his residence. See the discussion of this argument in the body of this decision.

The defense also throws in a paragraph on Jermaine Jervey that has nothing to do with Attachment 2. Jervey is discussed in the body of this decision.

### Attachment 3: Exculpatory FBI Lab Forensic Reports

There are two reports concerning the absence of any bleach residue or stains on any shoes or gloves seized by the police. The defense alleges the second report is not in their file, therefore another *Brady* violation exists.

The State acknowledges it cannot definitively state the defense received the second report based on the State of the record *i.e.,* the volume of the discovery produced and the fact that files exchanged hands of three pairs or attorneys.

The defense acknowledges this to be the situation based on the history of the case and notes the specific situation where the State pointed out that the postconviction counsel did not have DNA protocol evidence that trial counsel had.

But this is also much to do about nothing. Nobody knows what shoes and clothes the killer wore except the killer.

What we do know is that the jury knew apparently by stipulation "there is no bleach on any of Mr. Cooke's clothing, no bleach on his shoes which were tested, is no bleach at all." Mr. Figliola's closing: April 11, 2022; page 104. So, the jury knew this.

### Attachment 4: Interview Conducted by FBI Agents Alongside Newark Police Department Officers

Redacted FBI reports of three (3) interviews in which an FBI agent participated or was present are included as exhibits. Because of the FBI redacting, we do not know the persons interviewed nor the agent involved.

The defense acknowledges that in this case the State has provided "near-blanket"[16] production but because not everything has been produced and because the State opposes the defense open file discovery request there must be something more. I do not accept this argument. The State is bound by its *Brady* obligations. The defense is bound by *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), which holds Defendants have no right to search the State's files.

But we do know the FBI participated in the interview of Rochelle Campbell. The conduct of Agent Ross is discussed in the body of this decision. The State also notes that NPD reports from Detective Rubin and Corporal Corcoran disclosed these interviews. In other words, the defense knew what took place in the interviews.

---

[16] Paragraph 35 of the Defendant's Motion to Supplement.

244

## Renewed Discovery Request

The defense renews its request for discovery, for discovery of the State's **entire file**. Nothing is particularized. There is nothing in the defense supplement that triggers such a broad demand. It is unprecedented. There is an unknown answer as to whether or not the defense received the second no bleach FBI report but that is moot per Mr. Figliola's closing – "no bleach." The defense does not get to review the State's files. This renewed discovery request is denied. Postconviction relief as supplemented is denied.